No. 24-4624

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE EX PARTE APPLICATION OF GREGORY GLINER
FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782
GRANTING LEAVE TO OBTAIN DISCOVERY
FOR USE IN FOREIGN PROCEEDINGS

On Appeal from the United States District Court
for the Northern District of California at San Francisco
(Case No. 3:24-mc-80087-JD, Hon. James Donato)

## APPLICANT-APPELLANT GREGORY GLINER'S
## EXCERPTS OF RECORD
## (VOLUME 1 OF 1)

MICHELE FLOYD
KILPATRICK TOWNSEND
STOCKTON LLP
2 Embarcadero Center, Suite 1900
San Francisco, CA 94111
(415) 273-4756
mfloyd@ktslaw.com

JOSEPH R. OLIVERI
*Lead Counsel*
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
joe@clarelocke.com

*Attorneys for Applicant-Appellant Gregory Gliner*

September 6, 2024

| Document | File Date | USDC Dkt. No. | ER Page Nos. |
|---|---|---|---|
| **VOLUME 1 OF 1** | | | |
| Text-Only Order Denying Applicant's Rule 59(e) Motion to Alter or Amend and Reconsider (No Document Associated with Order) | 6/26/24 | 13 | 5 |
| Text-Only Order Denying Applicant's Application (No Document Associated with Order) | 5/28/24 | 11 | 6 |
| Gregory Gliner's Motion Under Federal Rule of Civil Procedure 59(e) to Alter or Amend and Reconsider the Court's Order and Judgment Denying His Application Under 28 U.S.C. § 1782 | 6/7/24 | 12 | 7-19 |
| Order Reassigning Case | 4/29/24 | 10 | 20 |
| Order Regarding Procedure for Application to Serve Request for Discovery for Use in a Foreign Proceeding | 4/21/24 | 5 | 21-22 |
| Gregory Gliner's Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings (the "Application") | 4/11/24 | 1 | 23-26 |
| Memorandum in Support of Application | 4/11/24 | 1-1 | 27-47 |
| Exhibit A to Application (Proposed Document Subpoena) | 4/11/24 | 1-2 | 48-55 |
| Exhibit B to Application (Proposed Deposition Subpoena) | 4/11/24 | 1-3 | 56-61 |
| Exhibit C to Application (Certification of Conflicts and Interested Entities or Persons) | 4/11/24 | 1-4 | 62-64 |

| | | | |
|---|---|---|---|
| Declaration of Gregory D. Gliner in Support of Application | 4/11/24 | 1-5 | 65-70 |
| Declaration of Joseph R. Oliveri in Support of Application | 4/11/24 | 1-6 | 71-112 |
| Declaration of Alexandra Whiston-Dew in Support of Application | 4/11/24 | 1-7 | 113-207 |
| Civil Cover Sheet | 4/11/24 | 1-8 | 208 |
| Proposed Order | 4/11/24 | 1-9 | 209-210 |
| Applicant Gregory Gliner's Notice of Appeal | 11/20/20 | 14 | 211-215 |
| Docket Sheet, *In re Ex Parte Application of Gregory Gliner for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 3:24-mc-80087-JD (N.D. Cal) | -- | -- | 216-220 |

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2024, I caused the foregoing Applicant-Appellant Gregory Gliner's Excerpts of Record to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 6, 2024        By:    */s/ Joseph R. Oliveri*
                                              Joseph R. Oliveri

**From:** ECF-CAND@cand.uscourts.gov
**Subject:** Activity in Case 3:24-mc-80087-JD In re Ex Parte Application of Gregory Gliner et al Order
**Date:** June 26, 2024 at 6:02 PM
**To:** efiling@cand.uscourts.gov



**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### California Northern District

### Notice of Electronic Filing

The following transaction was entered on 6/26/2024 at 2:59 PM and filed on 6/26/2024

**Case Name:**        In re Ex Parte Application of Gregory Gliner et al
**Case Number:**    3:24-mc-80087-JD
**Filer:**
**Document Number:** 13(No document attached)

**Docket Text:**
**ORDER. Gliner's request for reconsideration, Dkt. No. 12, is denied for lack of good cause. Signed by Judge James Donato on 6/26/2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc3, COURT STAFF) (Filed on 6/26/2024)**

**Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)**

**3:24-mc-80087-JD Notice has been electronically mailed to:**

**Joseph Ronald Oliveri**    joe@clarelocke.com, paralegals@clarelocke.com

**Michele D. Floyd**    mfloyd@kilpatricktownsend.com, aako-nai@kilpatricktownsend.com

**Steven Harrison**    steven@clarelocke.com

**Steven James Harrison**    steven@clarelocke.com

**3:24-mc-80087-JD Please see Local Rule 5-5**; Notice has NOT been electronically mailed to:

For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings

**From:** ECF-CAND@cand.uscourts.gov
**Subject:** Activity in Case 3:24-mc-80087-JD In re Ex Parte Application of Gregory Gliner et al Order
**Date:** May 28, 2024 at 12:46 PM
**To:** efiling@cand.uscourts.gov



---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**California Northern District**

### Notice of Electronic Filing

The following transaction was entered on 5/28/2024 at 9:42 AM and filed on 5/28/2024
**Case Name:**        In re Ex Parte Application of Gregory Gliner et al
**Case Number:**      3:24-mc-80087-JD
**Filer:**
**Document Number:** 11(No document attached)

**Docket Text:**
ORDER. Gregory Gliner has applied *ex parte* for an order permitting Gliner to obtain discovery from nonparty Dynadot, Inc. (Dynadot) in aid of foreign proceedings in the United Kingdom, pursuant to 28 U.S.C. § 1782. The Court retains wide discretion to grant discovery under Section 1782, *Intel Corp. v. Advanced Micro Devices, Inc.*, 642 U.S. 241, 260-61 (2004), and the application is denied. Gliner seeks to issue subpoenas to Dynadot to uncover the identities of the anonymous operators of the website PoliticalLore.com, and the anonymous author of an allegedly defamatory article about Gliner published on the website. "An author's decision to remain anonymous is an aspect of the freedom of speech protected by the First Amendment." *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1185 (9th Cir. 2017) (quoting *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011)) (cleaned up). Gliner's application does not address why disclosure of the website operator and author's identities would be justified or appropriate in light of their First Amendment interests, and is consequently denied. Signed by Judge James Donato on 5/28/2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc3, COURT STAFF) (Filed on 5/28/2024)

---

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)

**3:24-mc-80087-JD Notice has been electronically mailed to:**

Joseph Ronald Oliveri     joe@clarelocke.com, paralegals@clarelocke.com

Michele D. Floyd     mfloyd@kilpatricktownsend.com, aako-nai@kilpatricktownsend.com

Steven Harrison     steven@clarelocke.com

Steven James Harrison     steven@clarelocke.com

**3:24-mc-80087-JD Please see Local Rule 5-5; Notice has NOT been electronically mailed to:**

For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings

**ER-6**

Michele Floyd (SBN 163031)
KILPATRICK TOWNSEND & STOCKTON LLP
2 Embarcadero Center, Suite 1900
San Francisco, CA 94111
Telephone:  (415) 273-4756
Email:  mfloyd@ktslaw.com

Joseph R. Oliveri*
Steven J. Harrison*
CLARE LOCKE LLP
10 Prince Street
Alexandra, VA 22314
Telephone: (202) 628-7400
Email:  joe@clarelocke.com
Email:  steven@clarelocke.com
*Pro Hac Vice

Attorneys for Applicant Gregory Gliner

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of<br><br>Gregory Gliner,<br><br>Applicant,<br><br>For an Order Pursuant to 28 U.S.C. § 1782<br>Granting Leave to Obtain Discovery<br>for Use in Foreign Proceedings | CASE NO. 3:24-MC-80087-JD<br><br>**GREGORY GLINER'S MOTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e) TO ALTER OR AMEND AND RECONSIDER THE COURT'S ORDER AND JUDGMENT DENYING HIS APPLICATION UNDER 28 U.S.C. § 1782** |

1

## <u>TABLE OF CONTENTS</u>

2

TABLE OF AUTHORITIES ........................................................................................... ii

3

INTRODUCTION ....................................................................................................... 1

4

LEGAL STANDARD ................................................................................................ 2

5

ARGUMENT ............................................................................................................. 3

6

I.    The First Amendment Is Not Implicated by Mr. Gliner's Application Because There Is

7

No Indication That the Anonymous Publisher Is a U.S. Citizen or Located in the United

States So As to Have First Amendment Rights. ................................................. 3

8

II.    The First Amendment Is Not Implicated by Mr. Gliner's Application Because He Pled

9

(in Detail, with Supporting Evidence) That the PoliticalLore.com Article Is False and

Defamatory, and the First Amendment Does Not Protect Defamatory Speech.................. 5

10

CONCLUSION ......................................................................................................... 7

11

FILER ATTESTATION ............................................................................................ 9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  591 U.S. 430 (2020) ................................................................................................. 2, 3

*Allstate Ins. Co. v. Herron*,
  634 F.3d 1101 (9th Cir. 2011) ...................................................................................... 3

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ................................................................................................. 2, 6

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
  690 F.2d 1240 (9th Cir. 1982) ...................................................................................... 3

*CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*,
  34 F.4th 801 (9th Cir. 2022) ........................................................................................ 1

*CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*,
  No. 21-mc-80091, 2023 WL 8604197 (N.D. Cal. Oct. 11, 2023) ................................ 2

*Felton v. Griffin*,
  185 F. App'x 700 (9th Cir. 2006) ................................................................................. 6

*Hey, Inc. v. Twitter, Inc.*,
  No. 22-mc-80034, 2023 WL 3874022 (N.D. Cal. June 6, 2023) ............................. 4, 6

*Highfields Cap. Mgmt., L.P. v. Doe*,
  385 F. Supp. 2d 969 (N.D. Cal. 2005) ......................................................................... 6

*In re Anahara*,
  No. 22-mc-80063, 2022 WL 783896 (N.D. Cal. Mar. 15, 2022) ................................ 5

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) ...................................................................................... 7

*In re Application of Pioneer Corp.*,
  No. 18-cv-4524, 2018 WL 4963126 (N.D. Cal. Aug. 27, 2018) .................................. 2

*In re Ex Parte Application of Takada*,
  No. 22-mc-80221, 2023 WL 1452080 (N.D. Cal. Feb. 1, 2023) ............... 2, 3, 4, 5, 6

*In re Ex Parte Application of Team Co.*,
  No. 22-mc-80183, 2023 WL 1442886 (N.D. Cal. Feb. 1, 2023) ............................. 4, 6

*In re Rule 45 Subpoenas Issued to Google LLC & LinkedIn Corp.*,
  337 F.R.D. 639 (N.D. Cal. 2020) ................................................................................. 7

*Intel Corp. v. Advanced Miro Devices, Inc.*,
  542 U.S. 241 (2004) ..................................................................................................... 4

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ......................................................................................................... 6

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966) ........................................................................................... 6

*Rupert v. Bond*,
  No. 12-cv-5292, 2015 WL 78739 (N.D. Cal. Jan. 6, 2015) ............................... 3

*Takagi v. Twitter, Inc.*,
  No. 22-mc-80240, 2023 WL 1442893 (N.D. Cal. Feb. 1, 2023) ..................... 4, 6

*United States v. Meta Platforms, Inc.*,
  No. 23-mc-80249, 2023 WL 8438579 (N.D. Cal. Dec. 5, 2023) ................... 2, 4, 5

*United States v. Stevens*,
  559 U.S. 460 (2010) ........................................................................................... 6

*Zuru Inc. v. Glassdoor, Inc.*,
  614 F. Supp. 3d 697 (N.D. Cal. 2022 ........................................................ 2, 4, 6, 7

**Statutes**

28 U.S.C. § 1782 ..................................................................................................... 1

**Rules**

Fed. R. Civ. P. 59 ..................................................................................................... 2

Local Rule 7-9 ..................................................................................................... 2, 3

1

## **INTRODUCTION**

2    Gregory Gliner, a dual U.K. and U.S. citizen who lives in the United Kingdom, brought his

3 Application under 28 U.S.C. § 1782 to obtain discovery from Dynadot, Inc., the host and registrant

4 of the website PoliticalLore.com, for use in a forthcoming defamation lawsuit in the United

5 Kingdom. (Mem. 1-6.)[1]  Against the background of contentious litigation in the United Kingdom

6 in which Mr. Gliner's wife's claims to her late father's wealth were challenged by Russian-backed

7 interests, an "article" was published under a pseudonym on the website PoliticalLore.com that

8 falsely accused Mr. Gliner of criminal activity, including embezzlement and theft.  (*Id.* at 3-5.)

9 "PoliticalLore.com bears all the hallmarks of a disinformation website—not a legitimate news site,"

10 including the fact that "[a]lmost all of the articles ... are Russian-centric, exhibit poor English, []

11 contain over-the-top anti-Western rhetoric," and appear to be "paid-for."  (*Id.* at 4 n.4.)

12    Mr. Gliner plans to sue the publisher(s) of that article for defamation in the United

13 Kingdom, but do to so he must identify them.  (*Id.* at 5-7.)  Dynadot, as the registrant of

14 PoliticalLore.com, almost certainly possesses documents that will lead to the publisher(s)'

15 identity(ies), as Dynadot requires people who use its services to "provide ... accurate and reliable

16 contact details." (*Id.* at 6.)  Thus, Mr. Gliner brought the instant Application.

17    On May 28, 2024, the Court entered a one-paragraph Minute Order denying Mr. Gliner's

18 Application.  The Court did so on the ground that:

19
20
> Gliner's application does not address why disclosure of the website operator and author's identities would be justified or appropriate in light of their First Amendment interests.

21 (Minute Order (May 28, 2024) [Dkt. 11].)

22    Mr. Gliner respectfully moves under Federal Rule of Civil Procedure 59(e) to alter or amend

23 and reconsider that judgment.[2]  As explained below, relief is warranted because Court's holding

24

_____

25 [1] Gregory Gliner's Mem. in Supp. of His *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) [Dkt. 1-1].

26 [2] Because the denial of a Section 1782 Application by a District Judge is a final, appealable order
27 and not an interlocutory order, *see CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*, 34 F.4th 801, 806 (9th Cir. 2022), courts in this District have held that Rule 59(e) (or Rule 60)—not Local Rule 7-9—"is the appropriate procedural mechanism through which to seek reconsideration of a court order on a
28 Section 1782 petition," *CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*, No. 21-mc-80091, 2023 WL

- 1 -

constitutes a manifest error of law and fact and, separately, because the denial of Mr. Gliner's Application would work a manifest injustice.

As explained below, disclosure of the identity of the publisher(s) of the defamatory PoliticalLore.com article would not infringe any First Amendment interests because, under controlling precedent:

1. "[F]oreign citizens outside U.S. territory do not possess rights under the U.S. Constitution," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020), and "where the record does not indicate that anonymous speakers are entitled to First Amendment protections, U.S. free-speech principles should not factor into a federal district court's evaluation of a § 1782 application," *United States v. Meta Platforms, Inc.*, No. 23-mc-80249, 2023 WL 8438579, at *6 (N.D. Cal. Dec. 5, 2023); *accord In re Ex Parte Application of Takada*, No. 22-mc-80221, 2023 WL 1452080, at *4 (N.D. Cal. Feb. 1, 2023) (cited at Mem. 8, 14); and

2. Mr. Gliner pled (in detail, with supporting evidence) that the anonymous publisher(s)' statements are defamatory, and "freedom of speech ... does not embrace certain categories of speech, including defamation." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-46 (2002); *see also Zuru Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 706 (N.D. Cal. 2022) (denying motion to quash Section 1782 subpoena).

Accordingly, Mr. Gliner respectfully requests that the Court grant this Motion, vacate its Minute Order denying his Section 1782 Application, and grant the Application. Dynadot and the article's publisher(s) (through counsel) will, of course, have the opportunity to raise any applicable defenses (including any applicable First Amendment defenses) in support of a motion to quash.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) permits a party to file "[a] motion to alter or amend a judgment" within "28 days after the entry of judgment." Fed. R. Civ. P. 59(e). Relief under Rule 59(e) is appropriate (1) "to correct manifest errors of law or fact upon which the judgment rests"; (2) "to present newly discovered or previously unavailable evidence"; (3) "to prevent manifest injustice"; or (4) in light of "an intervening change in controlling law." *Allstate Ins. Co.*

---

8604197, at *2 n.3 (N.D. Cal. Oct. 11, 2023); *In re Application of Pioneer Corp.*, No. 18-cv-4524, 2018 WL 4963126, at *1 (N.D. Cal. Aug. 27, 2018) (similar); *see also Schroeder v. McDonald*, 55 F.3d 454, 459 (9th Cir. 1995) (motion for reconsideration of final order is a Rule 59(e) motion). To the extent this Court disagrees, Mr. Gliner respectfully moves for leave of Court under Local Rule 7-9 to file this Motion and respectfully submits that the Local Rule 7-9 standard is satisfied for the same reason the Federal Rule of Civil Procedure 59(e) standard is satisfied.

*v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  "A court considering a Rule 59(e) motion is not limited merely to these four situations," and although Rule 59(e) relief is often referred to as "an extraordinary remedy," district courts "enjoy[] considerable discretion" to grant Rule 59(e) motions.  *Id.*; *see also Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1249 (9th Cir. 1982) ("Errors in the trial court may be most speedily corrected by the trial judge. ... A motion for reconsideration may ... avoid the necessity of an appeal.").[3]  As relevant here, "manifest errors of law" include the "misapplication, or failure to recognize controlling precedent on the part of the court."  *Rupert v. Bond*, No. 12-cv-5292, 2015 WL 78739, at *2 (N.D. Cal. Jan. 6, 2015).

## ARGUMENT

### I. The First Amendment Is Not Implicated by Mr. Gliner's Application Because There Is No Indication That the Anonymous Publisher Is a U.S. Citizen or Located in the United States So As to Have First Amendment Rights.

The Court's denial of Mr. Gliner's Application on the ground that it did "not address why disclosure of the website operator and author's identities would be justified or appropriate in light of their First Amendment interests" constitutes a manifest error of law because there is no indication that the publisher of the defamatory article has any connection to the United States, and, under settled precedent, foreign citizens outside the United States have no First Amendment rights such that U.S. free-speech principles do not factor into the evaluation of a Section 1782 application.

U.S. Supreme Court precedent is clear:  Although "U.S. citizens, whether inside or outside U.S. territory, possess First Amendment rights," *In re Ex Parte Application of Takada*, No. 22-mc-80221, 2023 WL 1452080, at *3 (N.D. Cal. Feb. 1, 2023), "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).  In light of this precedent, courts in this District have repeatedly held that "where the record does not indicate that anonymous speakers are entitled to First Amendment protections, U.S. free-

---

[3] Although inapplicable here, Local Rule 7-9 provides for reconsideration (of interlocutory orders) where there has been "[a] manifest failure by the Court to consider material facts or dispositive legal arguments."  Local Rule 7-9(b)(3).

speech principles should not factor into a federal district court's evaluation of a § 1782 application." *United States v. Meta Platforms, Inc.*, No. 23-mc-80249, 2023 WL 8438579, at *6 (N.D. Cal. Dec. 5, 2023); *accord, e.g.*, *Hey, Inc. v. Twitter, Inc.*, No. 22-mc-80034, 2023 WL 3874022, at *3 (N.D. Cal. June 6, 2023) (same); *In re Takada*, 2023 WL 1452080, at *3-4 (same); *Takagi v. Twitter, Inc.*, No. 22-mc-80240, 2023 WL 1442893, at *3 (N.D. Cal. Feb. 1, 2023) (same); *In re Ex Parte Application of Team Co.*, No. 22-mc-80183, 2023 WL 1442886, at *3-4 (N.D. Cal. Feb. 1, 2023) (same); *Zuru, Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 706-08 & n.6 (N.D. Cal. 2022) (same; admonishing that "the Supreme Court has made clear that [Section 1782] does *not* require the applicant to show 'that United States law would allow discovery in domestic litigation analogous to the foreign proceeding'" (emphasis in *Zuru*; quoting *Intel Corp. v. Advanced Miro Devices, Inc.*, 542 U.S. 241, 263 (2004))).

As explained in *Takada*, "[s]imply assuming First Amendment protection applies, in the absence of any facts or circumstances suggesting that it does, is inconsistent with *Intel*'s caution against evaluating an anticipated foreign proceeding through the lens of the nearest domestic analog." *Takada*, 2023 WL 1452080, at *4 (cited at Mem. 8, 14); *accord Team Co.*, 2023 WL 1442886, at *3; *Takagi*, 2023 WL 1442893, at *4. That is the law notwithstanding the fact that "the First Amendment is reflective of a general public policy of the United States in favor of freedom of speech worldwide" and the fact that "given the borderless nature of the Internet, there exists at least the potential that such public policy could be implicated in a case involving online speech." *Meta Platforms*, 2023 WL 8438579, at *6; *see also Zuru*, 614 F. Supp. 3d at 706-08 (expressly rejecting the argument that courts should generally "still consider First Amendment free-speech principles" when there is no indication that the anonymous speakers have First Amendment rights, and admonishing that "there's good reason to tread lightly in applying U.S. free-speech principles abroad"); *Takada*, 2023 WL 1452080, at *3 (There is "no authority for the expansive proposition that anonymous speech implicates First Amendment protections if that speech is merely *accessible* to U.S. citizens over the Internet.").

The Court wholesale disregarded or failed to recognize this precedent in its Minute Order, and the straightforward application of that precedent compels the conclusion that the publisher(s)

1  of the challenged PoliticalLore.com article do not have First Amendment interests that could be

2  implicated by disclosure of their identities.  As in *Meta Platforms*, *Hey*, *Takagi*, *Takada*, *Team Co.*,

3  *Zuru*, and similar cases, there is no evidence or indication that the publisher(s) of the defamatory

4  PoliticalLore.com article is a U.S. citizen or is located in the United States.  And what's more, there

5  are affirmative indications that the publisher(s) is not a U.S. citizen and is not located in the United

6  States.  As explained in the Memorandum in Support of Mr. Gliner's Application, the defamatory

7  PoliticalLore.com article was published amidst contentious litigation in the United Kingdom in

8  which Mr. Gliner's wife's claims to her late father's wealth were challenged by Russian-backed

9  interests, and PoliticalLore.com bears all the hallmarks of an anti-U.S. disinformation website, as

10 "[a]lmost all of the articles ... are Russian-centric, exhibit poor English, [] contain over-the-top anti-

11 Western rhetoric," and appear to be "paid-for."  (Mem. at 3-5 & n.4.)

12      As such, was it manifest error and "inconsistent with *Intel*[]" for the Court to "[s]imply

13 assum[e] First Amendment protection applies, in the absence of any facts or circumstances

14 suggesting that it does."  *Takada*, 2023 WL 1452080, at *3.  The First Amendment does not apply

15 here, and the Application should be granted.

16      To the extent the Court may remain concerned about the publisher(s) of the

17 PoliticalLore.com article potentially having First Amendment rights, the proper course is not to

18 deny the Application based on that mere possibility, but rather to grant it "without prejudice to any

19 such [First Amendment] argument that might be raised in a motion to quash" by Dynadot or those

20 publisher(s), who could raise that argument through counsel while maintaining their anonymity.

21 *In re Anahara*, No. 22-mc-80063, 2022 WL 783896, at *5 n.1 (N.D. Cal. Mar. 15, 2022); *accord*

22 *Meta Platforms*, 2023 WL 8438579, at *6.

23 **II.    The First Amendment Is Not Implicated by Mr. Gliner's Application Because He Pled
          (in Detail, with Supporting Evidence) That the PoliticalLore.com Article Is False and
24         Defamatory, and the First Amendment Does Not Protect Defamatory Speech.**

25      The Court's denial of Mr. Gliner's Application on the ground that it did "not address why

26 disclosure of the website operator and author's identities would be justified or appropriate in light

27 of their First Amendment interests" also constitutes a manifest error of law for the separate reason

28 that Mr. Gliner pled that the author/operator's speech was defamatory (and even proffered

1    supporting evidence) and, under settled precedent, defamatory speech is not entitled to First

2    Amendment protection.

3         Again, U.S. Supreme Court precedent is clear:  "The freedom of speech has its limits; it

4    does not embrace certain categories of speech, including defamation."  *Ashcroft v. Free Speech*

5    *Coal.*, 535 U.S. 234, 245-46 (2002); *accord United States v. Stevens*, 559 U.S. 460, 468 (2010)

6    ("From 1791 to the present ... the First Amendment has permitted restrictions upon the content of

7    speech in a few limited areas, ... including ... defamation."); *Felton v. Griffin*, 185 F. App'x 700,

8    701 (9th Cir. 2006) ("The First Amendment does not protect slander.").  The Court has "regularly

9    acknowledged the 'important social values which underlie the law of defamation,' and recognized

10   that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon

11   reputation.'"  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22-23 (1990) (quoting *Rosenblatt v. Baer*,

12   383 U.S. 75, 86 (1966))).  In light of that law, courts in this District have repeatedly rejected the

13   argument that the First Amendment shields the identities of publishers of defamatory statements

14   when discovery is sought under Section 1782.  *E.g.*, *Zuru*, 614 F. Supp. 3d at 706-08; *Hey*, 2023

15   WL 3874022, at *5; *Takada*, 2023 WL 1452080, at *5-6; *Takagi*, 2023 WL 1442893, at *5-6; *Team

16   Co.*, 2023 WL 1442886, at *5-6.

17        So, too, here.  Mr. Gliner has not simply alleged that the statements anonymously published

18   in the PoliticalLore.com article are defamatory—which is all that is necessary when there is no

19   indication that the anonymous defamer is a U.S. citizen or is located in the United States[4]—he has

20   done much more.  Mr. Gliner submitted actual evidence to establish "a real evidentiary basis" for

21   his defamation claims so as to satisfy even the standard in *Highfields Capital Management, L.P. v.*

22   *Doe*, 385 F. Supp. 2d 969, 975 (N.D. Cal. 2005), that "[s]ome courts" have applied to ensure First

23   Amendment interests are protected in cases involving the unmasking of U.S. citizen anonymous

24   speakers.  *Zuru*, 614 F. Supp. 3d at 706 & n.6.  Mr. Gliner has not merely alleged that the challenged

---

[4] As courts in this District have repeatedly held, under these circumstances an applicant "need only
describe the legal and factual bases for a contemplated foreign legal proceeding, and [] explain how
the discovery the applicant seeks will aid in prosecution of that proceeding."  *Takada*, 2023 WL
1452080, at *5-6; *accord Takagi*, 2023 WL 1442893, at *3; *Team Co.*, 2023 WL 1442886, at *5-6.
At most, courts "take a peek at the merits" to ensure the contemplated lawsuit is "legitimate."  *Zuru*,
614 F. Supp. 3d at 706-08.

statements in the PoliticalLore.com article are false and defamatory; he has declared under penalty of perjury that they are false (Gliner Decl. ¶¶ 12-14)[5] and submitted a declaration (also under penalty of perjury) from an English solicitor explaining how "[t]he Article is defamatory of Mr. Gliner under English law" (Whiston-Dew Decl. ¶¶ 13-16).[6]

That is competent evidence sufficient to establish a "real evidentiary basis" for Mr. Gliner's defamation claims and render inapplicable any potential countervailing First Amendment interests. *See Zuru*, 614 F. Supp. 3d at 706.  Indeed, even if such interests could apply (they do not, as discussed herein), they are "'not unlimited,' and competing interests, including [Mr. Gliner's] interest in protecting his reputation against falsehoods," (*i.e.*, via defamation claims), "outweigh an anonymous speaker's free-speech rights." *Id.* (quoting *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011); citing *In re Rule 45 Subpoenas Issued to Google LLC & LinkedIn Corp.*, 337 F.R.D. 639, 646 (N.D. Cal. 2020) (The First Amendment "does not protect tortious, defamatory, or libelous speech.")).

The Court manifestly erred by holding otherwise, and its denial of Mr. Gliner's Application on that basis has worked a manifest injustice by depriving Mr. Gliner of discovery to which he is legally entitled that is necessary for him to pursue his U.K. defamation claims and protect his rights.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Gliner respectfully requests that the Court grant his Motion to Alter or Amend and Reconsider, vacate its Minute Order denying his Section 1782 Application, and grant the Application subject to the subsequent resolution of any appropriately-filed motion to quash.

---

[5] Decl. of Gregory D. Gliner in Supp. of His *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) [Dkt. 1-4].

[6] Decl. of Alexandra Whiston-Dew in Supp. of Gregory Gliner's *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) [Dkt. 1-7].

Dated:  June 7, 2024

KILPATRICK TOWNSEND & STOCKTON LLP

By:     */s/ Michele Floyd*
        Michele Floyd (SBN 163031)

CLARE LOCKE LLP

By:     */s/ Joseph R. Oliveri*
        Joseph R. Oliveri* (DC Bar No. 994029)
        *Pro Hac Vice*

*Attorneys for Applicant Gregory Gliner*

**FILER ATTESTATION**

    In accordance with Civil Local Rule 5-1(h)(3), I hereby certify that I have authorization to file this document from the signatories above.

    I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed on this 7th day of June, 2024 at Knoxville, Tennessee.

          _/s/ Joseph R. Oliveri_

          Joseph R. Oliveri

1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    IN RE EX PARTE APPLICATION OF          Case No.  24-mc-80087-LB
     GREGORY GLINER,
8                                           **ORDER REASSIGNING CASE**
              Plaintiff,
9
          v.
10
     ,
11
              Defendant.
12

13        IT IS ORDERED that this case has been reassigned using a proportionate, random and

14   blind system pursuant to General Order No. 44 to the Honorable James Donato in the San

15   Francisco division for all further proceedings. Counsel are instructed that all future filings shall

16   bear the initials JD immediately after the case number.

17        All hearing and trial dates presently scheduled are vacated. However, existing briefing

18   schedules for motions remain unchanged. Motions must be renoticed for hearing before the judge

19   to whom the case has been reassigned, but the renoticing of the hearing does not affect the prior

20   briefing schedule. Other deadlines such as those for ADR compliance and discovery cutoff also

21   remain unchanged.

22   Dated:  April 29, 2024

23

24                                          _____

25                                          Mark B. Busby
                                            Clerk, United States District Court
26
27
28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10    San Francisco Division

11  | IN RE EX PARTE APPLICATION OF     | Case No. 24-mc-80087-LB
    | GREGORY GLINER,                   |
12  |                                   | **ORDER REGARDING PROCEDURE
    |          Applicant.               | FOR APPLICATION TO SERVE
13  |                                   | REQUEST FOR DISCOVERY FOR USE
    |                                   | IN A FOREIGN PROCEEDING**
14  |                                   |
    |                                   | Re: ECF No. 1
15  |                                   |

16

17        Gregory Gliner applied ex parte under 28 U.S.C. § 1782 to obtain discovery from Dynadot,

18    Inc., for use in a civil case in the United Kingdom against the persons responsible for publishing

19    an allegedly defamatory article about him published "anonymously/pseudonymously" on the

20    website PoliticalLore.com. Under Dynadot's terms of service, persons supply "accurate and

21    reliable contact details," including name, address, email, and telephone number, and Dynadot will

22    have "other information identifying them, including IP addresses."[1] Because the undersigned lacks

23    jurisdiction to decide Section 1782 applications without the consent of all parties, this order sets

24    forth a procedure to position the matter for decision.

25

26

27    ───────────────────

28    [1] Appl – ECF No. 1 at 1; Mem. – ECF No. 1-1 at 6, 11. Citations refer to material in the Electronic
      Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

ORDER – No. 24-mc-80087-LB                    **ER-21**

United States District Court
Northern District of California

1    Section 1782 provides that "[t]he district court of the district in which a person resides or is

2    found may order him to give his testimony or statement or to produce a document or other thing for

3    use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). An ex parte

4    application is an acceptable method for seeking discovery pursuant to Section 1782. *In re Letters*

5    *Rogatory from Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976) (subpoenaed parties may raise

6    objections and exercise their due-process rights by moving to quash the subpoenas). That said, "a

7    magistrate judge may not issue binding rulings on case-dispositive matters without the parties'

8    consent." *CPC Pat. Techs. Pty Ltd. v. Apple, Inc.*, 34 F.4th 801, 807 (9th Cir. 2022). And Section

9    1782 applications are case-dispositive matters. *Id.* at 807–08. Without the consent of all parties, the

10    undersigned lacks jurisdiction to enter an order resolving the application. Accordingly, the

11    following procedure is ordered to properly position the matter for decision.

12    First, within seven days of this order, Mr. Gliner must file a statement indicating whether he

13    wants the application to be considered ex parte. If the undersigned determines that the matter should

14    be considered ex parte, then the matter will be randomly reassigned to a district judge.

15    Second, if Mr. Gliner does not ask for the application to be considered ex parte, he must, again

16    within seven days of this order, serve Dynadot with (1) this order and (2) the application and all

17    associated documents (ECF Nos. 1 and 1-1–1-9).

18    Third, within fourteen days of the date it is served by Mr. Gliner, Dynadot must serve and file

19    a response to the application. If Dynadot does not do so, then the matter will be randomly

20    reassigned to a district judge.

21    Fourth, if Dynadot files a response to the application, the court will issue a letter advising that

22    all parties must, within seven days of the letter, file a consent or declination to magistrate-judge

23    jurisdiction pursuant to 28 U.S.C. § 636(c

24    Fifth, if all parties consent within that time period, the undersigned will enter an order

25    resolving the application. Otherwise, the matter will be randomly reassigned to a district judge.

26    **IT IS SO ORDERED.**

27    Dated: April 21, 2024

28    _____

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

1  Michele Floyd (SBN 163031)
   KILPATRICK TOWNSEND & STOCKTON LLP
2  2 Embarcadero Center, Suite 1900
   San Francisco, CA 94111
3  Telephone:  (415) 273-4756
   Email:  mfloyd@ktslaw.com
4

5  Joseph R. Oliveri*
   Steven J. Harrison*
   CLARE LOCKE LLP
6  10 Prince Street
   Alexandria, VA 22314
7  Telephone: (202) 628-7400
   joe@clarelocke.com
8  steven@clarelocke.com
   *Pro Hac Vice Application Forthcoming
9

10  Attorneys for Applicant Gregory Gliner

11          UNITED STATES DISTRICT COURT

12         NORTHERN DISTRICT OF CALIFORNIA

13

14  *In re Ex Parte* Application of        MISCELLANEOUS CASE NO.:

15  Gregory Gliner,

16      Applicant,            **GREGORY GLINER'S *EX PARTE***
                       **APPLICATION FOR AN ORDER**
17  For an Order Pursuant to 28 U.S.C. § 1782  **PURSUANT TO 28 U.S.C. § 1782**
   Granting Leave to Obtain Discovery     **GRANTING LEAVE TO OBTAIN**
   for Use in Foreign Proceedings       **DISCOVERY FOR USE IN FOREIGN**
18                         **PROCEEDINGS**

19

20                **INTRODUCTION**

21     Applicant Gregory Gliner, through counsel, applies to the Court for an Order under

22  28 U.S.C. § 1782 granting him leave to issue subpoenas to Dynadot, Inc. to produce documents

23  and give testimony for use in a lawsuit in the United Kingdom against the person(s) who operate

24  the website PoliticalLore.com and anonymously authored and/or caused to be published on

25  PoliticalLore.com an article defaming him.  This Application is required in aid of Mr. Gliner's to-

26  be-filed U.K. lawsuit—and as a last resort—because the soon-to-be defendant(s) have hidden their

27  identities such that Mr. Gliner cannot obtain information revealing their identities without judicial

28  assistance.

This Application is supported by the Memorandum of Points and Authorities and the Declarations of Gregory Gliner ("Gliner Decl."), Joseph R. Oliveri ("Oliveri Decl."), and Alexandra Whiston-Dew ("Whiston-Dew Decl.").  A proposed subpoena to produce documents, information, or objects in a civil action is attached hereto as **Exhibit A**, a proposed subpoena to testify at a deposition in a civil action is attached hereto as **Exhibit B**, and a Certification of Interested Parties or Persons is attached hereto as **Exhibit C**.  A Proposed Order is also being filed with this Application.

## STATEMENT OF JURISDICTION

Pursuant to Civil Local Rule 3-5(a), Mr. Gliner submits the following statement of jurisdiction:

### A.    Jurisdiction.

This Court has subject-matter jurisdiction over Mr. Gliner's Application under 28 U.S.C. § 1782—which provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal"—because Mr. Gliner's Application seeks discovery from Dynadot, Inc., which has its headquarters and principal place of business in this district (in San Mateo, California) and is thus found in this district.  (Oliveri Decl. ¶¶ 10-12.[1])  This Court also has subject-matter jurisdiction over Mr. Gliner's Application under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States.

### B.    Divisional Assignment.

Under Civil Local Rule 3-2(c) and 3-2(d), this action is properly assigned to the Court's San Francisco or Oakland Division because it arises from and relates to the actions of Dynadot in San Mateo County, California, where it is headquartered and has its principal place of business. (Oliveri Decl. ¶¶ 10-12.)

---

[1] Decl. of Joseph R. Oliveri in Supp. of Gregory Gliner's *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) (filed contemporaneously herewith).

1

## **CONCLUSION**

2

For the reasons in the Memorandum of Points and Authorities and Declarations filed

3

contemporaneously herewith, Mr. Gliner respectfully requests that the Court grant his Application.

4

5

Dated:  April 11, 2024

KILPATRICK TOWNSEND & STOCKTON LLP

6

By:     /s/ Michele Floyd
        Michele Floyd (SBN 163031)

7

CLARE LOCKE LLP

8

By:     /s/ Joseph R. Oliveri

9

        Joseph R. Oliveri* (DC Bar No. 994029)
        *Pro Hac Vice Application Forthcoming

10

*Attorneys for Applicant Gregory Gliner*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER ATTESTATION**

In accordance with Civil Local Rule 5-1(h)(3), I hereby certify that I have authorization to file this document from the signatories above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed on this 11th day of April, 2024, at San Francisco, California.

_/s/ Michele Floyd_
Michele Floyd

Michele Floyd (SBN 163031)
KILPATRICK TOWNSEND & STOCKTON LLP
2 Embarcadero Center, Suite 1900
San Francisco, CA 94111
Telephone:  (415) 273-4756
Email:  mfloyd@ktslaw.com

Joseph R. Oliveri*
Steven J. Harrison*
CLARE LOCKE LLP
10 Prince Street
Alexandra, VA 22314
Telephone: (202) 628-7400
Email:  joe@clarelocke.com
Email:  steven@clarelocke.com
*Pro Hac Vice Application Forthcoming

Attorneys for Applicant Gregory Gliner

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of<br><br>Gregory Gliner,<br><br>Applicant,<br><br>For an Order Pursuant to 28 U.S.C. § 1782<br>Granting Leave to Obtain Discovery<br>for Use in Foreign Proceedings | MISCELLANEOUS CASE NO.:<br><br>**GREGORY GLINER'S MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |

1

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    Gregory Gliner Earns a Reputation as a Successful and Ethical Businessman in the United Kingdom. ......................................................................... 2

    B.    Mr. Gliner's Father-in-Law Passes Away and Litigation Over the Family Wealth—and a Smear Campaign Against Mr. Gliner's Family—Follow. .............. 3

    C.    Mr. Gliner Is Falsely Accused of Criminality by an Anonymous Person or Persons in an Article on the Website PoliticalLore.com. ......................................... 4

    D.    Mr. Gliner Intends to Sue the Anonymous Defamer or Defamers in the United Kingdom—And This Application Seeks Evidence of Their Identity or Identities Necessary for Him to Do So. ............................................................................. 5

ARGUMENT ...................................................................................................... 7

I.    28 U.S.C. § 1782 Broadly Allows Discovery in Aid of Foreign Proceedings. ................... 7

II.    Mr. Gliner's Application Easily Satisfies Section 1782's Statutory Requirements. ........... 8

III.    The Discretionary *Intel* Factors All Weigh in Favor of Granting Mr. Gliner's Application. ................................................................................................ 9

    A.    The First *Intel* Factor Is Satisfied:  Dynadot Will Not Be a Party to the Foreign (English) Proceeding and Therefore That Court Cannot Compel Dynadot to Provide Discovery. ............................................................................... 10

    B.    The Second *Intel* Factor Is Satisfied:  The English Court Will Accept, Not Reject, Assistance from Discovery Obtained Under Section 1782. ................ 10

    C.    The Third *Intel* Factor Is Satisfied:  This Application Does Not Attempt to Circumvent Foreign Proof-Gathering Restrictions. ............................................... 12

    D.    The Fourth *Intel* Factor Is Satisfied:  Mr. Gliner's Request is Not Unduly Burdensome. ................................................................................................ 13

CONCLUSION ................................................................................................... 14

FILER ATTESTATION ...................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akebia Therapeutics, Inc. v. FibroGen, Inc.*,
  793 F.3d 1108 (9th Cir. 2015)...................................................... 9

*Digit. Shape Techs., Inc. v. Glassdoor, Inc.*,
  No. 16-mc-80150, 2016 WL 5930275 (N.D. Cal. Oct. 12, 2016) ............ 14

*Eurasian Nat. Res. Corp. Ltd. v. Simpson*, No.
  19-mc-699, 2020 WL 8456039 (D. Md. Jan. 6, 2020) ...................... 11

*Franklin v. Madden*,
  586 F. App'x 431 (9th Cir. 2014) ...................................... 13

*Garneau v. City of Seattle*,
  147 F.3d 802 (9th Cir. 1998) ........................................ 13

*Givens v. Cal. Dep't of Corrs. & Rehab.*,
  No. 19-cv-0017, 2023 WL 6313986 (E.D. Cal. Sept. 28, 2023) ............ 13

*Heraeus Kulzer, GmbH v. Biomet, Inc.*,
  633 F.3d 591 (7th Cir. 2011)......................................... 11

*Hey, Inc. v. Twitter, Inc.*,
  No. 22-mc-80034, 2022 WL 1157490 (N.D. Cal. Apr. 19, 2022)............ 2, 13, 14

*HRC-Hainan Holding Co. v. Yihan Hu*,
  No. 19-mc-80277, 2020 WL 906719 (N.D. Cal. Feb. 25, 2020) ............ 8, 13

*Illumina Cambridge Ltd. v. Complete Genomics, Inc.*,
  No. 19-mc-80215, 2020 WL 820327 (N.D. Cal. Feb. 19, 2020) ............ 12

*In re Application for Appointment of a Comm'r re Request for
  Judicial Assistance for the Issuance of Subpoena Pursuant to 28 U.S.C. § 1782*,
  No. 11-cv-80136, 2011 WL 2747302 (N.D. Cal. July 13, 2011) ............ 10

*In re Application of Credit Suisse Virtuoso*,
  No. 21-mc-80308, 2022 WL 1786050 (N.D. Cal. June 1, 2022)............. 11

*In re Application of Eurasian Nat. Res. Corp.*,
  No. 18-mc-80041, 2018 WL 1557167 (N.D. Cal. Mar. 30, 2018) ............ 11

*In re Application of Guy*,
  No. 19-mc-96, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004)............... 11

*In re Application of Joint Stock Co. Raiffeinsenbank*,
  No. 16-mc-80203, 2016 WL 6474224 (N.D. Cal. Nov. 2, 2016) ............ 13

*In re Application of JSC Comm. Bank Privatbank*,
  No. 21-mc-80216, 2021 WL 4355334 (N.D. Cal. Sept. 24, 2021) ............ 11

*In re Application of Pishevar*,
No. 21-mc-105, 2023 WL 2072454 (D.D.C. Feb. 17, 2023) ...................... 11

*In re Application of Vahabzadeh*,
No. 20-mc-80116, 2020 WL 7227205 (N.D. Cal. Dec. 8, 2020) ................... 12

*In re Ex Parte Application of ANZ Commodity Trading Pty Ltd.*,
No. 17-mc-80070, 2017 WL 3334878 (N.D. Cal. Aug. 4, 2017) ..................... 9

*In re Ex Parte Application of Apple Retail UK Ltd.*,
No. 20-mc-80109, 2020 WL 3833392 (N.D. Cal. July 8, 2020) ............... 1, 10, 14

*In re Ex Parte Application of Hattori*,
No. 21-mc-80236, 2021 WL 4804375 (N.D. Cal. Oct. 14, 2021) ..................... 14

*In re Ex Parte Application of Legatum*,
No. 21-mc-80032, 2021 WL 706436 (N.D. Cal. Feb. 23, 2021) ............... 2, 11, 13, 14

*In re Ex Parte Application of Motorola Mobility, LLC*,
No. 12-cv-80243, 2012 WL 4936609 (N.D. Cal. Oct. 17, 2012) ................... 10, 12

*In Re Ex Parte Application of Nouvel, LLC*,
No. 22-mc-4, 2022 WL 3012521,(C.D. Cal. June 8, 2022),
*adopted*, 2022 WL 2901715 (C.D. Cal. July 22, 2022) .............................. 12

*In re Ex Parte Application of Takada*,
No. 22-mc-80221, 2023 WL 1452080 (N.D. Cal. Feb. 1, 2023) ................... 2, 8, 14

*In re Ex Parte Application of Takagi*,
No. 22-mc-80240, 2022 WL 7620511 (N.D. Cal. Oct. 13, 2022) ..................... 8

*In re Ex Parte Application of Varian Med. Sys. Int'l AG*,
No. 16-mc-80048, 2016 WL 1161568 (N.D. Cal. Mar. 24, 2016) ................... 11, 12

*In re Ex Parte Application of Yasuda*,
No. 19-mc-80156, 2020 WL 759404 (N.D. Cal. Feb. 14, 2020) ..................... 9

*In re Letters Rogatory from the Tokyo Dist.*,
539 F.2d 1216 (9th Cir. 1976) ...................................................... 1

*In re Letters Rogatory From Tokyo Dist. Prosecutor's Office*,
16 F.3d 1016 (9th Cir. 1994) ...................................................... 13

*In re Republic of Ecuador*,
No. 10-mc-80225, 2010 WL 3702427 (N.D. Cal. Sept. 15, 2010) ................... 1, 7

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004). ..................................................... 7, 8, 9, 10, 12, 13

*IPCom GMBH & Co. KG v. Apple Inc.*,
61 F. Supp. 3d 919 (N.D. Cal. 2014) .............................................. 1

*IS Prime Ltd. v. Glassdoor, Inc.*,
No. 21-mc-80178, 2021 WL 5889373 (N.D. Cal. Dec. 13, 2021) ................... 2, 11, 14

*London v. Does*,
   279 F. App'x 513 (9th Cir. 2008) ........................................................... 10

*Siemens AG v. W. Digital Corp.*,
   No. 13-cv-1407, 2013 WL 5947973 (C.D. Cal. Nov. 4, 2013) ................................ 10

**Statutes**

28 U.S.C. § 1782 ........................................................................... 1, 7

**United Kingdom (England) Cases**

*Nokia Corp. v. Interdigital Technology Corp.*
   [2004] EWHC 2920 ..................................................................... 12

*South Carolina Co. v. Assurantie N.V.*
   [1987] 1 A.C. 24 (HC) ................................................................ 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Applicant Gregory Gliner submits this Memorandum of Law in support of his *Ex Parte*[1] Application for an Order pursuant to 28 U.S.C. § 1782 requesting limited discovery from Dynadot, Inc. to aid foreign litigation in the United Kingdom. Specifically, Mr. Gliner's Application requests discovery for a lawsuit in the United Kingdom—where he is a citizen and permanent resident— that he intends to file against the person (or persons) responsible for the publication of an article on the website PoliticalLore.com that makes numerous false and defamatory accusations against him, including allegations of embezzlement and theft.

Mr. Gliner files this Section 1782 Application as a last resort because critical evidence necessary for his U.K. lawsuit is only available in this jurisdiction. As explained below, although Mr. Gliner intends to sue in his home country the persons responsible for publishing the false and defamatory article about him on PoliticalLore.com, the persons who operate PoliticalLore.com and authored the article have gone to great lengths to hide their identities, including by publishing the article anonymously/pseudonymously and using a privacy service offered by Dynadot to register the PoliticalLore.com domain. But under Dynadot's Terms of Service, those persons were required to provide Dynadot "accurate and reliable contact details," including their full names, postal address, email address, telephone number, and the like. And Dynadot will also have other information identifying them, including IP addresses. Accordingly, Mr. Gliner's Application requests leave to issue a narrowly tailored subpoena to Dynadot for documents sufficient to identify the persons who registered, own, and/or operate PoliticalLore.com, and a one-hour deposition for Dynadot to authenticate those documents. Only with that information can Mr. Gliner bring his U.K. lawsuit to remedy the harm that the defamatory article has caused to him and his reputation.

---

[1] "Applications brought pursuant to 28 U.S.C. § 1782 typically are considered on an *ex parte* basis, since 'parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it.'" *In re Ex Parte Application of Apple Retail UK Ltd.*, No. 20-mc-80109, 2020 WL 3833392, at *2 (N.D. Cal. July 8, 2020) (quoting *IPCom GMBH & Co. KG v. Apple Inc.*, 61 F. Supp. 3d 919, 922 (N.D. Cal. 2014)); *see also In re Republic of Ecuador*, No. 10-mc-80225, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010); *In re Letters Rogatory from the Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976).

1      As explained below, Mr. Gliner's Application satisfies all Section 1782 statutory

2  requirements, and all discretionary factors that courts consider in evaluating Section 1782

3  Applications weigh heavily in favor of granting his Application.  In similar circumstances, courts

4  have repeatedly granted Section 1782 Applications seeking discovery.  *See, e.g.*, *Hey, Inc. v.*

5  *Twitter, Inc.*, No. 22-mc-80034, 2022 WL 1157490, at *2-4 (N.D. Cal. Apr. 19, 2022) (granting

6  application to discover identity of anonymous defamer); *In re Ex Parte Application of Takada*,

7  No. 22-mc-80221, 2023 WL 1452080, at *2-3 (N.D. Cal. Feb. 1, 2023) (same; denying motion to

8  quash subpoena); *IS Prime Ltd. v. Glassdoor, Inc.*, No. 21-mc-80178, 2021 WL 5889373, at *3-4

9  (N.D. Cal. Dec. 13, 2021) (same); *In re Ex Parte Application of Legatum*, No. 21-mc-80032, 2021

10  WL 706436, at *3 (N.D. Cal. Feb. 23, 2021) (same).  The Court should grant Mr. Gliner's

11  Application.

12                                  **FACTUAL BACKGROUND**

13  **A.      Gregory Gliner Earns a Reputation as a Successful and Ethical Businessman
              in the United Kingdom.**

14

15      Mr. Gliner, a dual citizen of the United Kingdom and United States, has worked tirelessly

16  for years to become, and earn a reputation as, a successful and ethical businessman and

17  entrepreneur.  (Gliner Decl. ¶¶ 2, 4-8.)[2]  After receiving Bachelor of Science and Arts degrees in

18  finance and history, respectively, in the mid-2000s, Mr. Gliner earned Master of Business

19  Administration (MBA) degrees from the London Business School and the Columbia Business

20  School.  (*Id.* ¶ 3.)  He then entered the business and investment fields and worked at various large

21  hedge funds in the United States and United Kingdom, as well as at one of the largest consulting

22  firms in the world.  (*Id.* ¶ 4.)

23      In 2015, Mr. Gliner left the United States and moved to the United Kingdom, permanently

24  settling in London, England in 2016, where he has since lived with his wife and their children.  (*Id.*

25  ¶¶ 2-5.)  Also in 2015, Mr. Gliner founded Ironwall Capital Management LLP, a London-based

26  global macro fund.  (*Id.* ¶ 5.)  Mr. Gliner has continually served as Ironwall Capital Management's

27  ───────────────
[2] Decl. of Gregory D. Gliner in Supp. of His *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C.
28  § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) (filed
contemporaneously herewith).

1  Chief Investment Officer since that time.  (*Id.*)  Mr. Gliner (together with his wife) also serves as a

2  Director of Ironwall Capital Services Ltd., a London-based affiliate of Ironwall Capital

3  Management.  (*Id.*)  In addition to his work at Ironwall Capital and in the investment industry,

4  Mr. Gliner is and has been actively involved in philanthropic endeavors in the United Kingdom,

5  including serving for nearly seven years as a director of a charitable organization dedicated to the

6  prevention of child abuse in the United Kingdom and the support and treatment of victims of child

7  abuse in the United Kingdom.  (*Id.* ¶ 6.)  Mr. Gliner has also authored a book, "Global Macro

8  Trading: Profiting in a New World Economy," the proceeds of which he donated to charity.  (*Id.*

9  ¶ 7.)

10      Mr. Gliner's efforts and dedication have been successful, and he has earned a reputation in

11  the United Kingdom (in England) as a successful, ethical, and upstanding investment advisor and

12  businessman.  (*Id.* ¶ 8.)

### B.  Mr. Gliner's Father-in-Law Passes Away and Litigation Over the Family Wealth—and a Smear Campaign Against Mr. Gliner's Family—Follow.

13

14      Since 2015, Mr. Gliner has been married to Veronica Bourlakova.  (*Id.* ¶¶ 2, 9.)

15  Ms. Bourlakova is the daughter of Oleg and Loudmila Bourlakov, who together rose from humble

16  beginnings in Soviet Russia and Ukraine to found and grow multi-billion-dollar businesses in a

17  variety of industries across the globe.  (*Id.* ¶ 9.)  In 2018, following the revelation that Mr.

18  Bourlakov had taken a mistress, Mrs. Bourlakova initiated divorce proceedings.  (*Id.*)  In 2021,

19  while those divorce proceedings were still pending, Mr. Bourlakov passed away due to

20  complications from COVID-19.  (*Id.*)

21      Litigation over the family's wealth—including substantial litigation in the United

22  Kingdom[3]—followed.  (*Id.* ¶ 10.)  At the same time, the parties opposing Loudmila's and

23  Veronica's claims to the family wealth (and the claims of Loudmila's other daughter, Veronica's

24  sister Elena) began a campaign to publicly disparage their side of the family in an apparent effort

25  to coerce them to abandon or settle their claims to the family wealth.  (*Id.*)  As part of that campaign,

26

27

28  ───────────────

[3] *See, e.g.*, *Bourlakova & Ors v Bourlakov & Ors*, No. BL-2020-001050 (Eng. ChD.).

numerous false accusations of criminality against the family have been anonymously published online in the form of supposed news articles.  (*Id.*)

**C.**    **Mr. Gliner Is Falsely Accused of Criminality by an Anonymous Person or Persons in an Article on the Website PoliticalLore.com.**

Mr. Gliner has discovered that he, too, has been targeted with false accusations of criminality.  (*Id.* ¶¶ 11-13.)  Specifically, Mr. Gliner learned of an article published on the website PoliticalLore.com—a website that purports to be (but is not) a legitimate news site[4]—headlined "Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale" (the "Article"), that lists as its author an "Edward Swensson."[5]  (*Id.* ¶ 11.)  The Article purports to describe a dispute relating to the distribution of Mr. Bourlakov's estate.  (*Id.*)  In reality, though, the Article falsely describes that dispute and makes numerous false accusations against the Bourlakovas and against Mr. Gliner and his family.  (*Id.* ¶¶ 11-13)

As relevant here, the Article makes many false, defamatory, and highly damaging accusations against Mr. Gliner, including accusations that Mr. Gliner has engaged in criminal conduct such as embezzlement and theft.  (*Id.* ¶ 12.)  The Article does so by stating, among other things, that:

- "Gliner and the Bourlakovas remembered the good old 90ies in Russia where assets could be grabbed swiftly" and "started to engage in classic corporate raiding tactics to gain control over entities that hold assets they had not yet placed their hands on";

- Gliner "us[ed]" "[a] Latvian notary ... in an attempt to obtain control over an enormous yacht built by Mr Bourlakov [sic] and to get a swift inheritance certificate" despite having no right or title to that yacht; and

- "Gliner's plan was simple: Ludmila, who had authority over Mr Bourlakov's accounts, withdraws assets which then get transferred to accounts outside Mr Bourlakova's control.  From thereon, funds would be placed in a trust and other vehicles that would ensure an [sic] juicy income stream for Veronica, Elena, Ludmila and Gliner without any need to exert oneself."

---

[4] PoliticalLore.com bears all the hallmarks of a disinformation website—not a legitimate news site. Almost all of the articles on the website are Russian-centric, exhibit poor English, and contain over-the-top anti-Western rhetoric; the website is completely devoid of advertising; and although the site contains a link for companies that wish to advertise on it, the link leads to a dead-end, thus strongly suggesting that the website is independently funded and/or relies on paid-for content.

[5] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale*, Political Lore (June 2, 2023), https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

- 4 -

1  (*Id.*)

2      Those statements and accusations convey categorically and demonstrably false (purported)

3  facts.  (*Id.* ¶ 13.)   Mr. Gliner has dedicated his career to being an ethical and law-abiding

4  businessman and has ***never*** engaged in any acts of embezzlement or theft of any kind.  (*Id.*)

5  Mr. Gliner has ***not*** "grabbed" "assets" that do not belong to him; he has ***not*** "engage[d] in classic

6  corporate raiding tactics" to unlawfully obtain any corporate entity's or any person's assets; he has

7  ***not*** "us[ed]" "[a] Latvian notary" to attempt to improperly take or assert dominion over a "yacht

8  built by Mr Bourlakov" or thereby sought to "get a swift inheritance certificate"; and he was ***never***

9  part of any plan to "withdraw[] assets" from "Mr Bourlakov's accounts" to obtain income for his

10  wife (Veronica), his sister-in-law (Elena), his mother-in-law (Loudmila), himself, or any other

11  person.  (*Id.*)

12      The statements and accusations plainly accuse Mr. Gliner or criminal actions and damage

13  Mr. Gliner and his reputation as an honest, upstanding, and ethical person and businessman.  (*Id.*

14  ¶¶ 8, 12-14.)  As such, they are defamatory under English law.  (Whiston-Dew Decl. ¶¶ 13-14).[6]

15      **D.    Mr. Gliner Intends to Sue the Anonymous Defamer or Defamers in the United**
            **Kingdom—And This Application Seeks Evidence of Their Identity or Identities**
16          **Necessary for Him to Do So.**

17      Because the defamatory statements and accusations in the Article have caused—and are

18  continuing to cause—substantial harm to Mr. Gliner and his reputation, Mr. Gliner intends to sue

19  the person or persons responsible for the Article's publication—that is, the person or persons who

20  operate PoliticalLore.com and/or authored the Article.  (Gliner Decl. ¶¶ 13-14; Whiston-Dew Decl.

21  ¶¶ 3, 12.)  And Mr. Gliner has retained English counsel—the law firm of Mishcon de Reya LLP

22  and Alexandra Whiston-Dew and Harry Eccles-Williams—for this purpose.  (Gliner Decl. ¶ 17;

23  Whiston-Dew Decl. ¶¶ 2-3.)

24      However, Mr. Gliner and his English counsel are unable to presently file their lawsuit

25  because they are unable to identify the person or persons who anonymously published the

26  _____

27  [6] Decl. of Alexandra Whiston-Dew in Supp. of Gregory Gliner's *Ex Parte* Appl. for an Order
     Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings
28  (Apr. 11, 2024) (filed contemporaneously herewith); *see also* U.K. Defamation Act of 1996 § 1;
     U.K. Defamation Act of 2013 §§ 5, 10.

defamatory Article.  (Gliner Decl. ¶¶ 15-17; Whiston-Dew Decl. ¶¶ 3-4; Oliveri Decl. ¶¶ 3, 8.[7]) PoliticalLore.com does not provide information tending to identify the person(s) who operate it. (Oliveri Decl. ¶ 4.)  Likewise, the persons who registered and/or operate PoliticalLore.com have taken affirmative steps to hide their identity or identities by using privacy services provided by Dynadot, Inc. ("Dynadot") to register the PoliticalLore.com domain.  (*Id.* ¶ 5.)  Thus, Mr. Gliner and his counsel have been unable to identify that person(s).  (Gliner Decl. ¶ 16; Oliveri Decl. ¶ 8.) Similarly, neither PoliticalLore.com nor the Article provide any information from which the article's author—identified in the Article as "Edward Swensson"—can be identified.  (Oliveri Decl. ¶¶ 4-5.)  Mr. Gliner's counsel have conducted detailed research to attempt to determine whether the "Edward Swensson" who is listed as the author of the Article is a real person, but those efforts identified only two people by the name "Edward Swensson" in the United States who have no apparent connections to PoliticalLore.com.  (*Id.* ¶ 7.)  As such, Mr. Gliner and his counsel have concluded that "Edward Swensson" as listed in the Article is an alias/pseudonym and/or a person located outside the United States who cannot be identified through reasonable efforts.  (*Id.*)

Dynadot, however, almost certainly possesses documents containing information that will identify or lead to the identity of the person or persons who operate PoliticalLore.com and published the Article.  (Oliveri Decl. ¶ 9.)  Persons who use Dynadot's services to register a website are required to "provide to Dynadot accurate and reliable contact details and correct and update them within seven (7) days of any change during the term of a domain name's registration, including" the person's "full name"; "postal address"; "e-mail address"; "voice telephone number"; "fax number, if available"; for organizations, association, or corporations, "the name of an authorized person for contact purposes"; "the names of the primary nameserver and secondary nameserver(s) for the associated domain name"; "the name, postal address, e-mail address, voice telephone number, and (if available) fax number of the technical contact for the associated domain name"; and "the name, postal address, e-mail address, voice telephone number, and (if available) fax

---

[7] Decl. of Joseph R. Oliveri in Supp. of Gregory Gliner's *Ex Parte* Appl. for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Disc. for Use in Foreign Proceedings (Apr. 11, 2024) (filed contemporaneously herewith).

number of the administrative contact for the associated domain name.  (Oliveri Decl. ¶ 9 & Ex. 1, Dynadot Service Agreement § 2.1.)[8]

Accordingly, Mr. Gliner brings this Application to obtain from Dynadot information sufficient to identify the person or persons responsible for operating PoliticalLore.com and publishing the false and defamatory Article on it.  To Mr. Gliner's and his counsel's knowledge, Dynadot is the only available source for this information.

## **ARGUMENT**

### I.     **28 U.S.C. § 1782 Broadly Allows Discovery in Aid of Foreign Proceedings.**

28 U.S.C. § 1782 "is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  And over time, Congress has consistently and "substantially broadened the scope of assistance federal courts could provide for foreign proceedings."  *Id.* at 247-48.  Section 1782 provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal....  The order may be made ... upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced[.]

28 U.S.C. § 1782(a).  Thus, under Section 1782, federal courts may grant an *ex parte* application for discovery when three statutory requirements are satisfied: **(1)** the person from whom discovery is sought resides or is found in the district of the district court where the application is made; **(2)** the discovery is for use in a proceeding before a foreign tribunal; and **(3)** the application is made by an interested person.  *Id.*; *In re Republic of Ecuador*, No. 10-mc-80225, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010).  "Once those three statutory requirements are met, a district court has

---

[8] Dynadot's Service Agreement, to which persons who use Dynadot's services agree as a condition and term of use, further provides that if a person using Dynadot's services "directly or indirectly, willfully provide inaccurate or unreliable information to Dynadot, willfully fail to update information provided to Dynadot within seven (7) days of any change, or fail to respond for over fifteen (15) days to inquiries by Dynadot concerning the accuracy of contact details associated with [the person's] domain name, then such action or inaction, as appropriate, shall constitute a material breach of this Agreement and become a basis for suspension and/or cancellation of the associated domain name registration."  (*Id.* § 2.2.)

wide discretion to grant discovery under [Section] 1782." *HRC-Hainan Holding Co. v. Yihan Hu*, No. 19-mc-80277, 2020 WL 906719, at *3 (N.D. Cal. Feb. 25, 2020).

In exercising their discretion to grant discovery, district courts consider four factors identified by the Supreme Court in *Intel*: **(1)** whether the person from whom discovery is sought is a participant in the foreign proceeding; **(2)** the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government to U.S. federal court judicial assistance; **(3)** whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and **(4)** whether the request is unduly burdensome.  *Intel*, 542 U.S. at 264-65.

As explained below, because Mr. Gliner's Application easily satisfies all three statutory Section 1782 requirements and all four discretionary factors strongly favor allowing discovery, the Court should grant his Application for limited discovery.

## II.    Mr. Gliner's Application Easily Satisfies Section 1782's Statutory Requirements.

Mr. Gliner's Application for a narrow subpoena to Dynadot easily satisfies Section 1782's three statutory requirements.

***First***, Dynadot "resides or is found" in this District because it is headquartered and has its principal place of business in San Mateo, California.  (Oliveri Decl. ¶¶ 10-12 & Exs. 2-3.)  Under Section 1782, "[a] business entity is 'found' in the judicial district where it has its principal place of business." *See, e.g.*, *In re Ex Parte Application of Takagi*, No. 22-mc-80240, 2022 WL 7620511, at *3 (N.D. Cal. Oct. 13, 2022); *In re Ex Parte Application of Takada*, No. 22-mc-80221, 2022 WL 4913183, at *3 (N.D. Cal. Oct. 3, 2022) (same).[9]

***Second***, Mr. Gliner's Application seeks discovery for use in a contemplated proceeding before a foreign tribunal—namely, the Courts of England and Wales in the United Kingdom.

---

[9] Indeed, Dynadot's Terms of Use, to which persons who use Dynadot's services must agree as a condition to using Dynadot's services, provide that "[a]ll legal proceedings arising out of or in connection with this Agreement, with anyone's use of this website or App or with anyone's use of [Dynadot's] Services shall be brought solely either in the United States District Court for the Northern District of California or in the Superior Court of California, San Mateo County.  You expressly submit to the exclusive jurisdiction of said courts …  Each party waives any objection (on the grounds of lack of jurisdiction, forum non conveniens or otherwise) to the exercise of such jurisdiction over it by any such courts."  (Oliveri Decl. ¶ 9 & Ex. 1, Terms of Use § 3.6.)

As the Supreme Court has explained, the requisite foreign proceeding "need not be 'pending' or 'imminent'"; rather, "the 'proceeding' for which discovery is sought" only need be "in reasonable contemplation." *Intel*, 542 U.S. at 247; *see In re Ex Parte Application of Yasuda*, No. 19-mc-80156, 2020 WL 759404, at \*4 (N.D. Cal. Feb. 14, 2020); *In re Ex Parte Application of ANZ Commodity Trading Pty Ltd.*, No. 17-mc-80070, 2017 WL 3334878, at \*3 (N.D. Cal. Aug. 4, 2017) ("It is of no import that [Applicant] has not yet filed suit[.]").  In fact, this statutory requirement is satisfied even when the contemplated foreign litigation is only at the "the investigative stage." *Intel*, 542 U.S. at 247; *Yasuda*, 2020 WL 759404, at \*4.  Here, Mr. Gliner's English lawsuit is well within "reasonable contemplation"; as described above, Mr. Gliner intends to sue the person or persons responsible for publishing the Article as soon as discovery produced pursuant to this Application identifies that person or person, and, demonstrating the promptness with which Mr. Gliner intends to file his English lawsuit, has already retained English counsel for this purpose. (Gliner Decl. ¶¶ 17-18; Whiston-Dew Decl. ¶¶ 3-4.)

*Third*, Mr. Gliner, as the plaintiff in his upcoming English lawsuit, qualifies as an "interested party" entitled to seek discovery under Section 1782.  As the Supreme Court has explained, "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *see also Akebia Therapeutics, Inc. v. FibroGen, Inc.*, 793 F.3d 1108, 1110 (9th Cir. 2015) ("An 'interested person' seeking to invoke the discovery mechanism set forth under § 1782 may include 'not only litigants before foreign or international tribunals, but also ... any other person [who] ... merely possess[es] a reasonable interest in obtaining [judicial] assistance.'" (quoting *Intel*, 542 U.S. at 256-57)).

## III. The Discretionary *Intel* Factors All Weigh in Favor of Granting Mr. Gliner's Application.

All of the discretionary *Intel* factors likewise weigh heavily in favor of granting Mr. Gliner's Application for limited discovery.

**A.** **The First *Intel* Factor Is Satisfied: Dynadot Will Not Be a Party to the Foreign (English) Proceeding and Therefore That Court Cannot Compel Dynadot to Provide Discovery.**

The first *Intel* factor weighs heavily in favor of granting discovery because Dynadot will not be a party to Mr. Gliner's English lawsuit (and it has no presence in the United Kingdom). (Gliner Decl. ¶ 17; Oliveri Decl. ¶ 13.). As the Supreme Court has explained, "nonparticipants in [a] foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also, e.g.*, *London v. Does*, 279 F. App'x 513, 515 (9th Cir. 2008) (granting application; explaining that "evidence sought may be unattainable in the [foreign] court while it is within the district court's jurisdiction and accessible in the United States"); *In re Ex Parte Application of Motorola Mobility, LLC*, No. 12-cv-80243, 2012 WL 4936609, at *2 (N.D. Cal. Oct. 17, 2012) (same); *In re Application for Appointment of a Comm'r re Request for Judicial Assistance for the Issuance of Subpoena Pursuant to 28 U.S.C. § 1782*, No. 11-cv-80136, 2011 WL 2747302, at *5 (N.D. Cal. July 13, 2011).

Because Dynadot, a U.S. corporation without a U.K. presence, will be a nonparticipant in Mr. Gliner's English lawsuit, the English Court will be unable to compel it to produce discovery and this Application is the only means through which Mr. Gliner can obtain discovery from Dynadot evidence necessary to his English lawsuit—namely, documents identifying or leading to the identities of the persons who published the defamatory Article. This factor thus weighs heavily in favor of granting Mr. Gliner's Application.

**B.** **The Second *Intel* Factor Is Satisfied: The English Court Will Accept, Not Reject, Assistance from Discovery Obtained Under Section 1782.**

The second *Intel* factor—the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government to U.S. federal court judicial assistance— weighs heavily in favor of discovery where, as here, there is no "'authoritative proof that a foreign tribunal would reject evidence obtained with the aid of Section 1782.'" *Siemens AG v. W. Digital Corp.*, No. 13-cv-1407, 2013 WL 5947973, at *3 (C.D. Cal. Nov. 4, 2013); *accord In re Ex Parte Application of Apple Retail UK Ltd.*, No. 20-mc-80109, 2020 WL 3833392, at *2 (N.D. Cal. July 8,

1  2020).  Moreover, in evaluating this factor, courts must "err on the side of permitting discovery."

2  *In re Application of Eurasian Nat. Res. Corp.*, No. 18-mc-80041, 2018 WL 1557167, at *3 (N.D.

3  Cal. Mar. 30, 2018); *accord In re Ex Parte Application of Varian Med. Sys. Int'l AG*, No. 16-mc-

4  80048, 2016 WL 1161568, at *4 (N.D. Cal. Mar. 24, 2016) (factor favors discovery when "'there

5  is nothing to suggest that the [foreign] court would be affronted by [plaintiff's] recourse to U.S.

6  discovery'" (quoting *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 597 (7th Cir. 2011)).

7        Notably, "no [] aspect of the nature of the English court or the character of the anticipated

8  English proceedings weighs against [a Section 1782] application," *In re Application of Credit*

9  *Suisse Virtuoso*, No. 21-mc-80308, 2022 WL 1786050, at *10-11 (N.D. Cal. June 1, 2022), and

10  district courts routinely grant requests for discovery under Section 1782 for use in litigation in the

11  United Kingdom.  *See, e.g.*, *IS Prime Limited v. Glassdoor, Inc.*, No. 21-mc-80178, 2021 WL

12  5889373, at *3-4 (N.D. Cal. Dec. 13, 2021); *In re Application of JSC Comm. Bank Privatbank*,

13  No. 21-mc-80216, 2021 WL 4355334, at *1-4 (N.D. Cal. Sept. 24, 2021); *In re Ex Parte*

14  *Application of Legatum*, No. 21-mc-80032, 2021 WL 706436, at *3 (N.D. Cal. Feb. 23, 2021).[10]

15  Moreover, English attorney Ms. Whiston-Dew has explained in her Declaration that, based on her

16  experience, U.K. courts—including the Courts of England and Wales—are receptive to receiving

17  evidence obtained from U.S. courts under 28 U.S.C. § 1782 and would be so receptive in this

18  matter.  (Whiston-Dew Decl. ¶¶ 5-12.)  Indeed, the House of Lords in *South Carolina Co. v.*

19  *Assurantie N.V.* [1987] 1 A.C. 24, 42 (HC)—the "leading authority" on the issue—has expressly

20  held that a party does nothing wrong "by seeking to exercise a right potentially available to them

21  under the Federal law of the United States [under 28 U.S.C. § 1782]," and such applications do not

22  "in any way depart[] from, or interfere[] with, the procedure of the English court."  (Whiston-Dew

23  Decl. ¶ 7 & Ex. 2.)  Other English Courts are in accord, with the High Court of Justice, for example,

24

25  [10] *See also, e.g.*, *In re Application of Pishevar*, No. 21-mc-105, 2023 WL 2072454, at *3 (D.D.C. Feb. 17, 2023) ("The nature of the English court system … raise[s] no concerns[.]"); *Eurasian Nat.*

26  *Res. Corp. Ltd. v. Simpson*, No. 19-mc-699, 2020 WL 8456039, at *1 (D. Md. Jan. 6, 2020) ("[T]here is no suggestion that the court presiding over the foreign proceedings [in the U.K.] would

27  not be receptive to the assistance."); *In re Application of Guy*, No. 19-mc-96, 2004 WL 1857580, at *2-3 (S.D.N.Y. Aug. 19, 2004) (There is no "reason to suppose that the government of the United

28  Kingdom would disfavor granting Applicants relief under § 1782.").

1  explaining in *Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920, ¶ 23, that "[i]t is

2  legitimate for the requesting party to use the [Section 1782] request to ascertain facts and obtain

3  documents of which the requesting party is unaware, but which may be in the future deployed in

4  the English proceedings." (Whiston-Dew Decl. ¶¶ 8-12 & Exs. 3-6.)

5      The second *Intel* factor thus weighs heavily in favor of granting Mr. Gliner's Application

6  because not only is there no "authoritative proof"—or any proof whatsoever—that the English

7  Court would reject the evidence sought, but there is affirmative evidence that it would accept that

8  evidence.

9      **C.**     **The Third *Intel* Factor Is Satisfied: This Application Does Not Attempt to Circumvent Foreign Proof-Gathering Restrictions.**

10

11      The third *Intel* factor weighs heavily in favor of discovery where, as here, there is no

12  evidence that the Application "conceals an attempt to circumvent foreign proof-gathering

13  restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 264-65;

14  *Motorola Mobility*, 2012 WL 4936609 at *2; *Varian Med. Sys.*, 2016 WL 1161568 at *5. Indeed,

15  absent a bad-faith attempt to undermine such restrictions or policies, this factor weighs in favor of

16  allowing discovery even where (unlike here) the documents sought would not be discoverable in

17  the foreign jurisdiction. *Intel*, 542 U.S. at 260-63 (explaining that Section 1782 imposes no foreign-

18  discoverability requirement).

19      Moreover, as courts considering Section 1782 applications have repeatedly explained, "an

20  applicant need not attempt to exhaust the discovery procedures available in the foreign court before

21  invoking section 1782 in federal court." *In Re Ex Parte Application of Nouvel, LLC*, No. 22-mc-4,

22  2022 WL 3012521, at *4 (C.D. Cal. June 8, 2022), *adopted*, 2022 WL 2901715 (C.D. Cal. July 22,

23  2022) (denying motion to quash subpoena); *In re Application of Vahabzadeh*, No. 20-mc-80116,

24  2020 WL 7227205, at *5 (N.D. Cal. Dec. 8, 2020) (same). Indeed, courts have "'refused to engraft

25  a quasi-exhaustion requirement onto section 1782 that would force litigants to seek information

26  through the foreign or international tribunal before requesting discovery from the district court.'"

27  *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215, 2020 WL 820327, at *6

28  (N.D. Cal. Feb. 19, 2020) (citation omitted).

Here, there is no indication that any policy of the United Kingdom—or the United States—would weigh against the limited discovery sought by Mr. Gliner; indeed, English lawyer Ms. Whiston-Dew has affirmatively explained in her Declaration that he is aware of no such "proof-gathering restrictions or policies under English law or civil procedure rules that would be circumvented by obtaining evidence pursuant to 28 U.S.C. § 1782" either in general or in this Application. (Whiston-Dew Decl. ¶¶ 5, 12; *see also id.* ¶¶ 6-11); *see also Legatum*, 2021 WL 706436, at *3 (holding Section 1782 application was "not an attempt to circumvent proof gathering restrictions in either the United Kingdom or the United States"). Indeed, as explained above, U.S. courts have routinely granted applications under Section 1782 to obtain evidence for use in foreign proceedings in the United Kingdom. Accordingly, the third *Intel* factor weighs heavily in favor of granting Mr. Gliner's Application.

**D.**     **The Fourth *Intel* Factor Is Satisfied:  Mr. Gliner's Request is Not Unduly Burdensome.**

The fourth *Intel* factor weighs in favor of discovery where, as here, an applicant's discovery request is not "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, as "determined by the Federal Rules of Civil Procedure," *In re Application of Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203, 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016) (citing *In re Letters Rogatory From Tokyo Dist. Prosecutor's Office*, 16 F.3d 1016, 1019 (9th Cir. 1994)). Under longstanding, ordinary discovery rules, "discovery 'is permitted if reasonably calculated to lead to the discovery of admissible evidence.'" *HRC-Hainan Holding*, 2020 WL 906719, at *3 (quoting *Franklin v. Madden*, 586 F. App'x 431, 432 (9th Cir. 2014)). And "[r]elevance for purposes of discovery is defined very broadly." *Givens v. Cal. Dep't of Corrs. & Rehab.*, No. 19-cv-0017, 2023 WL 6313986, at *1 (E.D. Cal. Sept. 28, 2023) (quoting *Garneau v. City of Seattle*, 147 F.3d 802, 812 (9th Cir. 1998)).

As relevant here, courts have repeatedly held that this factor weighs in favor of granting a Section 1782 Application where the applicant seeks discovery to reveal the identity of a person who allegedly infringed his rights. *See, e.g.*, *Hey, Inc. v. Twitter, Inc.*, No. 22-mc-80034, 2022 WL 1157490, at *2-4 (granting Section 1782 application subpoena seeking "documents identifying the

1   user(s) of the three [Twitter] accounts; names and addresses of credit card holders registered on the

2   accounts; and access logs for the dates the tweets in question were posted," and holding that the

3   "discovery is appropriately tailored to documents and information identifying the individual(s)

4   responsible" for alleged wrongful conduct); *In re Ex Parte Application of Takada*, No. 22-mc-

5   80221, 2023 WL 1452080, at *2-3 (N.D. Cal. Feb. 1, 2023) (denying motion to quash subpoena

6   issued pursuant to Section 1782 application and ordering Twitter to produce documents sufficient

7   to identify a user of its service); *IS Prime*, 2021 WL 5889373, at *3-4 (similar); *Legatum*, 2021 WL

8   706436, at *3 (similar); *Digit. Shape Techs., Inc. v. Glassdoor, Inc.*, No. 16-mc-80150, 2016 WL

9   5930275, at *2 (N.D. Cal. Oct. 12, 2016) (similar).

10       Here, Mr. Gliner's Application seeks only limited discovery from Dynadot necessary to

11   identify the person or persons responsible for publishing the defamatory article: (1) documents

12   sufficient to identify or provide information tending to identify the person or persons who own,

13   operate, registered, and/or or engaged the services of Dynadot with regard to the website

14   PoliticalLore.com; and documents sufficient to identify or provide information tending to identify

15   the person identified as "Edward Swensson" in the Article who authored or contributed to the

16   publication of the Article on PoliticalLore.com; and (2) a one-hour deposition in which a Dynadot

17   corporate representative can authenticate the documents produced. As such, the burden on Dynadot

18   is minimal. Such requests are routinely approved as not being unduly burdensome. *Hey, Inc.*, 2022

19   WL 1157490, at *2-4; *Takada*, 2023 WL 1452080, at *2-3; *In re Ex Parte Application of Hattori*,

20   No. 21-mc-80236, 2021 WL 4804375, at *5 (N.D. Cal. Oct. 14, 2021); *Apple Retail UK Limited*,

21   2020 WL 3833392, at *4.[11] Accordingly, this final *Intel* factor also weighs heavily in favor of

22   granting Mr. Gliner's Application.

23

24                       **CONCLUSION**

25       For the foregoing reasons, Mr. Gliner respectfully requests that the Court grant his

26   Application and issue an Order authorizing the issuance of the subpoenas attached to his

27

28   [11] Mr. Gliner's counsel will, of course, meet and confer with Dynadot's counsel to discuss ways to obtain this discovery as efficiently and with as little burden as possible.

1   Application as **Exhibit B** and **Exhibit C**.  A Proposed Order is also attached to Mr. Gliner's

2   Application as **Exhibit A**.

3

4   Dated:  April 11, 2024            KILPATRICK TOWNSEND & STOCKTON LLP

5                       By:    */s/ Michele Floyd*
                              Michele Floyd (SBN 163031)

6                      CLARE LOCKE LLP

7                       By:    */s/ Joseph R. Oliveri*
                              Joseph R. Oliveri* (DC Bar No. 994029)

8                              **Pro Hac Vice* Application Forthcoming

9                      *Attorneys for Applicant Gregory Gliner*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPP. OF GREGORY GLINER'S APPLICATION PURSUANT TO 28 U.S.C. § 1782

1

## **FILER ATTESTATION**

2      In accordance with Civil Local Rule 5-1(h)(3), I hereby certify that I have authorization to

3    file this document from the signatories above.

4      I declare under penalty of perjury under the laws of the United States of America and the

5    State of California that the foregoing is true and correct.  Executed on this 11th day of April, 2024

6    at San Francisco, California.

7

8                     _/s/ Michele Floyd_____
                      Michele Floyd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| In re Application of Gliner under 28 USC §1782 | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  
Dynadot, Inc.  
210 S. Ellsworth Avenue, #345, San Mateo, CA 94401

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A.

| Place: Clare Locke LLP<br>10 Prince Street, Alexandria, VA 22314<br>(or such other place as to be agreed) | Date and Time: |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

_CLERK OF COURT_

OR

_____          _____
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
Gregory Gliner_____ , who issues or requests this subpoena, are:

Joseph R. Oliveri, Clare Locke LLP, 10 Prince Street, Alexandria, VA 22314; joe@clarelocke.com; (202) 628-7405

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. _____

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

ER-50

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)  For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)**  within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)**  within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)**  is a party or a party's officer; or
      **(ii)**  is commanded to attend a trial and would not incur substantial expense.

  **(2)  For Other Discovery.** A subpoena may command:
    **(A)**  production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)**  inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)  Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)  Command to Produce Materials or Permit Inspection.**
    **(A)**  Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)**  Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)**  At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)**  These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)  Quashing or Modifying a Subpoena.**
    **(A)**  When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)**  fails to allow a reasonable time to comply;
      **(ii)**  requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)**  requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)**  subjects a person to undue burden.
    **(B)**  When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)**  disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)**  Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)**  shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)**  ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)  Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
    **(A)**  Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)**  Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)**  Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
    **(D)**  Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)  Claiming Privilege or Protection.**
    **(A)**  Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)**  expressly make the claim; and
      **(ii)**  describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)**  Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

# ATTACHMENT A

## DEFINITIONS AND INSTRUCTIONS

1.      "Article" means the article on PoliticalLore.com headlined "Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale" that lists as its author an "Edward Swensson" and (as of the date of this subpoena) is available at https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

2.      "Dynadot," "You," and "Your" mean Dynadot, Inc., and all its corporate locations, predecessors, predecessors-in-interests, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationships with Dynadot Inc. and others acting on behalf of Dynadot Inc.

3.      "Communication" means any oral, written, or electronic exchange of words, thoughts, information, interrogatories, inquiries or ideas with another person.  "Communication" includes statements made in person, by telephone, teleconference, letter, envelope, fax, email, email attachment, text message, instant message, voice mail, social media, mobile or electronic application, or the Internet.

4.      "Document" is an all-inclusive term with the broadest possible meaning accorded to it under case law and the Federal Rules of Civil Procedure, and means the original (or a true and accurate copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining, or otherwise) of any writing or record (whether in electronic, tangible, or any other form) in your actual or constructive possession, custody, or control, including all documents you have provided to your counsel. "Document" shall include, but is not limited to, an electronic or computerized data compilation (including email and other computer-readable files), whether or not printed, stored, or displayed, and any preliminary versions, drafts, or revisions thereof, ESI, communication, memorandum, letter, correspondence, electronic mail, text message, blog post, Internet post, report, note, message

slip, telephone log or record, diary, journal, calendar, electronic organizer entry, writing, drawing, spreadsheet, presentation, ledger, minutes, financial report or record, draft, facsimile, contract, invoice, record of purchase or sale, graph, chart, photograph, video or audio recording, transcript, index, directory, or any other written, printed, typed, punched, taped, filmed, or graphic matter however produced, stored, or reproduced.  "Document" also includes the file, folder tabs, and labels appended to or containing any documents, ***as well as any metadata applicable to any document***.

5.     "Person" means any natural person or any business, legal, or governmental entity or association, regardless of whether incorporated.

6.     "PoliticalLore" and "PoliticalLore.com" mean the website located at https://www.politicallore.com.

7.     If any information called for by this subpoena is withheld because You claim that such information is protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or by any privilege or protection from disclosure, provide a description of the basis of the claimed privilege or protection and all information necessary for the Court and Legatum to assess the claim of privilege or protection in accordance with applicable law, including: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document, including, where appropriate, the author, addressees, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

## REQUESTS FOR DOCUMENTS

### REQUEST NO. 1

Documents and Communications sufficient to identify the person(s) who own and/or registered and/or engaged the services of Dynadot in any respect with regard to the website PoliticalLore.com, including Documents and Communications reflecting the name(s), address(es), email address(es), IP address(es), telephone and/or facsimile number(s), and forms and means of payment relating to the person(s).

### REQUEST NO. 2

Documents and Communications sufficient to identify the person(s) identified as "Edward Swensson" in the Article, including Documents and Communications reflecting the name(s), address(es), email address(es), IP address(es), telephone and/or facsimile number(s), and forms and means of payment relating to the person(s).

4

# Exhibit B

Case 3:24-mc-80087 Document 1-3 Filed 04/11/24 Page 2 of 6

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | |
|---|---|
| In re Application of Gliner under 28 USC §1782 | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No. |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                             Dynadot, Inc.
210 S. Ellsworth Avenue, #345, San Mateo, CA 94401

*(Name of person to whom this subpoena is directed)*

     ☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters: See Attachment A.

| Place: | Date and Time: |
|---|---|
| | |

         The deposition will be recorded by this method: _____

     ❑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

         The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

                *CLERK OF COURT*

                                        OR

       _____           _____
          *Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Gregory Gliner                                       , who issues or requests this subpoena, are:
Joseph R. Oliveri; 10 Prince Street, Alexandria, VA 22314; joe@clarelocke.com; (202) 628-7405

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

## <u>ATTACHMENT A</u>

### Deposition Topics

1.      Authentication and explanation of the documents produced in response to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action.

1   Michele Floyd (SBN 163031)
    KILPATRICK TOWNSEND & STOCKTON LLP
2   2 Embarcadero Center, Suite 1900
    San Francisco, CA 94111
3   Telephone:  (415) 273-4756
    Email:  mfloyd@ktslaw.com
4
    Joseph R. Oliveri*
5   Steven J. Harrison*
    CLARE LOCKE LLP
6   10 Prince Street
    Alexandria, VA 22314
7   Telephone: (202) 628-7400
    jered@clarelocke.com
8   joe@clarelocke.com
    steven@clarelocke.com
9   *Pro Hac Vice Application Forthcoming

10  *Attorneys for Applicant Gregory Gliner*

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14  *In re Ex Parte* Application of            MISCELLANEOUS CASE NO.:

15  Gregory Gliner,
                                              **CERTIFICATION OF CONFLICTS AND**
16  Applicant,                                **INTERESTED ENTITIES OR PERSONS**

17  For an Order Pursuant to 28 U.S.C. § 1782
    Granting Leave to Obtain Discovery for Use
18  in Foreign Proceedings

19

20          Pursuant to Civil L.R. 3-15, the undersigned certifies that the following listed persons,

21  associations of persons, firms, partnerships, corporations (including, but not limited to, parent

22  corporations), or other entities (i) have a financial interest in the subject matter in controversy or in

23  a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that

24  could be substantially affected by the outcome of this proceeding:

25          • Dynadot, Inc. (the entity on which Mr. Gliner seeks to serve subpoenas for

26              discovery)

27

28

Dated:  April 11, 2024

KILPATRICK TOWNSEND & STOCKTON LLP

By:    /s/ Michele Floyd
Michele Floyd (SBN 163031)

CLARE LOCKE LLP

By:    /s/ Joseph R. Oliveri
Joseph R. Oliveri* (DC Bar No. 994029)
*Pro Hac Vice Application Forthcoming

Attorneys for Applicant Gregory Gliner

1

## **FILER ATTESTATION**

2

      In accordance with Civil Local Rule 5-1(h)(3), I hereby certify that I have authorization to

3

file this document from the signatories above.

4

      I declare under penalty of perjury under the laws of the United States of America and the

5

State of California that the foregoing is true and correct.  Executed on this 11th day of April, 2024,

6

at San Francisco, California.

7

8

                */s/ Michele Floyd*
                Michele Floyd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michele Floyd (SBN 163031)
KILPATRICK TOWNSEND & STOCKTON LLP
2 Embarcadero Center, Suite 1900
San Francisco, CA 94111
Telephone: (415) 273-4756
Email: mfloyd@ktslaw.com

Joseph R. Oliveri*
Steven J. Harrison*
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: joe@clarelocke.com
Email: steven@clarelocke.com
*Pro Hac Vice Application Forthcoming

Attorneys for Applicant Gregory Gliner

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of | MISCELLANEOUS CASE NO.: |
| Gregory Gliner, | |
| Applicant, | **DECLARATION OF GREGORY D. GLINER IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN ORDER** |
| For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings | **PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |

## DECLARATION OF GREGORY D. GLINER

I, Gregory D. Gliner, declare:

1. I am over the age of 18 and have personal knowledge of the facts set forth below, except as to those facts set forth upon information and belief. As to those facts, I believe them to be true. If called as a witness, I would and could testify competently to them. I make this Declaration pursuant to 28 U.S.C. § 1746 in support of my *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings (the "Application"), being filed contemporaneously herewith. , am of sound mind, and make this Declaration on the basis of my personal knowledge.

2. I am a dual citizen of the United Kingdom and the United States and I have been a resident of the United Kingdom since 2015. My permanent residence and place of abode since 2016 has been London, England, where I live (and have continuously lived) with my wife Veronica Bourlakova (who I married in 2015) and our children.

3. I received Bachelor of Science and Bachelor of Arts degrees in Finance and History, respectively, in 2004. In 2011, I received Master of Business Administration (MBA) degrees from the London Business School and the Columbia Business School.

4. Since receiving my MBAs, I have worked in the business and investment fields at various large hedge funds in the United States and United Kingdom and one of the largest consulting firms in the world.

5. In 2015, I left the United States and moved permanently to the United Kingdom, and that same year I founded Ironwall Capital Management LLP ("Ironwall Capital Management"), a London-based global macro fund. I have served as the Chief Investment Officer of Ironwall Capital Management since founding it, and I also serve as a Director of Ironwall Capital Services Ltd. ("Ironwall Capital Services," and together with Ironwall Capital Management, "Ironwall Capital"), a London-based affiliate of Ironwall Capital Management.

6. In addition to my work at Ironwall Capital and in the investment industry, I am actively involved in philanthropic endeavors in the United Kingdom. To that end, I have since

1

2    2017 served as a director of a charitable organization dedicated to the prevention of child abuse in

3    the United Kingdom and the support and treatment of victims of child abuse in the United Kingdom.

4        7.      At the age of 29, I wrote a book, "Global Macro Trading: Profiting in a New World

     Economy," which was published by Bloomberg. I donated the proceeds from the book to charity.[1]

5

6        8.      I have worked hard for years to earn a reputation in the United Kingdom as a

7    successful, ethical, and upstanding investment advisor and businessman, and my reputation in the

8    United Kingdom as such is key to my ability to attract clients and pursue and continue my business

     and employment.

9

10        9.      I have been married to my wife, Veronica Bourlakova, since 2015. Veronica is the

11    daughter of Oleg and Loudmila Bourlakov, and has an older sister, Elena. Mr. and Mrs. Bourlakov

12    were born in Soviet Russia and Ukraine, and through a lifetime of work rose from humble

13    beginnings to found and grow multi-billion-dollar businesses in a variety of industries across the

14    globe. In 2018, Mrs. Bourlakova initiated divorce proceedings. Mr. Bourlakov passed away due

     to complications from COVID-19 in 2021 while the divorce proceedings were still pending.

15

16        10.      There has been much litigation over the family wealth—including substantial

17    litigation in the United Kingdom.[2] While those court cases have proceeded, various people

18    opposing Loudmila's, Veronica's, and Elena's claims to the family wealth have pursued a

19    campaign to publicly disparage their side of the family in an apparent effort to coerce them to

20    abandon or settle their claims to the family wealth. That campaign has involved many false

21    accusations of criminal conduct against the family that have been anonymously published online

     in posts pretending to be legitimate news articles.

22

23        11.      I recently learned about the article on PoliticalLore.com headlined "Inheritance of

24    Billionaire Oleg Burlakov – A Battle on an Epic Scale" (the "Article") that lists as its author an

25

26    ─────────────

27 [1] Gregory Gliner, *Global Macro Trading: Profiting in a New World Economy* (2014), https://www.amazon.co.uk/Global-Macro-Trading-Profiting-Bloomberg-ebook/dp/B00JUUZMG8.

28 [2] *See, e.g.*, *Bourlakova & Ors v Bourlakov & Ors*, Case No. BL-2020-001050 (Eng. ChD.)

"Edward Swensson."[3] The Article purports to describe a dispute and legal proceedings relating to the distribution of the estate of my wife's late father, Oleg Bourlakov.[4] In reality, though, it falsely describes that dispute and those proceedings.

12. As relevant to my Application, the Article makes many negative, disparaging, and highly damaging accusations against me, including accusations that I have engaged in criminal conduct like embezzlement and theft. The Article does so by stating, among other things, that "Gliner and the Bourlakovas remembered the good old 90ies in Russia where assets could be grabbed swiftly" and "started to engage in classic corporate raiding tactics to gain control over entities that hold assets they had not yet placed their hands on"; that I "us[ed]" "[a] Latvian notary ... in an attempt to obtain control over an enormous yacht built by Mr Bourlakov and to get a swift inheritance certificate" despite having no right or title to that yacht; and that "Gliner's plan was simple: Ludmila, who had authority over Mr Bourlakov's accounts, withdraws assets which then get transferred to accounts outside Mr Bourlakov's control. From thereon, funds would be placed in a trust and other vehicles that would ensure an [*sic*] juicy income stream for Veronica, Elena, Ludmila and Gliner without any need to exert oneself."

13. Those statements and accusations, as described in the preceding paragraph, are categorically and demonstrably false. I have dedicated my career to being an ethical and law-abiding businessman and have never engaged in any acts of embezzlement or theft of any kind. I have not "grabbed" "assets" that do not belong to me; I have not "engage[d] in classic corporate raiding tactics" to unlawfully obtain any corporate entity's or any person's assets; I have not "us[ed]" "[a] Latvian notary" to attempt to improperly take or assert dominion over a "yacht built by Mr Bourlakov" or thereby sought to "get a swift inheritance certificate"; and I was never part of any plan to "withdraw[] assets" from "Mr Bourlakov's accounts" to obtain income for my wife

---

[3] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale*, Political Lore (June 2, 2023), https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

[4] My wife's family name (last name)—Bourlakov (masculine version) or Bourlakova (feminine version)—is sometimes transliterated to English as "Burlakov"/"Burlakova." Similarly, my wife's mother's first name—Loudmila—is sometimes transliterated to English as "Ludmila" or "Lydmila.

1

2

(Veronica), my wife's sister (Elena), my wife's mother (Loudmila), myself, or any other person. All of those accusations are completely and utterly false.

3

4

5

6

14. I firmly believe that, by making the statements and accusations identified in the preceding paragraphs, the Article defames me. And I take very seriously that defamation because of the importance of my reputation for honesty and integrity to my career, my livelihood, my family, and myself.

7

8

9

15. Accordingly, I intend to file a lawsuit for defamation in the United Kingdom— where I have permanently lived since 2016 and am a citizen—against the person or persons responsible for the publication of the Article on PoliticalLore.com.

10

11

12

13

14

15

16

17

18

19

16. However, neither I nor my counsel, despite our best efforts, have been able to determine the identities of the person or persons who operate PoliticalLore.com or the person or persons who authored the Article and/or caused it to be published. PoliticalLore.com does not provide information about the identity of the person or persons who operate the website or who authored the Article. In fact, information to identify those people is affirmatively hidden by PoliticalLore's use of a privacy service by Dynadot, Inc. to register the website PoliticalLore.com. Thus, I have been unable, without the aid of judicial assistance and compulsory process, to identify the person or persons who operate PoliticalLore.com and/or the person or persons who authored and/or caused the Article to be published. As such, I have instructed my attorneys to file my Application.

20

21

22

23

24

17. When discovery obtained pursuant to the Application is received and reveals the identity of—or information that leads to the identity of—the person or persons who operate PoliticalLore.com and/or authored and/or caused the Article to be published, I intend to file a lawsuit against that person or persons in the United Kingdom for defamation. I have no intention of making or attempting to make Dynadot, Inc. a party to my English defamation lawsuit.

25

26

27

18. I have retained counsel in the United Kingdom—namely the law firm Mishcon de Reya LLP and attorneys Alexandra Whiston-Dew and Harry Eccles-Williams—to file and pursue

28

1  my defamation lawsuit in the United Kingdom against the person or persons who operate

2  PoliticalLore.com and/or authored and/or caused the Article to be published.

3

4      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United

5  States of America that the foregoing is true and correct to the best of my knowledge and belief.

6

7      Executed this 11th day of April, 2024, at Miami, Florida.

8

9      _____

10      Gregory D. Gliner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Michele Floyd (SBN 163031)
   KILPATRICK TOWNSEND & STOCKTON LLP
2  2 Embarcadero Center, Suite 1900
   San Francisco, CA 94111
3  Telephone: (415) 273-4756
   Email: mfloyd@ktslaw.com
4
   Joseph R. Oliveri*
5  Steven J. Harrison*
   CLARE LOCKE LLP
6  10 Prince Street
   Alexandria, VA 22314
7  Telephone: (202) 628-7400
   Email: joe@clarelocke.com
8  Email: steven@clarelocke.com
   *Pro Hac Vice Application Forthcoming
9
   Attorneys for Applicant Gregory Gliner
10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14
   In re Ex Parte Application of          MISCELLANEOUS CASE NO.:
15
   Gregory Gliner,
16                                         DECLARATION OF JOSEPH R.
   Applicant,                              OLIVERI IN SUPPORT OF GREGORY
17                                         GLINER'S EX PARTE APPLICATION
                                           FOR AN ORDER PURSUANT TO
18 For an Order Pursuant to 28 U.S.C. § 1782  28 U.S.C. § 1782 GRANTING LEAVE TO
   Granting Leave to Obtain Discovery     OBTAIN DISCOVERY FOR USE IN
19 for Use in Foreign Proceedings         FOREIGN PROCEEDINGS

20

21

22

23

24

25

26

27

28

DECL. OF JOSEPH R. OLIVERI IN SUPP. OF GREGORY GLINER'S 28 U.S.C. § 1782 APPLICATION

## DECLARATION OF JOSEPH R. OLIVERI

I, Joseph R. Oliveri, declare:

1.     I am an attorney at law duly authorized to practice before the courts of the District of Columbia, I am a partner of the law firm Clare Locke LLP, and I am contemporaneously filing an application to appear in this matter *pro hac vice*.  I am over the age of 18, am not a party to his action, and make this Declaration on the basis of my personal knowledge and my review of publicly available information.  I submit this Declaration in support of support of Gregory Gliner's *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings (the "Application"), being filed contemporaneously herewith.

2.     I am counsel for Applicant Gregory Gliner ("Mr. Gliner").

3.     Mr. Gliner retained my law firm to prepare and submit his Application seeking discovery to aid in his to-be-filed lawsuit in the United Kingdom against the person or persons who operate the website PoliticalLore.com and/or authored and/or caused to be published on PoliticalLore.com the article headlined "Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale" (the "Article") that lists as its author an "Edward Swensson."[1]

4.     Based on my review of the website PoliticalLore.com, I have concluded that PoliticalLore.com does not provide information from which the person or persons who operate the website can be identified.

5.     Publicly available domain registration information for the PoliticalLore.com website (as obtained via a "WHOIS" search of the Internet Corporation for Assigned Names and Numbers ("ICANN") database), lists only "Dynadot Inc" as the registrant of PoliticalLore.com.  That publicly available information does not include any information identifying the person or persons who operate the PoliticalLore.com website or who used Dynadot Inc. ("Dynadot"), a domain registration and privacy service company, to register the website PoliticalLore.com.

---

[1] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale*, Political Lore (June 2, 2023), https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

6.  Based on my review of the Article, and also my review of the website PoliticalLore.com, I have concluded that neither contains information from which the person or persons who authored the Article, listed in the Article as "Edward Swensson," can be identified.

7.  I and other persons at Clare Locke LLP have conducted detailed research in an attempt to determine whether the "Edward Swensson" who is listed as the author of the Article is a real person. Those search efforts identified only two people by the name "Edward Swensson" in the United States, and they uncovered no connections between those persons and PoliticalLore.com. As such, I have concluded that "Edward Swensson" as listed in the Article is an alias/pseudonym and/or is a person located outside the United States who we cannot through reasonable efforts identify or obtain contact information.

8.  Based on the above, I and my law firm have been unable to identify the person or persons who operate the website PoliticalLore.com and/or the person or persons who authored and/or caused the Article to be published.

9.  Because PoliticalLore.com was registered using Dynadot's services—and because Dynadot's Terms of Use require that persons who use its services "provide to Dynadot accurate and reliable contact details and correct and update them within seven (7) days of any change during the term of a domain name's registration"—I believe that Dynadot possesses documents and information that will identify or will lead to the identity of the person or persons who operate the website PoliticalLore.com and the person or persons who authored and/or caused the Article to be published on PoliticalLore.com. Attached hereto as **Exhibit 1** and incorporated herein by this reference is a copy of Dynadot's Terms of Use and Service Agreement, as printed from Dynadot's website, https://www.dynadot.com/terms-of-use.

10. According to its public representations and filings, Dynadot Inc. maintains its principal office in San Mateo, California.

11. Attached hereto as **Exhibit 2** and incorporated herein by reference is a true and correct printout of the "Contact" section of Dynadot's website,

https://www.dynadot.com/community/contact, which identifies Dynadot's address as "210 S Ellsworth Ave #345 San Mateo, CA 94401 US."

12.     Attached hereto as **Exhibit 3** and incorporated herein by reference is a true and correct copy of information relating to Dynadot as printed from the website of the California Secretary of State, https://bizfileonline.sos.ca.gov/search/business (search "Dynadot Inc."), which identifies Dynadot's "Principal Address" and "Mailing Address" as being in San Mateo, California.

13.     I have researched whether Dynadot has any office or presence in the United Kingdom and have not found any such office or presence in the United Kingdom.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11th day of April, 2024, at Knoxville, Tennessee.

Joseph R. Oliveri

# Exhibit 1

Whoa! Don't miss out on these exclusive flash sales. ⚡ Find great deals on over 20 top-level domains. Shop now!   EN ⌄   USD ($) ⌄   ✕

    

# Dynadot Service Agreement

## Contents

| | |
|---|---|
| **Part I:** Service Agreement | **Part V:** Marketplace Network Partners |
| **Part II:** Privacy Policy | **Part VI:** Community Policy |
| **Part III:** Dynadot Market | **Appendix A:** Additional TLD Rules |
| **Part IV:** Email, Hosting & SSL Services | **Exhibit 01:** Donuts TLDs |

## TERMS OF USE

**Version date:** 2023-09-18

This agreement ("Agreement") is between Dynadot Inc, a Californian general stock corporation, and its affiliates, (collectively, "Dynadot") and you ("You"). WHEREAS, Dynadot provides registrar services and other services related to the domain name industry and to the internet ("Services") and manages this website and the Dynadot downloadable application ("App"), and You wish to review this website and/or App and/or utilize the Services. NOW THEREFORE, in consideration of the terms and conditions set out herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

**1  ACCEPTANCE OF AGREEMENT**

1.1   You agree to the terms and conditions outlined in this Agreement, including to the terms and conditions enumerated in the following parts, appendices and exhibits attached to and incorporated by reference to this agreement (each a "Part"):

    a)   Part I: Service Agreement
    b)   Part II: Privacy Policy
    c)   Part III: Dynadot Market
    d)   Part IV: Email, Hosting & SSL Services
    e)   Part V: Marketplace Network Partners
    f)   Part VI: Community Policy
    g)   Appendix A: Additional TLD Rules
    h)   Appendix B: TLD-Specific Periods

1.2   This Agreement constitutes the entire and only agreement between Dynadot and You, and supersedes all prior or contemporaneous agreements, representations, warranties and understandings with respect to the Services and the subject-matter of this Agreement.

1.3   You agree to review this Agreement prior to reviewing any information on this website or App, obtaining any documents from this website or App or interacting with this website or App.

**ER-76**

1.4   This Agreement may be amended by Dynadot from time to time without specific advance notice to You. The latest Agreement

Case: 24-4624, Document 1-5, Filed 07/29/24, Page 77 of 42

1.4   This Agreement may be amended by Dynadot at any time without notice to You. The latest Agreement will be posted on this website, and you should review the Agreement prior to using this website or App.

1.5   The following third parties shall be deemed the only third-party beneficiaries of this Agreement and shall be entitled to enforce the provisions of this Agreement as if they were parties hereto:

   a)   8648255 CANADA LTD, a Canadian Corporation;

   b)   Each of Your domain names' registry and registry operator; and,

   c)   If Verisign Inc. is the registry or registry operator of Your domain name, Verisign Inc. and its affiliates, and each of their directors, officers, employees, contractors, agents, successors and assigns.

## 2  ACCEPTABLE USE & CONTENT

2.1   The content, organization, gathering, compilation, magnetic translation, digital conversion and other matters related to this website and App are protected under applicable copyrights, trademarks and other proprietary (including but not limited to intellectual property) rights. The copying, redistribution, use or publication by You of any such content or any part of this website or App is strictly prohibited. You do not acquire ownership rights to any content or document obtained through this website or App. The posting of information or materials on this website and App does not constitute a waiver of any right in such information and materials.

2.2   You shall not republish, distribute, assign, sublicense, sell or prepare derivative of any content, form or document provided on this website or App. Unless otherwise stated herein, no part of any content, form or document may be reproduced in any form or incorporated into any information retrieval system, electronic or mechanical.

2.3   This website and App contain links to other websites. Dynadot is not responsible for the content, accuracy, or opinions expressed in such other websites, and such other websites are not investigated, monitored or checked for accuracy or completeness by Dynadot. Inclusion of any linked website does not imply approval or endorsement of the linked website by Dynadot. If You decide to leave this website or App and access a third-party website, You do so at Your own risk.

## 3  GENERAL

3.1   Dynadot reserves the right in its sole discretion to edit or delete any documents, information or other content appearing on this website or App.

3.2   You agree to indemnify, defend and hold harmless Dynadot and its partners, attorneys, directors, employees, agents, staff and affiliates from any liability, loss, claim and expense, including reasonable attorney fees, related to Your violation of this Agreement, use of this website, use of the App and acceptance of the Services.

3.3   Your right to use this website and App is not transferable and any password or right given to You to obtain access is not transferable.

3.4   The Services, the App and this website, including but not limited to information, forms and agreements within, are provided "as is", "as available" and all warranties, express or implied, are disclaimed (including but not limited to the disclaimer of any implied warranties of merchantability and fitness for a particular purpose). This website, the App and the Services may contain bugs, errors, problems or other limitations. Neither Dynadot nor any registry operator (nor any registry) shall have any liability whatsoever for Your use of the website, the App or any Service. In particular, but not as a limitation thereof, neither Dynadot nor any registry operator (nor any registry) shall be liable for any direct, indirect, special, incidental or consequential damages (including damages for loss of business, loss of profits, litigation or the like), whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if advised of the possibility of such damages. The negation of damages set forth above is a fundamental element of the basis of the bargain between Dynadot and You. This website, the App and the Services would not be provided without such limitations. You understand and agree that Dynadot disclaims any loss or liability resulting from: (1) access delays or access interruptions to our web site or any Service; (2) data non-delivery or data mis-delivery; (3) acts of God; (4) the unauthorized use or misuse of Your account or any of the Services; (5) the inadvertent disclosure or theft of Your personal information; (6) errors, omissions, or misstatements in any and all information provided by Dynadot; (7) the deletion of, failure to store, or failure to process or act upon email messages, other mail and other means of communication; (8) the development or interruption of Your website and any Service; (9) errors in connection with the processing of Your application for any Service; (10) the processing of updated information to Your account; (11) the application of Dynadot's or any registry operator's or registry's dispute resolution policy; (12) the loss of registration, processing of, or use of any domain name; (13) the failure to renew the right to use a domain name; (14) the failure of or processing of any transfer request; (15) any corrective action Dynadot may take on Your account or Services provided to You as a result of Your violation of any term of this Agreement; (16) any rejection, cancellation, suspension, interruption, or termination of services provided by registries, registry operators or third party vendors; (17) the submission of proposed registration requests to registry operators or registries, including without limitation, Your ability or inability to obtain a particular domain name; (18) Your use of any hosting, email and website builder Service, spam protection, and any domain name utilizing any Afternic service, Sedo service or Uni Market services; (19) any failure or errors in renewing any Service; (20) service performance (throughput speed) levels; and, (21) any losses or damages related to any cancellation, discontinuation, expiration, or termination of any Service.

3.5   Each form and document should be treated as a guide or starting point and should not be considered a substitute for professional legal analysis. This website and the App are provided and each form, agreement and document is provided with the understanding and agreement that Dynadot is not engaged in rendering legal, accounting or other professional services. If legal or other expert assistance is required, the services of a competent professional should be sought. You assume all

responsibilities and obligations with respect to any decisions or advice made or given as a result of the use of any form, agreement or document and for the selection of a form, agreement or document to achieve Your intended results.

3.6    This Agreement shall be treated as though it were executed and performed in the State of California, San Mateo County, and shall be governed by and construed in accordance with the laws of the State of California (without regard to conflict of law principles). All legal proceedings arising out of or in connection with this Agreement, with anyone's use of this website or App or with anyone's use of the Services shall be brought solely either in the United States District Court for the Northern District of California or in the Superior Court of California, San Mateo County. You expressly submit to the exclusive jurisdiction of said courts and consent to extra-territorial service of process. Each party waives any objection (on the grounds of lack of jurisdiction, forum non conveniens or otherwise) to the exercise of such jurisdiction over it by any such courts. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to the interpretation or enforcement of this Agreement.

3.7    You agree to waive Your rights to a trial by jury (regardless of the source of that right) in any action against Dynadot, including tort claims, arising from this Agreement. If Dynadot prevails in any litigation against You then Dynadot will receive from You all costs and reasonable, actual attorney fees incurred in that litigation.

3.8    Any cause of action related to anyone's use of this website or App (and/or information, forms and agreements, thereon) or Dynadot's Services must be instituted within six months after the cause of action arose or be forever waived and barred.

3.9    Unless otherwise stated herein, nothing herein shall be deemed to create an agency, joint venture, amalgamation, partnership or similar relationship between any parties and no party shall assume any obligation or responsibility on behalf of another party.

3.10    The language in this Agreement shall be interpreted as to its fair meaning and not strictly for or against either party.

3.11    This Agreement, along with all documents and information provided on this website and App, is executed in the English language. To the extent any translation is provided to you, it is provided for convenience purposes only, and in the event of any conflict between the English version and a translated version, the English version will control and prevail.

3.12    Should any part of this Agreement be held invalid or unenforceable, that portion shall be construed consistent with applicable law and the remaining portions shall remain in full force and effect.

3.13    To the extent that anything in or associated with this website or App is in conflict or inconsistent with this Agreement, this Agreement shall take precedence.

3.14    Failure of Dynadot to enforce any provision of this Agreement shall not be deemed a waiver of such provision or of the right to enforce such provision.

3.15    The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein.

## PART I:

# SERVICE AGREEMENT

### 1    APPLICATION

1.1    This Part I (Service Agreement) applies to any person or entity which creates a user account with Dynadot, otherwise has control over a user account with Dynadot, or uses any of the services described herein.

### 2    ACCURACY OF REGISTRATION DATA

2.1    You shall provide to Dynadot accurate and reliable contact details and correct and update them within seven (7) days of any change during the term of a domain name's registration, including:
    a)    Your full name;
    b)    Your postal address;
    c)    Your e-mail address;
    d)    Your voice telephone number;
    e)    Your fax number, if available;
    f)    if you are an organization, association or corporation, the name of an authorized person for contact purposes;
    g)    the names of the primary nameserver and secondary nameserver(s) for the associated domain name;
    h)    the name, postal address, e-mail address, voice telephone number, and (if available) fax number of the technical contact for the associated domain name; and,
    i)    the name, postal address, e-mail address, voice telephone number, and (if available) fax number of the administrative contact for the associated domain name.

2.2    If You, directly or indirectly, willfully provide inaccurate or unreliable information to Dynadot, willfully fail to update information

2.2    If You, directly or indirectly, provide Dynadot with false information, fail to update your accurate information provided to Dynadot within seven (7) days of any change, or fail to respond for over fifteen (15) days to inquiries by Dynadot concerning the accuracy of contact details associated with Your domain name, then such action or inaction, as appropriate, shall constitute a material breach of this Agreement and become a basis for suspension and/or cancellation of the associated domain name registration.

## 3   THIRD PARTIES, LICENSING & RESALE

3.1    Prior to reselling a domain name to a third party:
   a)    You shall notify that third party that the domain name is registered with Dynadot, a domain name registrar accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN");
   b)    You shall notify that third party that You are neither a domain name registrar accredited by ICANN nor an authorized reseller of Dynadot's Services;
   c)    That third party shall furnish You with a written acceptance of this Agreement; and,
   d)    Any agreement between You and that third party shall provide that the terms of this Agreement shall prevail over the terms of the agreement between You and that third party.

3.2    If You license use of a domain name to a third party, then:
   a)    You remain responsible for providing Your own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the domain name; and,
   b)    You shall remain liable for harm caused by the wrongful use of the domain name, unless You disclose the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing You with reasonable evidence of actionable harm.

3.3    You shall provide notices and obtain consents equivalent to those enumerated under Part II (Privacy Policy) from any third-party individual whose personal data You supply to Dynadot.

3.4    You represent that, to the best of Your knowledge and belief, neither Your registration of a domain name nor the manner in which a domain name under Your control is directly or indirectly used shall result in the infringement of the legal rights of any third party.

## 4   DATA PROCESSING & SECURITY

4.1    Dynadot shall not process any personal data collected from You in a way incompatible with the purposes and other limitations about which Dynadot has provided notice to You in accordance with Part II (Privacy Policy).

4.2    You authorize Dynadot to process all account transactions and activities initiated through the use of Your account. You shall pay all fees and assume all liabilities arising from the use of Your account, including but not limited to circumstances these where transactions and/or activities are caused, directly or indirectly, by unauthorized parties.

4.3    You shall forthwith notify Dynadot of any unauthorized use of Your password, Your account, or any other breach of security.

4.4    You shall cooperate with Dynadot's security processes, including but not limited to secret questions and account locking processes, by providing complete, accurate, and truthful information.

4.5    Dynadot may, in its sole and absolute discretion, log off, delete, disable, or deactivate any account that is inactive for an extended period of time.

## 5   FEES

5.1    You shall pay Dynadot the applicable fees set forth in this Agreement and on this website or App at the time of Your purchase, upon receipt of an invoice from Dynadot and by the dates specified in the respective payment plan, as applicable.

5.2    You shall pay Dynadot's fees only in the currency required by Dynadot and only by way of the payment method required by Dynadot.

5.3    Unless otherwise stated herein, Dynadot shall neither refund nor credit any fee or amount paid.

5.4    An additional USD $15 processing fee shall apply to every wire transfer of an amount below USD $500.

5.5    An additional fee may apply to any wire transfer from third-parties intermediaries, including but not limited to banks based outside of the United States of America.

5.6    An additional fee, as stated on this website or App, shall apply for requests to Dynadot to reset the email address associated with Your account.

**ER-79**

5.7    Additional fees may apply for processing of Services by means other than by email or electronically and for responding to and

handing of disputes requiring legal action.

5.8    You may deposit funds in Your account ("Pre-Pay") against which Dynadot shall credit its fees. No Pre-Pay amount is refundable unless otherwise stated herein.

5.9    An additional USD $20 processing fee, or as otherwise stated on this website or App, shall apply to every instance where Your check or other order for the payment of money is returned unpaid for any reason.

5.10   Dynadot may charge its fees against Your credit card or other payment service on Your account.

5.11   In order to use the direct debit functionality of our application, you must open a "Dwolla Account" provided by Dwolla, Inc. and you must accept the Dwolla Terms of Service and Privacy Policy. Any funds held in or transferred through your Dwolla Account are held or transferred by Dwolla's financial institution partners. You must be at least 18 years old to create a Dwolla Account. You authorize us to collect and share with Dwolla your personal information including full name, email address and financial information, and you are responsible for the accuracy and completeness of that data. You understand that you will access and manage your Dwolla Account through our application, and Dwolla account notifications will be sent by us, not Dwolla. We will provide customer support for your Dwolla Account activity.

5.12   A Make Offer Fee shall be refunded only as a credit on Your account. A Make Offer Fee shall only be credited back to Your account if the registrant of the respective domain name or its agent does not respond to You or Your agent within 30 days of You or Your agent placing an offer via Dynadot's Make Offer Service. For the purpose of this section, any response by the registrant or its agent, including but not limited to a response rejecting Your offer or refusing to further communicate with You or Your agent, shall be deemed a response disentitling You from a refund for the Make Offer Fee credit.

## 6   RENEWAL

6.1    Dynadot disclaims all warranties, express or implied, respecting the fee applicable to and the length of the renewal of any Service or portion thereof.

6.2    You shall be solely responsible for maintaining your own records and reminders respecting the expiry of any Service or portion thereof.

6.3    If You opt-in for automatic renewal of a Service but Dynadot is unable to process a transaction, then the automatic renewal shall not occur.

6.4    Every domain name renewal transaction is final, irreversible, non-refundable and ineligible for account credit.

## 7   DISPUTES

7.1    For the adjudication of disputes concerning or arising from use of a domain name, You shall submit, without prejudice to other potentially applicable jurisdictions, to:
   a)    The jurisdiction of the courts of Your domicile; and,
   b)    The jurisdiction of the United States District Court for the Northern District of California.

7.2    Your registration of a domain name shall be subject to suspension, cancellation, or transfer pursuant to:
   a)    Any consensus policy, specification, policy, procedure, program, bylaw and associated amendments issued by ICANN ("ICANN Rule"); and,
   b)    Any Dynadot, registrar or registry procedure not inconsistent with any ICANN Rule concerning (1) the correction of mistakes by Dynadot or the domain name's registry operator in registering the domain name or (2) the resolution of disputes concerning the domain name.

7.3    Unless otherwise stated herein, Dynadot may, in its sole and absolute discretion:
   a)    Refuse to provide or cease providing any Service or portion thereof;
   b)    Refuse to affect any transaction on Your account;
   c)    Delete, suspend, cancel, terminate, or otherwise interrupt any Service and/or Your account where such Service or account is used in connection with a morally objectionable activity, including but not limited to spam, fraud, illegal activity, defamation, slander, harassment, obscenity, profanity, indecency, deceptive practices, tortuous behavior, racism, bigotry, hatred, vulgarity, invasion of privacy, impersonation, intellectual property infringement, trademark infringement, copyright infringement, counterfeiting, piracy, unsolicited bulk e-mailing, phishing, pharming use of botnets, malware, any harm or threat of harm to a third party or to Dynadot, any activity contrary to applicable law and any activity or material deemed objectionable by Dynadot, in its absolute and sole discretion ("Objectionable Use Activity");
   d)    Delete, suspend, cancel, terminate, or otherwise interrupt any Service and/or Your account while investigating whether Your account is used in connection with any Objectionable Use Activity; and,
   e)    Treat any Objectionable Use Activity as a termination of this Agreement and deny any request for account credit and/or refund.

## 8   RESTORATION OF AN EXPIRED DOMAIN

8.1 Any domain name that is not renewed prior to its expiration date shall enter a post-expiration period ("Post-Expiration Period"), during which:

    a) The domain name shall gain the Hold status and its nameserver information changed;

    b) You shall have no right to access or to use the domain name;

    c) You shall have no right to change the registrant information;

    d) You shall have no right to generate any revenue from the domain name's parking services; and,

    e) Dynadot shall provisionally renew the domain name registration on Your behalf in order to preserve Your ability to renew the domain name registration during the Post-Expiration Period, but such provisional renewal shall not entitle You to any rights to the domain name.

8.2 The Post-Expiration Period of a domain name shall be 40 calendar days.If Dynadot, in its absolute and sole discretion, allows You to renew Your domain name during the Post-Expiration Period, then the Post-Expiration Period shall also end on the day when Dynadot accepts Your payment for the domain name's renewal.

8.3 An additional restoration fee shall apply to any domain name renewal submitted in the last 10 calendar days of the Post-Expiration Period.

8.4 Dynadot may auction for sale any domain name that is not renewed within the lesser of the first 30 calendar days of the Post-Expiration Period and such other shorter time period applicable to the respective top-level domain as specified under Appendix B (TLD-Specific Periods).

8.5 Dynadot may transfer any domain name to another registrant if that domain name is not renewed within the Post-Expiration Period.

8.6 You shall have no right to transfer the domain name to another registrant or to another registrar in the last 10 calendar days of the Post-Expiration Period.

8.7 Subsequent to the conclusion of its Post-Expiration Period, a domain name that is neither sold by auction nor renewed shall enter a deletion period ("Deletion Period"), during which the domain name may be flagged for deletion by the respective registry or registry operator. However, there shall be no Deletion Period for any domain (a) that is sold by auction during the Post-Expiration Period or (b) with respect to which the respective registry or registry operator restricts the restoration of domain names.

8.8 The Deletion Period shall be 30 calendar days.If Dynadot, in its absolute and sole discretion, allows You to renew Your domain name during the Deletion Period, then the Deletion Period shall also end on the day when Dynadot accepts Your payment for the domain name's restoration.

8.9 Every domain name restoration transaction is final, irreversible, non-refundable and ineligible for account credit.

8.10 No domain name may be transferred during the 60 calendar days subsequent to the day that it is restored during the Deletion Period.

8.11 Every domain name that is transferred within 45 calendar days of its expiration date shall have its new expiration date reduced by 1 calendar year. Such a transfer shall be final, irreversible, non-refundable and ineligible for account credit despite the loss of the 1 calendar year.

8.12 Notwithstanding anything to the contrary herein, the terms and conditions of the Post-Expiration Period and the Deletion Period of every domain are subject to the policies and requirements of the respective registries and registry operators. These policies and requirements may include, but are not limited to, limitations respecting Your rights and obligations during these periods, changes to the lengths of these periods, and the elimination of one or both of these periods.

## 9 DOMAIN PARKING

9.1 Dynadot shall implement its own parked page ("Default Parked Page") for every new registered domain name until such time that You input nameserver values for the domain name.

9.2 A domain name set to Default Parked Page may contain third-party links and commercial advertising related to the domain name's meaning and to Your competitors.

9.3 The Default Parked Page may contain links to other websites. Dynadot shall not be responsible for the content, accuracy, or opinions expressed in such other websites, and such other websites are not investigated, monitored or checked for accuracy or completeness by Dynadot. Inclusion of any linked website does not imply approval or endorsement of the linked website by Dynadot.

## 10 NEW REGISTRATION DELETION

10.1 You may request that Dynadot delete the registration of a domain name that You registered within the 5 preceding calendar

days or within such other timeframe as specified on this website or App ("Deletion Request").

10.2 Dynadot may not satisfy a Deletion Request:
    a)    Where the Deletion Request is made within 24 hours preceding the stated deadline;
    b)    Where the Deletion Request would cause an excess deletion fee by the respective registry or registry operator;
    c)    Where the Deletion Request is disallowed by the respective registry or registry operator;
    d)    Where you fail to pay Dynadot's fee applicable to the Deletion Request;
    e)    Which Dynadot determines, in its absolute and sole discretion, as an abuse of the Deletion Request service; or,
    f)    For any other reason as determined by Dynadot, in its absolute and sole discretion.

10.3 Subsequent to satisfying a Deletion Request, Dynadot may, in its absolute and sole discretion, provide You with account credit or refund less all Dynadot fees applicable to the Deletion Request.

## 11  TRANSFER OF DOMAIN NAME

11.1 Unless otherwise stated herein, You may request that Dynadot transfer a domain name from another registrar and, where the transfer is between two Dynadot accounts, You may request that Dynadot transfer a domain name from or to another registrant.

11.2 Unless otherwise stated herein, a domain name may not be transferred unless the transferor registrant or its authorized agent provides express authorization for the transfer. Dynadot shall treat the party listed as the Administrative Contact in the RDDS Output of the registrar of the respective domain as the authorized agent for the transferor registrant.

11.3 You expressly appoint Dynadot as Your Designated Agent to approve any Change of Registrant request and to opt out of a 60-day lock.

11.4 Circumstances where a domain name may not be transferred include but are not limited to:
    a)    Where the registrar of the transferor or of the transferee refuses to process the transfer;
    b)    Where the policies of the registry or registry operator of the domain name forbid the transfer;
    c)    Where there is a dispute concerning or arising from the use of the domain name;
    d)    A court order prohibiting the transfer of the domain name;
    e)    Where there is dispute over the identity of the registrant or its agent;
    f)    Where there is evidence suggesting fraud concerning or arising from the use of the domain name;
    g)    During the 60 days immediately subsequent to the restoration of the respective expired domain name;
    h)    Subsequent to the Post-Expiration Period of the respective domain name;
    i)    Where You are in default of any obligation towards Dynadot; and,
    j)    Where the domain name has the Hold status or is locked.

11.5 Dynadot shall not be treated as the registrar of a domain name transferred from a registrar other than Dynadot until Dynadot issues a notice accepting the transfer request.

11.6 Where You are a transferor registrant, neither You nor Your agent(s) shall change any of the contact information of Your account until after the transfer is complete.

11.7 Dynadot disclaims all warranties, express or implied, respecting the expiration date of a domain name immediately subsequent to its transfer. You understand and agree that the length of the registration period of Your domain name immediately subsequent to the transfer of Your domain name is subject to the policies of other registrars and registries.

## 12  DOMAIN PRE-ORDERS

12.1 Where applicable, You may purchase registration rights to a domain name offered through the respective registry's or registry operator's back-order service or sunrise period service ("Pre-Order").

12.2 All Pre-Orders shall be subject to the applicable terms and conditions of the registry and the registry operator, including but not limited to:
    a)    Sunrise application, registration and dispute resolution policies;
    b)    Your obligation to ensure that a sunrise application or sunrise registration contains true, accurate and up to date information, and is made in good faith, for a lawful purpose and does not infringe the rights of any third party; and,
    c)    Data collection and processing policies.

12.3 Dynadot may, in its absolute and sole discretion, process Your Pre-Order through Dynadot's backorders service. Any Pre-Order processed through Dynadot's backorders service shall be subject to the terms and conditions applicable to Backorders under Part III (Dynadot Market).

12.4 Dynadot disclaims all warranties, express or implied, respecting the availability of any domain name for a Pre-Order purchase.

12.5 Any Pre-Order purchase may be reversed by Dynadot, **ER-82** and absolute discretion. Dynadot shall provide You with

(83 of 121), Page 83 of 121 Case: 24-4624, 09/06/2024, DktEntry: 3.2, Page 83 of 121
Case 2:23-cv-38087 Document 16 Filed 04/17/24 Page 13 of 42
account credited up to the Pre-Order purchase price where Dynadot reverses the Pre-Order.

## 13   APPLICATION PROGRAMMING INTERFACE

13.1   You shall not, and shall not permit any third party to:

    a)    reverse engineer or otherwise attempt to discover the source code of or trade secrets embodied in Dynadot's application programming interface ("API") or any portion thereof;

    b)    distribute, transfer, grant sublicenses to, or otherwise make available the API (or any portion thereof, or any data derived out of its use) to third parties;

    c)    embed or incorporate in any manner the API (or any element thereof, or any data derived out of its use) into other applications or third parties;

    d)    create modifications to or derivative works of the API;

    e)    reproduce the API;

    f)    attempt or permit any third party to attempt to modify, alter, or circumvent the license control and protection mechanisms within the API;

    g)    use or transmit the API in violation of any applicable law, rule or regulation, including any export/import laws;

    h)    use or transmit the API in a manner that causes or contributes to, directly or indirectly, the degradation of the API service, this website or App or in a manner determined by Dynadot, in its absolute and sole discretion, as abusive of the API service; or,

    i)    in any way access, use, or copy any portion of the API code (including the logic and/or architecture thereof and any trade secrets included therein) to directly or indirectly develop, promote, distribute, sell or support any product or service that is competitive with the API.

13.2   Dynadot shall retain all ownership rights in and to the API, its associated marks, functionality, documentation, deliverables, support services, updates, upgrades, other derivative works of the API and all intellectual property rights incorporated into or related to the foregoing. All rights not expressly licensed by Dynadot under this Agreement are reserved.

## 14   ACCOUNT LOCK FEATURE

14.1   You may request Dynadot to enable on Your account enhanced security features ("Account Lock Feature") intended to assist You with preventing the theft or hijacking of Your account and Your domain name(s).

14.2   To enable Account Lock Feature:

    a)    You shall provide Dynadot, at Your sole expense, with the number of Your mobile telephone device;

    b)    Your mobile telephone device must be capable of text messaging;

    c)    You shall verify Your mobile telephone device as required by Dynadot; and,

    d)    You shall pay Dynadot's fees applicable to the verification process.

14.3   To disable Account Lock Feature, You shall follow the verification process required by Dynadot.

14.4   You shall be solely responsible for any third-party fees arising out of Your verification of Your mobile telephone device.

## 15   TLD-SPECIFIC RULES

15.1   You understand and agree that any Service may be, wholly or partially, limited by the policies of the registry and the registry operator of the respective domain name.

15.2   Subject to section 15.3 below, if You register or gain control of, directly or indirectly, a domain name of a top-level domain listed under Appendix A (Additional TLD Rules), then You agree to the additional terms and conditions applicable to a registrant of the respective top-level domain as specified under Appendix A (Additional TLD Rules) and all applicable exhibits, as well as all other terms, conditions, operational standards, policies, procedures and practices of the respective registry and registry operator.

15.3   Notwithstanding anything to the contrary herein, none of the additional terms and conditions referred to under section 15.2 above shall be deemed legally binding on Dynadot or create any obligation on behalf of Dynadot. This clause shall survive the termination of this Agreement.

15.4   If You register or gain control of, directly or indirectly, a domain name of a .CA top-level domain, then You acknowledge and agree that the registrar of the respective domain shall be deemed to be 8648255 Canada Ltd., a Canadian corporation certified to act as a registrar of the .CA registry in accordance with its registrar agreement with the Canadian Internet Registration Authority.

15.5   You shall, within thirty days of demand from the respective party, indemnify, defend and hold harmless the respective registry and registry operator of a domain name, as well as their respective affiliates, subsidiaries, owners, directors, managers, officers, employees, contractors, service providers and agents, from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable legal fees and expenses and including on appeal) arising out of or relating in any way to:

    a)    Your domain name registration, including, without limitation, the use, registration, extension, renewal, deletion, and/or transfer thereof and/or the violation of any applicable terms or conditions governing the registration; and,

    b)    Your use of a second level domain.

15.6 You understand and agree that, where required by the respective registry or registry operator:

    a)  the registration fee of a domain name shall be subject to the variable pricing applicable to the registry operator's standard domain names and premium domain names;

    b)  the renewal fee of a domain name may differ from the renewal fee of other domain names in the same or other category of top-level domains; and,

    c)  the registry and the registry operator may periodically conduct technical analysis to assess whether Your domain name is used to perpetrate security threats, such as pharming, phishing, malware, and botnets.

15.7 You understand and agree that the registry or the registry operator of a domain name may, but is not obligated to, reject the registration of the respective domain name, delete, revoke, suspend, reject, cancel or transfer Your domain name and Your Pre-Order and place Your domain name on registry lock, hold or similar status, in its absolute and sole discretion, for any of the following reasons:

    a)  to enforce registry policies, ICANN Rules and other polices adopted by any industry group generally recognized as authoritative with respect to the integrity and stability of the internet;

    b)  where the respective domain's registration or Pre-Order was not accompanied by complete and accurate information, or where required information is not updated or corrected in accordance with registry policies or ICANN Rules;

    c)  to protect the integrity and stability of the registry operator's and registry's operations;

    d)  to comply with applicable laws, regulations, policies or any holding, order, or decision by a competent court, administrative authority or dispute resolution service provider;

    e)  to establish, assert, or defend the legal rights of the registry, registry operator or a third party, or to avoid any actual or potential civil or criminal liability on the part of or damage to the registry operator or its affiliates, subsidiaries, contracted parties, officers, directors, representatives, employees, contractors, and stockholders;

    f)  to correct mistakes made by the registry operator, the registry or any registrar in connection with the respective registration or Pre-Order;

    g)  with respect to a Pre-Order, where the registry operator or registry receives notice that the respective signed mark data file is under dispute; and,

    h)  as otherwise provided in this Agreement and the agreement between Dynadot and the respective registry or registry operator.

## PART II:

## PRIVACY POLICY

Protecting our customers' privacy and personal information is of paramount importance and fundamental to the way Dynadot does business.

### 1  APPLICATION

1.1 This Part II (Privacy Policy) applies to any person who accepts services from Dynadot, visits this website or App, or provides Dynadot with personal information. The terms herein may change from time to time, so you should review them for changes periodically.

### 2  DATA PROTECTION OFFICER

2.1 For the purpose of this Part II (Privacy Policy), the contact information for Dynadot's data protection officer is:
Data Protection Officer
DataProtectionOfficer@dynadot.com
1-866-262-3399

### 3  IDENTIFYING PURPOSE

3.1 Dynadot identifies the reasons for processing personal data before or at the time of collection. Unless required by law, Dynadot does not use or disclose, for any new purpose, personal data that has been processed without first identifying and documenting the purpose and obtaining Your consent.

3.2 Dynadot may process the following information about You ("Processed Information"): registration data about the registered name holder, Google referral sources, page visits, address, name, password, phone number, IP address, domain searches and associated TLD rankings, single sign-on (Open ID), forum views and posts, chats, account creation, order placement, form submissions, how you heard about us, payment information, call start and duration, referring page, referral landing page, birthdate, and security questions and answers. If You use the App, Processed Information shall include partial geographic location information, ID of Your device, phone camera permissions and mobile phone photo gallery permissions.

3.3 The purposes for processing Processed Information include, but are not limited to: troubleshooting errors, abuse detection, targeted marketing, localizing data, site and usage statistics, communication with You, account creation, collection of registration data, provisioning of Services, provisioning of Services via the App, compliance with ICANN requirements, transfer of registration data to registry, registry operator, registry operator back-end service, data escrow agent, ICANN contractual compliance, emergency back-end registry operator, public RDDS/WHOIS, transfer of payment data to payment processor and address verifier, ACH Payments Provider, transfer of phone number to text message processor, disclosure of

non-public RDDS/WHOIS to third parties, ICANN and registry data retention requirements, to comply with applicable laws, regulations, policies or any holding, order, or decision by a competent court, administrative authority or dispute resolution service provider, and to establish, assert, or defend our legal rights, to avoid any actual or potential civil or criminal liability on our part and our affiliates, subsidiaries, contracted parties, officers, directors, representatives, employees, contractors, and stockholders.

3.4   You understand and agree that the processing of Processed Information is required for the provisioning of Services and for compliance with ICANN and registry requirements.

## 4   RIGHTS TO ACCESS, RECTIFICATION & PROCESSING RESTRICTION

4.1   You may request and obtain from Dynadot's data protection officer confirmation as to whether or not personal data concerning You is being processed by Dynadot and, where that is the case, the following:

    a)   access to the personal data;

    b)   the purposes of the processing;

    c)   the categories of personal data concerned;

    d)   the recipients or categories of recipient to whom the personal data have been or will be disclosed;

    e)   where possible, the envisaged period for which the personal data will be stored, or, if not possible, the criteria used to determine that period;

    f)   where the personal data are not collected from You, any information available to Dynadot as to their source;

    g)   where personal data are transferred to a third country or to an international organisation, information respecting safeguards relating to the transfer; and,

    h)   the existence of any automated decision-making, profiling, meaningful information about the logic involved and the significance and the envisaged consequences of such processing for You.

4.2   You may request Dynadot's data protection officer to restrict the processing of or to rectify personal data concerning You. Dynadot may refrain from complying with any portion of such request where such compliance would undermine Dynadot's ability to establish, exercise or defend legal claims or conflict with Dynadot's reasonable grounds for processing which override Your interests, rights and freedoms.

4.3   You may lodge a complaint about Dynadot's performance under this Part II (Privacy Policy) with a supervisory authority of a member state of the European Union.

4.4   Notwithstanding anything to the contrary herein, Dynadot may refrain from complying with any requirements of this Section 4 (Rights to Access, Rectification & Processing Restriction) where Dynadot is unable to reasonably determine Your identity.

4.5   Dynadot may refrain from complying with any successive access request(s) under this Section 4 (Rights to Access, Rectification & Processing Restriction) until You pay Dynadot's reasonable fee(s) for same.

## 5   RIGHT TO PORTABILITY

5.1   Any information furnished by Dynadot in response to a request under this Part II (Privacy Policy) shall be in a structured, commonly used and machine-readable format.

5.2   You may request Dynadot to transmit any information furnished by Dynadot in response to a request under this Part II (Privacy Policy) to a third-party.

## 6   RIGHT TO ERASURE

6.1   Dynadot shall maintain reasonable controls and practices for retention and erasure of personal data that is no longer necessary or relevant for the identified purposes or required by law to be retained.

6.2   You may request Dynadot's data protection officer to erase personal data concerning You. Dynadot shall comply with such a request where:

    a)   the personal data is no longer necessary in relation to the purposes for which it was collected or otherwise processed;

    b)   You withdraw consent on which the processing is based and where there is no other legal ground for the processing;

    c)   You object to the processing and there are no overriding legitimate grounds for the processing;

    d)   the personal data have been unlawfully processed; or,

    e)   the personal data have been collected in relation to the offer of information society services to a child.

6.3   Notwithstanding anything to the contrary herein, Dynadot may refrain from complying with any requirements of this Section 6 (Right to Erasure) where such compliance:

    a)   undermines Dynadot's ability to establish, exercise or defend legal claims;

    b)   conflicts with Dynadot's reasonable grounds for processing which override Your interests, rights and freedoms;

    c)   undermines an individual's right of freedom of expression and information;

    d)   undermines archiving in the public interest, statistical purposes, or for scientific or historical research; or,

    e)   undermines Dynadot's compliance with a legal obligation.

## 7  SAFEGUARDS

7.1   Dynadot shall protect personal data against such risks as loss, misuse, unauthorized access or disclosure, alteration, or destruction through appropriate security measures. Dynadot shall protect the information regardless of the format in which it is held.

## PART III:

# DYNADOT MARKET

## 1  APPLICATION

1.1   This Part III (Dynadot Market) applies to any person or entity which accesses, uses or seeks to access or use Dynadot's market ("Dynadot Market").

## 2  GENERAL

2.1   No part of the Dynadot Market shall be accessible to You unless You register a user account with Dynadot.

2.2   Notwithstanding anything to the contrary herein, at no time shall Dynadot be deemed as an auctioneer or an escrow agent.

## 3  MARKETPLACE DOMAINS

3.1   Neither You nor Your agent shall advertise a domain name with an unexpired registration date for sale at a fixed price ("Marketplace Domain") on the Dynadot Market unless:
   a)   You own the Marketplace Domain;
   b)   You are entitled to sell the Marketplace Domain;
   c)   The sale of the Marketplace Domain does not infringe on any other party's intellectual property rights, trademark or copyright;
   d)   The transfer of the Marketplace Domain does not violate any other term of this Agreement; and,
   e)   The Marketplace Domain is not and will not become, in the reasonably foreseeable future, as determined by Dynadot in its sole and absolute discretion, related to a dispute regulated by an ICANN Rule or to any Objectionable Use Activity.

3.2   A Marketplace Domain shall be transferred to a buyer's account only after Dynadot receives payment for the full amount of the fixed price.

3.3   No Marketplace Domain may be transferred to another account or to another registrar during:
   a)   where the respective buyer's purchase is not subject to an instalment payment plan, the 30 calendar days subsequent to the day that the Marketplace Domain is transferred to a buyer following the Marketplace Domain's sale on the Dynadot Market; or,
   b)   where the respective buyer's purchase is subject to an instalment payment, the 30 calendar days subsequent to the final payment under the respective payment plan; and,
   the respective domain name shall gain a buy-lock status during this period.

3.4   If You sell a Marketplace Domain on the Dynadot Market and the respective buyer's purchase is not subject to an instalment payment plan, then Your account shall be credited, within 10 business days, an amount equal to the price at which the respective Marketplace Domain sold less a percentage equal to Dynadot's commission fee, as specified elsewhere on this website or App.

3.5   If You sell a Marketplace Domain on the Dynadot Market and the respective buyer's purchase is subject to an instalment payment plan, then Your account shall be credited, within 10 business days of each date when the buyer makes a payment under the payment plan, an amount equal to the buyer's respective payment under the payment plan, except the first such payment under the respective payment plan which shall instead equal to the amount of the buyer's first payment under the respective payment plan less a percentage equal to Dynadot's commission fee, as specified elsewhere on this website or App, applicable to the price at which the respective Marketplace Domain sold.

3.6   If Dynadot determines, in its sole and absolute discretion, that You breached any term of this Agreement, that Your account was used in connection with any Objectionable Use Activity or that the sale of a Marketplace Domain on the Dynadot Market is connected with any Objectionable Use Activity, then Dynadot may, in its sole and absolute discretion and without liability to You, Your agents or to any third party:
   a)   delete, suspend, cancel or otherwise reverse any sale on the Dynadot Market;
   b)   delete, suspend, cancel or otherwise reverse any credit and payment issued in connection with a sale on the Dynadot Market; and,
   c)   transfer any domain name previously transferred in connection with a sale on the Dynadot Market, including but not limited to transferring the domain name to the respective seller's account or to a separate holding account.

3.7   Subject to the terms of this Agreement and notwithstanding anything to the contrary communicated by the seller of a Marketplace Domain, the sale of a Marketplace Domain on the Dynadot Market shall only grant the buyer control and

ER-86

possession of the respective domain name.

3.8    The transfer of a Marketplace Domain consequent to its sale on the Dynadot Market shall not extend the expiration date of the domain name.

3.9    Subject to section 3.11 below, no Marketplace Domain sold subject to an instalment payment plan and transferred to the respective buyer's account may be transferred to another account or to another registrar until all payments under the respective payment plan are made by the buyer. The respective domain name shall gain a buy-lock status during this period.

3.10   A Marketplace Domain sold subject to an instalment payment plan shall gain a Hold status and have its nameservers disabled 3 calendar days after the buyer fails to make a scheduled payment under the respective payment plan. The respective Hold status shall be removed and the nameservers reactivated if the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date.

3.11   A Marketplace Domain sold subject to an instalment payment plan shall be transferred back to the respective seller 14 calendar days after the buyer fails to make a scheduled payment under the respective payment plan unless the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date. No payment made by the buyer under the respective plan shall be refundable despite the return of the respective domain name to the seller.

## 4   EXPIRED DOMAINS

4.1    A domain name with an expired registration date ("Expired Domain Name") advertised for sale on the Dynadot Market shall not be deemed sold and will not be transferred to the winning bidder unless:
   a)   The Expired Domain Name is not renewed by the respective former registrant;
   b)   The Expired Domain Name is not transferred to another account;
   c)   Where the Expired Domain Name is sold free of an instalment payment plan, Dynadot receives payment for the full amount of the bid within the specified time period; and,
   d)   Where the Expired Domain Name is sold subject to an instalment payment plan, Dynadot receives payment for the full amount of the first scheduled payment under the respective payment plan within the specified time period.

4.2    With respect to an Expired Domain Name that is sold free of an instalment payment plan, if You paid Dynadot for Your winning bid and the Expired Domain Name is renewed by its former registrant, Dynadot shall either credit your account for an amount equal to Your winning bid or, at Dynadot's sole and absolute discretion, refund You for an amount equal to Your winning bid.

4.3    With respect to an Expired Domain Name that is sold subject to an instalment payment plan, if You paid Dynadot for the first scheduled payment under the respective payment plan and the Expired Domain Name is renewed by its former registrant, Dynadot shall either credit your account for an amount equal to this payment or, at Dynadot's sole and absolute discretion, refund You for an amount equal to this payment.

4.4    A bid for an Expired Domain Name for an amount in excess of the total of the respective current bid and the minimum bid increment shall become a proxy bid ("Proxy Bid").

4.5    If Your bid is the winning bid at the end of the bidding period, You shall pay Dynadot an amount equal to Your winning bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) within the lesser of 48 hours of the end of the bidding period and such other time period as required by Dynadot. If Dynadot does not receive payment from the winning bidder within the time period required under this section, then the bidder of the second highest bid may become the winning bidder and may pay Dynadot an amount equal to this second highest bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan applicable to the second bid) within the lesser of the subsequent 24 hours and such other time period as required by Dynadot.

4.6    No Expired Domain Name may be transferred to another account or to another registrar during:
   a)   where the respective buyer's purchase is not subject to an instalment payment plan, the 15 calendar days subsequent to the day that the Expired Domain Name is transferred to a buyer following the Expired Domain Name's sale on the Dynadot Market; or,
   b)   where the respective buyer's purchase is subject to an instalment payment plan, the 15 calendar days subsequent to the final payment under the respective payment plan; and,
   the respective domain name shall gain an auction-lock status during this period.

4.7    If a bid for an Expired Domain Name is posted within the last 5 minutes of the end of its bidding period, then the end of its bidding period shall be extended by 5 minutes.

4.8    Subject to section 4.10 below, no Expired Domain Name sold subject to an instalment payment plan and transferred to the respective buyer's account may be transferred to another account or to another registrar until all payments under the respective payment plan are made by the buyer. The respective domain name shall gain a buy-lock status during this period.

4.9    An Expired Domain Name sold subject to an instalment payment plan shall gain a Hold status and have its nameservers disabled 3 calendar days after the buyer fails to make a scheduled payment under the respective payment plan. The respective Hold status shall be removed and the nameservers reactivated if the buyer cures the payment default prior to the

14th calendar day after the scheduled payment date.

4.10 An Expired Domain Name sold subject to an instalment payment plan shall be transferred out of the respective buyer's account 14 calendar days after the buyer fails to make a scheduled payment under the respective payment plan unless the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date. No payment made by the buyer under the respective plan shall be refundable despite the removal of the respective domain name from the buyer's account.

## 5   BACKORDERS

5.1   Dynadot shall not complete an order to obtain registration rights for a domain name subsequent to its release by the respective registry ("Backorder") where:
   a)   More than 1 order for the respective domain name is placed; or.
   b)   Dynadot is unable to obtain the registration rights for the respective domain name for any reason whatsoever.

5.2   Dynadot disclaims all warranties, express or implied, respecting the availability of any domain name for a Backorder purchase.

5.3   You shall pay Dynadot's fee for Your Backorder (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) no later than 48 hours commencing from the date of the respective domain name's registration date.

5.4   If more than 1 Backorder is placed for the same domain name and Dynadot was able to obtain the registration rights for the respective domain name, then the domain name shall be auctioned for sale ("Backorder Auction").

5.5   A domain name subject to a Backorder Auction shall not be deemed sold and will not be transferred to the winning bidder unless Dynadot receives payment for the full amount of the bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) within the specified time period.

5.6   A bid for a domain name subject to a Backorder Auction for an amount in excess of the total of the respective current bid and the minimum bid increment shall become a proxy bid ("Proxy Bid").

5.7   If Your bid is the winning bid at the end of the bidding period, You shall pay Dynadot an amount equal to Your winning bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) within the lesser of 48 hours of the end of the bidding period and such other time period as required by Dynadot. If Dynadot does not receive payment from the winning bidder within the time period required under this section, then the bidder of the second highest bid may become the winning bidder and may pay Dynadot an amount equal to this second highest bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan applicable to the second bid) within the lesser of the subsequent 24 hours and such other time period as required by Dynadot.

5.8   If a bid for a Backorder Auction is posted within the last 5 minutes of the end of its bidding period, then the end of its bidding period shall be extended by 5 minutes.

5.9   Subject to section 5.11 below, no domain name subject to a Backorder Auction and sold subject to an instalment payment plan and transferred to the respective buyer's account may be transferred to another account or to another registrar until all payments under the respective payment plan are made by the buyer. The respective domain name shall gain a buy-lock status during this period.

5.10   A domain name subject to a Backorder Auction and sold subject to an instalment payment plan shall gain a Hold status and have its nameservers disabled 3 calendar days after the buyer fails to make a scheduled payment under the respective payment plan. The respective Hold status shall be removed and the nameservers reactivated if the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date.

5.11   A domain name subject to a Backorder Auction and sold subject to an instalment payment plan shall be transferred out of the respective buyer's account 14 calendar days after the buyer fails to make a scheduled payment under the respective payment plan unless the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date. No payment made by the buyer under the respective plan shall be refundable despite the removal of the respective domain name from the buyer's account.

## 6   USER AUCTIONS

6.1   Neither You nor Your agent shall advertise a domain name with an unexpired registration date for sale on the user auctions page ("User Auction Domain") of the Dynadot Market unless:
   a)   You own the User Auction Domain;
   b)   You are entitled to sell the User Auction Domain;
   c)   The sale of the User Auction Domain does not infringe on any other party's intellectual property rights, trademark or copyright; **ER-88**
   d)   The transfer of the User Auction Domain does not violate any other term of this Agreement; and

d)

e)   The User Auction Domain is not and will not become, in the reasonably foreseeable future, as determined by Dynadot in its sole and absolute discretion, related to a dispute regulated by an ICANN Rule or to any Objectionable Use Activity.

6.2   Neither You nor Your agent may:
   a)   Rescind, delete, suspend, cancel, terminate, or otherwise interrupt the auction of a User Auction Domain, except that You may terminate the auction of a User Auction Domain if no bids have been placed on the respective User Auction Domain;
   b)   Unless otherwise stated herein, transfer a domain name subject to a User Auction Domain to another account, registrant or registrar; and,
   c)   Delete a domain name subject to a User Auction Domain.

6.3   A User Auction Domain shall be transferred to a buyer's account only after Dynadot receives payment for the full amount of the winning bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan).

6.4   No User Auction Domain may be transferred to another account or to another registrar during:
   a)   where the respective buyer's purchase is not subject to an instalment payment plan, the 30 calendar days subsequent to the day that the respective domain name is transferred to a buyer following the domain name's sale on the Dynadot Market; or,
   b)   where the respective buyer's purchase is subject to an instalment payment plan, the 30 calendar days subsequent to the final payment under the respective payment plan; and,
   the respective domain name shall gain a buy-lock status during this period.

6.5   If You sell a User Auction Domain on the Dynadot Market and the respective buyer's purchase is not subject to an instalment payment plan, Your account shall be credited, within 10 business days, an amount equal to the winning bed less a percentage equal to Dynadot's commission fee, as specified elsewhere on this website or App.

6.6   If You sell a User Auction Domain on the Dynadot Market and the respective buyer's purchase is subject to an instalment payment plan, then Your account shall be credited, within 10 business days of each date when the buyer makes a payment under the payment plan, an amount equal to the buyer's respective payment under the payment plan, except the first such payment under the respective payment plan which shall instead equal to the amount of the buyer's first payment under the respective payment plan less a percentage equal to Dynadot's commission fee, as specified elsewhere on this website or App, applicable to the price at which the respective User Auction Domain sold.

6.7   If Dynadot determines, in its sole and absolute discretion, that You breached any term of this Agreement, that Your account was used in connection with any Objectionable Use Activity or that the sale of a User Auction Domain on the Dynadot Market is connected with any Objectionable Use Activity, then Dynadot may, in its sole and absolute discretion and without liability to You, Your agents or to any third party:
   a)   delete, suspend, cancel or otherwise reverse any sale on the Dynadot Market;
   b)   delete, suspend, cancel or otherwise reverse any credit and payment issued in connection with a sale on the Dynadot Market; and,
   c)   transfer any domain name previously transferred in connection with a sale on the Dynadot Market, including but not limited to transferring the domain name to the respective seller's account or to a separate holding account.

6.8   Subject to the terms of this Agreement and notwithstanding anything to the contrary communicated by the seller of a User Auction Domain, the sale of a User Auction Domain on the Dynadot Market shall not grant the buyer rights to anything except control and possession of the respective domain name.

6.9   The transfer of a User Auction Domain consequent to its sale on the Dynadot Market shall not extend the expiration date of the domain name.

6.10   A bid for a User Auction Domain for an amount in excess of the total of the respective current bid and minimum bid increment shall become a proxy bid ("Proxy Bid").

6.11   If Your bid is the winning bid at the end of the bidding period, You shall pay Dynadot an amount equal to Your winning bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) within 72 hours of the end of the bidding period.

6.12   If a bid for a User Auction Domain is posted within the last 5 minutes of the end of its bidding period, then the end of its bidding period shall be extended by 5 minutes.

6.13   Subject to section 6.15 below, no User Auction Domain sold subject to an instalment payment plan and transferred to the respective buyer's account may be transferred to another account or to another registrar until all payments under the respective payment plan are made by the buyer. The respective domain name shall gain a buy-lock status during this period.

6.14   A User Auction Domain sold subject to an instalment payment plan shall gain a Hold status and have its nameservers disabled 3 calendar days after the buyer fails to make a scheduled payment under the respective payment plan. The respective Hold

status shall be removed and the nameservers reactivated if the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date.

6.15   A User Auction Domain sold subject to an instalment payment plan shall be transferred back to the respective seller 14 calendar days after the buyer fails to make a scheduled payment under the respective payment plan unless the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date. No payment made by the buyer under the respective plan shall be refundable despite the return of the respective domain name to the seller.

## 7   LAST CHANCE AUCTIONS

7.1   A domain name relisted for sale on the Dynadot Market subsequent to its rescinded sale on the Dynadot Market ("Last Chance Domain") shall not be deemed sold and will not be transferred to the winning bidder unless:
   a)   The Last Chance Domain is not transferred to another account.
   b)   Where the Last Chance Domain Name is sold free of an instalment payment plan, Dynadot receives payment for the full amount of the bid within the specified time period; and,
   c)   Where the Last Chance Domain is sold subject to an instalment payment plan, Dynadot receives payment for the full amount of the first scheduled payment under the respective payment plan within the specified time period.

7.2   With respect to a Last Chance Domain that is sold free of an instalment payment plan, if You paid Dynadot for Your winning bid and the Last Chance Domain is renewed by its former registrant, Dynadot shall either credit your account for an amount equal to Your winning bid or, at Dynadot's sole and absolute discretion, refund You for an amount equal to Your winning bid.

7.3   With respect to a Last Chance Domain that is sold subject to an instalment payment plan, if You paid Dynadot for the first scheduled payment under the respective payment plan and the Last Chance Domain is renewed by its former registrant, Dynadot shall either credit your account for an amount equal to this payment or, at Dynadot's sole and absolute discretion, refund You for an amount equal to this payment.

7.4   The transfer of a Last Chance Domain consequent to its sale on the Dynadot Market shall not extend the expiration date of the domain name.

7.5   A bid for a Last Chance Domain for an amount in excess of the total of the respective current bid and the minimum bid increment shall become a proxy bid ("Proxy Bid").

7.6   If Your bid is the winning bid at the end of the bidding period, You shall pay Dynadot an amount equal to Your winning bid (or, where the sale is subject to an instalment payment plan, an amount equal to the first scheduled payment under the respective payment plan) within 72 hours of the end of the bidding period.

7.7   No Last Chance Domain may be transferred to another account or to another registrar during:
   a)   where the respective buyer's purchase is not subject to an instalment payment plan, the 15 calendar days subsequent to the day that the Last Chance Domain is transferred to a buyer following the Last Chance Domain's sale on the Dynadot Market; or,
   b)   where the respective buyer's purchase is subject to an instalment payment plan, the 15 calendar days subsequent to the final payment under the respective payment plan; and,
   the respective domain name shall gain an auction-lock status during this period.

7.8   If a bid for a Last Chance Domain is posted within the last 5 minutes of the end of its bidding period, then the end of its bidding period shall be extended by 5 minutes.

7.9   Subject to section 7.11 below, no Last Chance Domain sold subject to an instalment payment plan and transferred to the respective buyer's account may be transferred to another account or to another registrar until all payments under the respective payment plan are made by the buyer. The respective domain name shall gain a buy-lock status during this period.

7.10   A Last Chance Domain sold subject to an instalment payment plan shall gain a Hold status and have its nameservers disabled 3 calendar days after the buyer fails to make a scheduled payment under the respective payment plan. The respective Hold status shall be removed and the nameservers reactivated if the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date.

7.11   A Last Chance Domain sold subject to an instalment payment plan shall be transferred out of the respective buyer's account 14 calendar days after the buyer fails to make a scheduled payment under the respective payment plan unless the buyer cures the payment default prior to the 14th calendar day after the scheduled payment date. No payment made by the buyer under the respective plan shall be refundable despite the removal of the respective domain name from the buyer's account.

## 8   REGISTRY EXPIRED DOMAINS

8.1   A domain name advertised for sale on the Dynadot Market by its registry or registry operator ("Registry Domain Name") shall not be deemed sold and will not be transferred to the winning bidder unless Dynadot receives payment for the full amount of the bid within the specified time period.

**ER-90**

8.2    A bid for a Registry Domain Name of an amount in excess of the total of the respective current bid and the minimum bid increment shall become a proxy bid ("Proxy Bid").

8.3    No Registry Domain Name may be transferred to another account or to another registrar during the 15 calendar days subsequent to the day that the Registry Domain Name is transferred to a buyer following the Registry Domain Name's sale on the Dynadot Market. The respective domain name shall gain an auction-lock status during this period.

8.4    If a bid for a Registry Domain Name is posted within the last hour of the end of its bidding period, then the end of its bidding period shall be extended by one hour.

8.5    Notwithstanding anything to the contrary herein, the terms and conditions applicable to Registry Domain Names are subject to the policies and requirements of the respective registries and registry operators, including but not limited to fees applicable to the placement of bids. These policies and requirements may include, but are not limited to, limitations respecting Your rights and obligations during these periods, changes to the lengths of these periods, and the elimination of one or both of these periods.

## 9  PROXY BIDDING

9.1    If a bidder submits a Proxy Bid for a domain name whose current bid exceeds or equals all preceding Proxy Bids, then the Dynadot Market shall post that the bidder submitted a bid equal to the current bid plus the respective minimum bid increment.

9.2    If a bidder for a domain name submits a bid for an amount less than another bidder's respective Proxy Bid, then the Dynadot Market shall post the bid and subsequently post a bid for an amount equal to this bid plus the respective minimum bid increment, causing the bidder of the Proxy Bid to remain the current high bidder.

9.3    A bid for a domain name that equals another bidder's preceding Proxy Bid shall cause the other bidder's Proxy Bid to become the current bid.

9.4    A Proxy Bid may not be rescinded, and the amount of a Proxy Bid may not be reduced.

## PART IV:

# EMAIL, HOSTING & SSL SERVICES

## 1  APPLICATION

1.1    This Part IV (Email, Hosting & SSL Services) applies to any person or entity which accesses, uses or seeks to access or use Dynadot's email hosting service ("Email Hosting"), advanced web hosting service ("Advanced Web Hosting"), site builder hosting service ("Site Builder Hosting"), VPS web hosting service ("VPS Web Hosting"), secure sockets layer certificates service ("SSL Services") or the single-page website hosting service ("Free One Page Hosting").

1.2    Dynadot shall not be responsible for any maintenance, changes, modifications, HTML coding, scripting, or programming of any of Your websites.

1.3    Dynadot shall determine, in its absolute and sole discretion, the IP numbers, IP addresses and servers applicable to Your use of Email Hosting, Advanced Web Hosting, Site Builder Hosting, VPS Web Hosting, SSL Services and Free One Page Hosting. Dynadot may, in its absolute and sole discretion, change or remove any and all IP numbers, IP addresses and servers applicable to Your use of Email Hosting, Advanced Web Hosting, Site Builder Hosting, VPS Web Hosting, SSL Services and Free One Page Hosting.

## 2  INELIGIBILITY

2.1    Email Hosting, Advanced Web Hosting, Site Builder Hosting, VPS Web Hosting, SSL Services and Free One Page Hosting shall not be available with respect to a domain name:
   a)    During its Post-Expiration Period;
   b)    During its Deletion Period;
   c)    At any time when the domain name's registration period expired or flagged for deletion;
   d)    At any time when the domain name's DNS records direct to any server other than a Dynadot server;
   e)    Subsequent to the domain name's transfer to another registrar or account; and,
   f)    If Dynadot determines, in its sole and absolute discretion, that You breached any term of this Agreement or that Your account was used in connection with any Objectionable Use Activity.

## 3  BANDWIDTH LIMIT

3.1    An additional fee, as stated on this website or App, shall apply if You exceed the storage, megabytes, or bandwidth limitations applicable to Your specific service plan (Email Hosting, Advanced Web Hosting, Site Builder Hosting, VPS Web Hosting, SSL Services and Free One Page Hosting service plans, as applicable).

## 4  NO BACK-UP

4.1 Dynadot shall not be responsible for Your files residing on the servers selected by Dynadot. You are solely responsible for independent back-up of data stored on the servers selected by Dynadot.

## 5 ADVANCED WEB HOSTING

5.1 Subject to section 5.2 below, if You register or gain control of, directly or indirectly, a domain name utilizing Advanced Web Hosting or if Your domain name utilizes Advanced Web Hosting, then You agree to the additional terms and conditions in: https://www.leaseweb.com/sites/default/files/Legal/US_ENG_B2B_LeaseWeb_Policies.pdf.

5.2 Notwithstanding anything to the contrary herein, none of the additional terms and conditions referred to under section 5.1 above shall be deemed legally binding on Dynadot or create any obligation on behalf of Dynadot. This clause shall survive the termination of this Agreement.

## 6 SSL Services

6.1 Subject to section 6.3 below, if You register or gain control of, directly or indirectly, a domain name utilizing Alpha SSL or if Your domain name utilizes Alpha SSL, then You agree to the additional terms and conditions in: https://www.alphassl.com/repository/index.html.

6.2 Subject to section 6.3 below, if You register or gain control of, directly or indirectly, a domain name utilizing Let's Encrypt SSL or if Your domain name utilizes Let's Encrypt SSL, then You agree to the additional terms and conditions in: https://letsencrypt.org/repository/.

6.3 Notwithstanding anything to the contrary herein, none of the additional terms and conditions referred to under section 6.1 and section 6.2 above shall be deemed legally binding on Dynadot or create any obligation on behalf of Dynadot. This clause shall survive the termination of this Agreement.

## 7 SITE BUILDER HOSTING & VPS WEB HOSTING

7.1 An account utilizing Site Builder Hosting or VPS Web Hosting for any of its domains name shall be billed against the account's default payment method at the end of each 30-day period or yearly, as applicable, for each respective service.

## 8 FREE ONE PAGE HOSTING SERVICES

8.1 You may elect to direct Your domain name to Free One Page Hosting.

8.2 Where you elect to direct Your domain name to Free One Page Hosting:
   a) Dynadot may display on the respective domain name's website third party commercial advertising and links to Dynadot's website, App and/or to third party websites ("FOPH Advertising");
   b) Dynadot may earn revenue from related to the FOPH Advertising; and,
   c) You shall not be entitled to any portion of the revenue earned from the FOPH Advertising.

8.3 FOPH Advertising may contain third-party links and commercial advertising related to the domain name's meaning and to Your competitors.

8.4 You shall be solely responsible for hosting any image file, audio file, video file or any other file required for the proper use of Free One Page Hosting, other than the single-page directed to by the respective domain name.

8.5 Free One Page Hosting shall not be available with respect to any domain name during its Post-Expiration Period, during its Deletion Period, at any time when the domain name's registration period expired or flagged for deletion, and/or with respect to any of Your domain names if Dynadot determines, in its sole and absolute discretion, that You breached any term of this Agreement or that Your account was used in connection with any Objectionable Use Activity.

8.6 You shall not, directly or indirectly, seek to generate web traffic to any of Your domain names that utilizes Free One Page Hosting by:
   a) Furnishing links leading to the domain name through or to newsgroups, bulk e-mailing, ICQ posting, chat room posting, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, or any other similar method;
   b) Begging, asking, enticing, or incentivizing others to click on the advertising links displayed on the domain name's respective webpage; or,
   c) Misrepresenting to others that they may receive anything other than an internet search page and/or results by clicking on a text link or a search box.

## PART V:

## MARKETPLACE NETWORK PARTNERS

**1  APPLICATION**

1.1   This Part V (Marketplace Network Partners) applies to any person or entity which accesses, uses or seeks to access or use Dynadot's Services in conjunction with Afternic services, Sedo services or Uni Market services (each a "Marketplace Network Partner's Services").

**2  GENERAL**

2.1   Subject to section 2.2 below, if You register or gain control of, directly or indirectly, a domain name utilizing any Marketplace Network Partner's Services or if Your domain name utilizes any Marketplace Network Partner's Services, then You agree to the additional terms and conditions in the service agreement of the respective third-party (Afternic, Sedo or Uni Market, as applicable).

2.2   Notwithstanding anything to the contrary herein, none of the additional terms and conditions referred to under section 2.1 above shall be deemed legally binding on Dynadot or create any obligation on behalf of Dynadot. This clause shall survive the termination of this Agreement.

2.3   A domain name utilizing any Marketplace Network Partner's Services may lose every transfer lock status.

2.4   You expressly appoint Dynadot as Your Designated Agent to approve any Change of Registrant request with respect to a domain name utilizing a Marketplace Network Partner's Services.

2.5   No Marketplace Network Partner's Services shall be available with respect to a domain name:
    a)   During its Post-Expiration Period;
    b)   During its Deletion Period;
    c)   At any time when the domain name's registration period expired or was flagged for deletion;
    d)   Subsequent to the domain name's transfer to another registrar or account; and,
    e)   If Dynadot determines, in its sole and absolute discretion, that You breached any term of this Agreement or that Your account was used in connection with any Objectionable Use Activity.

2.6   A domain sold in accordance with a Marketplace Network Partner's Services may be transferred to the respective buyer forthwith.

## PART VI:

# COMMUNITY POLICY

**1  APPLICATION**

1.1   This Part VI (Community Policy) applies to any person or entity which accesses, uses or seeks to access or use Dynadot's blogs, forums or user public profile (each a "Public Communication Channel").

**2  PROMOTIONAL POSTS**

2.1   Your information and content on any Public Communication Channel may promote a business, product, or service only if:
    a)   the information or content is valuable for Dynadot's users and is relevant to the specific discussion in the respective Public Communication Channel, as determined by Dynadot in its absolute and sole discretion; and,
    b)   You disclose all commercial relationships that You have with the promoted business, product, or service, as applicable, including but not limited to any relationship respecting payment, reciprocal advertising arrangement, conflicts of interest, and any non-commercial relationship.

**3  GENERAL**

3.1   Dynadot shall not be obligated to publish any of Your information or content on any Public Communication Channel.

3.2   Dynadot may, in its absolute and sole discretion, remove or modify any of Your information or content on any Public Communication Channel without notice.

3.3   Dynadot shall not be obligated to store, maintain or provide You a copy of any content or information on any Public Communication Channel.

3.4   You grant Dynadot a worldwide, perpetual, non-exclusive, transferable and sublicensable right to use, copy, modify, distribute, publish and process information and content that You submit to any Public Communication Channel without any further consent from and notice and compensation to You and any other third-party.

3.5   You shall not submit information or content to any Public Communication Channel if such submission is an Objectionable Use Activity.

3.6    All information and content that You submit to any Public Communication Channel shall be truthful.

3.7    Dynadot is not responsible for the content, accuracy, or opinions expressed in any Public Communication Channel, and the respective content and information is not investigated, monitored or checked for accuracy or completeness by Dynadot. Dynadot neither approves nor endorses any information or content on any Public Communication Channel.

## APPENDIX A
## ADDITIONAL TLD RULES

| Top Level Domains | ADDITIONAL APPLICABLE TERMS AND CONDITIONS |
|---|---|
| .com | All terms and conditions contained in:<br>https://www.verisign.com/assets/com-registrar-agreement.doc |
| .net | All terms and conditions contained in:<br>https://www.verisign.com/assets/net-registrar-agreement.docx |
| .name | All terms and conditions contained in:<br>https://www.verisign.com/assets/name-registrar-agreement.doc |
| .org | All terms and conditions contained in:<br>https://thenew.org/app/uploads/2019/09/org_RRA_2015-1.pdf |
| .机构 | All terms and conditions contained in:<br>https://thenew.org/app/uploads/2019/09/xn-nqv7f_RRA-Final.pdf |
| .opr | All terms and conditions contained in:<br>https://thenew.org/app/uploads/2019/09/xn-c1avg_RRA-Final.pdf |
| .संगठन | All terms and conditions contained in:<br>https://thenew.org/app/uploads/2019/09/xn-i1b6b1a6a2e_RRA-Final.pdf |
| .ngo | All terms and conditions contained in:<br>https://thenew.org/app/uploads/2019/09/RRA-ngo-12_11_14.pdf |
| .us | All terms and conditions contained in:<br>https://www.ntia.doc.gov/files/ntia/publications/technical_proposal_volume_1.pdf |
| .me | All terms and conditions contained in:<br>https://domain.me/wp-content/uploads/2014/10/RegistryRegistrarAgreement.pdf |
| .eu .ею | All terms and conditions contained in:<br>https://eurid.eu/en/register-a-eu-domain/rules-for-eu-domains/ |
| .pro | All terms and conditions contained in:<br>https://www.icann.org/resources/unthemed-pages/pro-appendix-8-2010-04-22-en |
| .in | All terms and conditions contained in: |

**ER-94**

| | |
|---|---|
| | https://www.registry.in/system/files/Terms_and_Conditions_for_Registrants_1_1.pdf |
| .la | All terms and conditions contained in:<br>https://www.rrpproxy.net/Legal/Terms_and_Conditions.html<br>https://www.rrpproxy.net/Legal/Registration_Agreement.html<br>https://www.la/e/terms<br>https://www.la/e/privacy |
| .am | All terms and conditions contained in:<br>https://www.rrpproxy.net/Legal/Terms_and_Conditions.html<br>https://www.rrpproxy.net/Legal/Registration_Agreement.html<br>https://www.amnic.net/policy/en/Policy_EN.pdf<br>https://www.amnic.net/faq/en/ |
| .cx | All terms and conditions contained in:<br>https://www.rrpproxy.net/Legal/Terms_and_Conditions.html<br>https://www.rrpproxy.net/Legal/Registration_Agreement.html<br>http://www.nic.cx/christmas/CX-WHOIS-NOV-2011.pdf<br>http://www.nic.cx/christmas/CX-RA-NOV-2011.pdf |
| .im | All terms and conditions contained in:<br>https://www.nic.im/pdfs/termsandconditions.pdf |
| .cymru | All terms and conditions contained in:<br>https://registrars.nominet.uk/gtlds/registry-registrar-agreement/cymru-wales-registry-registrar-agreement/ |
| .wales | All terms and conditions contained in:<br>https://registrars.nominet.uk/gtlds/registry-registrar-agreement/cymru-wales-registry-registrar-agreement/ |
| .london | All terms and conditions contained in:<br>https://domains.london/policies/ |
| .boston | All terms and conditions contained in:<br>https://mmx.co/uploads/archive/policies/Boston_Registration_Policies_Final.pdf |
| .uk | All terms and conditions contained in:<br>https://media.nominet.uk/wp-content/uploads/2018/05/22141655/Ts-and-Cs-of-Domain-Name-Registration.pdf<br>https://media.nominet.uk/wp-content/uploads/2018/05/22141819/dotUK-Rules-of-Registration.pdf |
| .vc | All terms and conditions contained in:<br>https://afilias-grs.info/system/files/attachments/MRAA%20--%20VC_Dec2010.pdf |
| .sc | All terms and conditions contained in:<br>https://afilias-grs.info/system/files/attachments/MRAA%20--%20LC_Dec2010.pdf |
| .bz | All terms and conditions contained in:<br>https://afilias-grs.info/system/files/attachments/MRAA%20--%20BZ.pdf |
| .lc | All terms and conditions contained in:<br>https://afilias-grs.info/system/files/attachments/MRAA%20--%20LC_Dec2010.pdf<br>http://www.nic.lc/policies.htm |
| .mn | All terms and conditions contained in:<br>https://afilias-grs.info/system/files/attachments/MRAA%20--%20MN_Dec2010.pdf<br>http://file.domain.mn/REGISTRATION_AGREEMENT.pdf |

| | |
|---|---|
| .ca | All terms and conditions contained in:<br>https://cira.ca/policy/legal-agreement/registrant-agreement |
| .kiwi | All terms and conditions contained in:<br>https://hello.kiwi/policies_files/Dot_Kiwi_Registrant_Agreement_v1.pdf |
| .lt | All terms and conditions contained in:<br>https://www.domreg.lt/informacija/dokumentai/procedural-regulation.pdf |
| .nl | All terms and conditions contained in:<br>https://www.sidn.nl/en/about-sidn/general-terms-and-conditions??language_id=2 |
| .pl | All terms and conditions contained in:<br>https://www.dns.pl/en/pl_domain_name_regulations |
| .ph | All terms and conditions contained in:<br>https://www.dot.ph/corporate/psa |
| .dev | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-dev-form.pdf |
| .page | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-page-form.pdf |
| .app | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-app-form.pdf |
| .how | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-how-form.pdf |
| .soy | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-soy-form.pdf |
| .みんな | All terms and conditions contained in:<br>http://services.google.com/fh/files/misc/crr-rra-minna-form.pdf |
| .shop | All terms and conditions contained in:<br>https://nic.shop/policies/registration_policy.pdf |
| .tokyo .nagoya .yokohama .okinawa | All terms and conditions contained in:<br>https://www.gmoregistry.com/en/policy/ |
| .voting | All terms and conditions contained in:<br>http://www.nic.voting/policies/index_en.html |
| .be | All terms and conditions contained in:<br>https://www.dnsbelgium.be/en/registrars/documents |
| .so | All terms and conditions contained in:<br>https://sonic.so/policies/ |
| .at | All terms and conditions contained in:<br>https://www.nic.at/en/my-at-domain/registration/registration-guidelines<br>https://www.nic.at/en/get-to-know/legal-backgrounds/privacy-policy |

| .ink .gay | All terms and conditions contained in: https://toplevel.design/policy |
|---|---|
| .lv | All terms and conditions contained in: https://www.nic.lv/en/policy |
| .mx | All terms and conditions contained in: https://www.registry.mx/jsf/static_content/domain/policies_first_new.jsf |
| .ren | All terms and conditions contained in: http://nic.ren/en/h-col-108.html |
| .wang | All terms and conditions contained in: http://en.zodiac.wang/policy.html |
| .koeln .cologne | All terms and conditions contained in: https://nic.koeln/en/Policies |
| .wien | All terms and conditions contained in: https://www.nic.wien/de/wien/policies |
| .paris | All terms and conditions contained in: http://bienvenue.paris/registry-policies-paris/ |
| .quebec | All terms and conditions contained in: https://registre.quebec/en/policy/ |
| .РУС | All terms and conditions contained in: http://rusnames.ru/en/rules.pl |
| .nyc | All terms and conditions contained in: https://www.ownit.nyc/policies |
| .sucks | All terms and conditions contained in: https://www.get.sucks/policies |
| .sx | All terms and conditions contained in: http://registry.sx/registrars/legal |
| .tel | All terms and conditions contained in: https://www.do.tel/policies/ |
| .osaka | All terms and conditions contained in: https://domain.osaka/en/legal/ |
| .cloud | All terms and conditions contained in: https://www.get.cloud/partner-with-us/policies.aspx |
| .menu | All terms and conditions contained in: http://www.nic.menu/#documents |
| .build | All terms and conditions contained in: https://registrar.build/registry-policies/ |

| .bid | All terms and conditions contained in: http://nic.bid/resources.html |
|------|------|
| .stream | All terms and conditions contained in: http://nic.stream/resources.html |
| .win | All terms and conditions contained in: http://nic.win/resources.html |
| .trade | All terms and conditions contained in: http://nic.trade/resources.html |
| .webcam | All terms and conditions contained in: http://nic.webcam/resources.html |
| .qpon | All terms and conditions contained in: https://www.dotqpon.com/wp-content/uploads/2018/06/REGISTRY-REGISTRAR-AGREEMENT.pdf |
| .cricket | All terms and conditions contained in: http://nic.cricket/resources.html |
| .loan | All terms and conditions contained in: http://nic.loan/resources.html |
| .faith | All terms and conditions contained in: http://nic.faith/resources.html |
| .taipei | All terms and conditions contained in: https://hi.taipei/en/policy_policies.html |
| .download | All terms and conditions contained in: http://nic.download/resources.html |
| .party | All terms and conditions contained in: http://nic.party/resources.html |
| .science | All terms and conditions contained in: http://nic.science/resources.html |
| .racing | All terms and conditions contained in: http://nic.racing/resources.html |
| .date | All terms and conditions contained in: http://nic.date/resources.html |
| .men | All terms and conditions contained in: http://nic.men/resources.html |
| .世界 | All terms and conditions contained in: http://www.stabletone.com/en/policies |
| .health | All terms and conditions contained in: https://get.health/documentation |

| .ac | All terms and conditions contained in: https://www.nic.ac/policy.htm |
| .io | All terms and conditions contained in: https://www.nic.io/policy.htm |
| .sh | All terms and conditions contained in: https://www.nic.sh/policy.htm |
| .asia .网站 .xn--5tzm5g | All terms and conditions contained in: https://www.dot.asia/dotasia-organisation/policy-development/ |
| .Autos .Boats .Homes .Yachts | All terms and conditions contained in: https://dominionregistries.domains/policies/ |
| .me | All terms and conditions contained in: https://domain.me/policies/ |
| .global | All terms and conditions contained in: https://go.global/global-policies |
| .сайт | All terms and conditions contained in: http://cyrillicregistry.net/site-pravila-ru/ |
| .онлайн | All terms and conditions contained in: http://cyrillicregistry.net/online-pravila-ru/ |
| بازار. | All terms and conditions contained in: http://dotbazaar.net/registration-policy/ |
| .scot | All terms and conditions contained in: https://dot.scot/wp-content/uploads/2018/05/scot_Registration_Policy_20180525.pdf |
| .berlin | All terms and conditions contained in: https://dot.berlin/registrierungsregeln-policies |
| .lat | All terms and conditions contained in: https://www.nic.lat/policies/ |
| .ws | All terms and conditions contained in: https://www.website.ws/newdesign/documents/Domain%20Name%20Registration%20Agreement.pdf |
| .ooo | All terms and conditions contained in: http://www.nic.ooo/policies/ooo-policies |
| .love | All terms and conditions contained in: http://get.love/wp-content/uploads/2020/02/Policies-dotlove-06-Feb-2020.pdf |
| .ink .wiki .design | All terms and conditions contained in: https://toplevel.design/policy |
| .rest | All terms and conditions contained in: https://www.register.rest/policies/ |

(100 of 121), Page 100 of 121
Case: 24-4624, 09/06/2024, DktEntry: 3.2, Page 100 of 121
Case 3:24-mc-80087  Document 1-6  Filed 04/11/24  Page 30 of 42

| .observer | All terms and conditions contained in:<br>http://www.nic.observer/registration-agreement/ |
|---|---|
| .fans | All terms and conditions contained in:<br>http://nic.fans/en/h-col-104.html |
| .baby | All terms and conditions contained in:<br>https://nic.baby/files/XYZ-registry-domain-name-policies.pdf |
| .college | All terms and conditions contained in:<br>https://nic.college/files/XYZ-domain-name-policies.pdf |
| .protection | All terms and conditions contained in:<br>https://nic.protection/files/XYZ-domain-name-policies.pdf |
| .rent | All terms and conditions contained in:<br>https://nic.rent/files/XYZ-domain-name-policies.pdf |
| .security | All terms and conditions contained in:<br>https://nic.security/files/XYZ-domain-name-policies.pdf |
| .storage | All terms and conditions contained in:<br>https://nic.storage/files/XYZ-registry-domain-name-policies.pdf |
| .theatre | All terms and conditions contained in:<br>https://nic.theatre/files/XYZ-domain-name-policies.pdf |
| .xyz | All terms and conditions contained in:<br>https://nic.xyz/downloads/XYZ-domain-name-policies.pdf |
| .monster | All terms and conditions contained in:<br>https://nic.monster/files/XYZ-registry-domain-name-policies.pdf |
| .art | All terms and conditions contained in:<br>http://nic.art/policies/ |
| .cam | All terms and conditions contained in:<br>https://nic.cam/#resources |
| .tickets | All terms and conditions contained in:<br>https://nic.tickets/pdfs/DotTickets-Policies-v3-July2017.pdf |
| .coop | All terms and conditions contained in:<br>https://www.coop/wp-content/uploads/2017/05/140103-registration_agreement.pdf<br>https://identity.coop/policies/ |
| .fm | All terms and conditions contained in:<br>https://dot.fm/policy.cfm<br>http://radio.fm/policy/ |
| .gdn | All terms and conditions contained in:<br>http://www.nic.gdn/policy/Anti-Abuse_Policy_v1.0.pdf<br>http://www.nic.gdn/policy/Domain_Policy_v1.0.pdf<br>http://www.nic.gdn/policy/IDN_Policy_v1.0.pdf<br>http://www.nic.gdn/policy/Sunrise_Policy_v1.0.pdf<br>http://www.nic.gdn/policy/Dispute_Policy_v1.0.pdf<br>http://www.nic.gdn/policy/Dispute_Resolution_Policy_v1.0.pdf |

http://www.nic.gdn/policy/WHOIS_Policy_v1.0.pdf

| | |
|---|---|
| .pw | All terms and conditions contained in:<br>https://registry.pw/policies/ |
| .vg | All terms and conditions contained in:<br>https://nic.vg/terms.php |
| .archi | All terms and conditions contained in:<br>https://domains.archi/about/dispute-resolution<br>https://domains.archi/about/afilias-anti-abuse-policy<br>https://domains.archi/archi_policy |
| .bio | All terms and conditions contained in:<br>https://domains.bio/about/dispute-resolution<br>https://domains.bio/about/afilias-anti-abuse-policy<br>https://domains.bio/bio_policy |
| .ski | All terms and conditions contained in:<br>https://domains.ski/about/dispute-resolution<br>https://domains.ski/about/afilias-anti-abuse-policy<br>https://domains.ski/ski_policy |
| .bet | All terms and conditions contained in:<br>https://get.bet/about/dispute-resolution<br>https://get.bet/about/afilias-anti-abuse-policy |
| .black | All terms and conditions contained in:<br>https://get.black/about/dispute-resolution<br>https://get.black/about/afilias-anti-abuse-policy |
| .blue | All terms and conditions contained in:<br>https://dotblue.blue/about/dispute-resolution<br>https://dotblue.blue/about/afilias-anti-abuse-policy |
| .eco | All terms and conditions contained in:<br>https://www.home.eco/policies |
| .green | All terms and conditions contained in:<br>https://get.green/about/dispute-resolution<br>https://get.green/about/afilias-anti-abuse-policy |
| .info .mobi | All terms and conditions contained in:<br>https://afilias.info/policies |
| .kim | All terms and conditions contained in:<br>https://get.kim/about/dispute-resolution<br>https://get.kim/about/afilias-anti-abuse-policy |
| .lgbt | All terms and conditions contained in:<br>https://get.lgbt/about/dispute-resolution<br>https://get.lgbt/about/afilias-anti-abuse-policy<br>https://get.lgbt/LGBTAUP |
| .llc | All terms and conditions contained in:<br>https://get.llc/about/dispute-resolution<br>https://get.llc/about/afilias-anti-abuse-policy |

| .motorcycles | All terms and conditions contained in: https://get.motorcycles/policies/ |
| --- | --- |
| .organic | All terms and conditions contained in: https://get.organic/about/dispute-resolution https://get.organic/about/afilias-anti-abuse-policy https://get.organic/registration_policy |
| .pet | All terms and conditions contained in: https://get.pet/about/dispute-resolution https://get.pet/about/afilias-anti-abuse-policy |
| .pink | All terms and conditions contained in: https://get.pink/about/dispute-resolution https://get.pink/about/afilias-anti-abuse-policy |
| .poker | All terms and conditions contained in: https://get.poker/about/dispute-resolution https://get.poker/about/afilias-anti-abuse-policy |
| .promo | All terms and conditions contained in: https://get.promo/about/dispute-resolution https://get.promo/about/afilias-anti-abuse-policy |
| .red | All terms and conditions contained in: https://get.red/about/dispute-resolution https://get.red/about/afilias-anti-abuse-policy |
| .shiksha | All terms and conditions contained in: https://get.shiksha/about/dispute-resolution https://get.shiksha/about/afilias-anti-abuse-policy |
| .vote | All terms and conditions contained in: https://get.vote/vote-anti-abuse-policy |
| .voto | All terms and conditions contained in: https://get.voto/voto-anti-abuse-policy |
| .移动 | All terms and conditions contained in: https://afilias.info/policies |
| .de | All terms and conditions contained in: https://www.denic.de/en/domain-guidelines/ https://www.denic.de/en/domain-terms-and-conditions/ https://www.denic.de/en/price-list/ |
| .top | All terms and conditions contained in: http://www.nic.top/en/Policy.asp |
| .co | All terms and conditions contained in: https://www.cointernet.com.co/politicas-y-procedimientos/ |
| .one | All terms and conditions contained in: http://nic.one/policies/ |
| .earth | All terms and conditions contained in: https://domain.earth/legal/ |

| | |
|---|---|
| .buzz | http://get.buzz/about/terms-of-service-tos/ |
| .tube | All terms and conditions contained in: http://www.nic.tube/policies |
| .cn .中国 .公司 .网络 | All terms and conditions contained in: http://cnnic.com.cn/PublicS/fwzxxgzcfg/ |
| .club | All terms and conditions contained in: https://get.club/terms/ |
| .blog | All terms and conditions contained in: https://my.blog/registry-policies-privacy/ |
| .在线 .中文网 | All terms and conditions contained in: https://internetregistry.info/idn-policies/ |
| .vegas | All terms and conditions contained in: http://nic.vegas/policies/ |
| .ag | All terms and conditions contained in: http://www.nic.ag/policies.htm |
| .ruhr | All terms and conditions contained in: https://www.dot.ruhr/registrierungsrichtlinien/ |
| .شبكة | All terms and conditions contained in: http://www.dotshabaka.com/policies-en.html |
| .rich | All terms and conditions contained in: https://nic.rich/policies.php |
| .onl | All terms and conditions contained in: https://nic.onl/policies.php |
| .career | All terms and conditions contained in: http://dotcareer.jobs/policies.html |
| .bar | All terms and conditions contained in: https://www.register.bar/policies/ |
| .review | All terms and conditions contained in: http://nic.review/resources.html |
| .dk | All terms and conditions contained in: https://www.dk-hostmaster.dk/en/terms |
| .je .gg | All terms and conditions contained in: https://www.channelisles.net/legal/terms-and-conditions-1 |
| .ceo .desi .saarland | All terms and conditions contained in: https://centralnicregistry.com/support/policies |
| melbourne | All terms and conditions contained in: |

| | |
|---|---|
| .melbourne | https://www.live.melbourne/policies/ |
| .sydney | All terms and conditions contained in: http://www.ariservices.com/dotsydney |
| .quest | All terms and conditions contained in: https://nic.quest/registry-policies |
| .beauty | All terms and conditions contained in: https://nic.beauty/registry-policies |
| .hair | All terms and conditions contained in: https://nic.hair/registry-policies |
| .skin | All terms and conditions contained in: https://nic.skin/registry-policies |
| .makeup | All terms and conditions contained in: https://nic.makeup/registry-policies |
| .kids | All terms and conditions contained in: https://www.nic.kids/dotkids-files/policies/Dotkids-Guiding-Principles.pdf |
| .nz | All terms and conditions contained in: https://dnc.org.nz/about/compliance-and-enforcement/nz-policies/ |
| .sbs .cfd .bond .cyou .icu | All terms and conditions contained in: https://shortdot.bond/terms-and-conditions-for-domain-registration/ |
| .tw | All terms and conditions contained in: https://www.twnic.tw/en_dnservice_tp.php |
| .spa | All terms and conditions contained in: https://www.nic.spa/spa-policies/ |
| .ong | All terms and conditions contained in: https://thenew.org/org-people/about-pir/policies/ |
| .radio | All terms and conditions contained in: https://www.nic.radio/policies |
| .za | All terms and conditions contained in: https://www.zadna.org.za/publications/policies-and-legislations/ |
| .beer .casa .cooking .fashion .fishing .fit .garden .horse .miami .rodeo .surf .vip .vodka .wedding .work .xn--g2xx48c .yoga .boston .xxx .porn .sex .london .adult | All terms and conditions contained in: https://mmx.co/policies |
| بهارت. ভারত .ভারত .భారత్ .இந்தியா .భారత్ भारत. | All terms and conditions contained in: https://www.registry.in/system/files/IDN_Registrar_Accreditation_Agreement_1.pdf https://www.registry.in/system/files/IDN_Terms_and_Conditions_for_Registrants_2.pdf |
| .link .sexy .tattoo .guitars | All terms and conditions contained in: |

.gift .pics .photo .christmas
.blackfriday .hiphop .juegos
.audio .click .hosting
.property .diet .help .flowers
.lol .game .mom .cars .car
.auto .hiv .country

.academy .accountants
.agency .apartments
.associates .bargains .bike
.bingo .boutique .builders
.business .cab .cafe
.camera .camp .capital
.cards .care .careers .cash
.casino .catering .center
.charity .chat .cheap .church
.city .claims .cleaning .clinic
.clothing .coach .codes
.coffee .community
.company .computer
.condos .construction
.contractors .cool .corp
.coupons .cpa .credit
.creditcard .cruises .dating
.deals .delivery .dental
.diamonds .digital .direct
.directory .discount .doctor
.dog .domains .education
.email .energy .engineering
.enterprises .equipment
.estate .events .exchange
.expert .exposed .express
.fail .farm .finance .financial
.fish .fitness .flights .florist
.football .foundation .fund
.furniture .fyi .gallery .gifts
.glass .gmbh .gold .golf
.graphics .gratis .gripe
.group .guide .guru
.healthcare .hockey
.holdings .holiday .home
.hospital .hotel .house .immo
.industries .institute .insure
.international .investments
.irish .jetzt .jewelry .kitchen
.land .lease .legal .life
.lighting .limited .limo .loans
.ltd .mail .maison
.management .marketing
.mba .media .money .movie
.music .network .partners
.parts .photography .photos
.pictures .pizza .place
.plumbing .plus .productions
.properties .recipes .reise
.reisen .rentals .repair
.report .restaurant .run
.salon .sarl .school .schule
.services .shoes .shopping
.show .singles .soccer .solar
.solutions .style .supplies
.supply .support .surgery
.systems .tax .taxi .team
.technology .tennis .theater
.tienda .tips .tires .today
.tools .tours .town .toys
.training .university
.vacations .ventures .viajes
.villas .vin .vision .voyage
.web .watch .wine .works
.world .wtf .zone .企业 .xn--
vhquv .商店 .xn--czrs0t .娱
乐 .xn--fjq720a .游戏 .xn--
unup4y .actor .airforce

All terms and conditions contained in:
i. https://donuts.domains/about/policies/ and,
ii. Exhibit 01 (Donuts TLDs).

.army .attorney .auction
.band .consulting .contact
.dance .degree .democrat
.dentist .engineer .family
.fan .forsale .futbol .games
.gives .haus .immobilien
.kaufen .lawyer .live .market
.memorial .moda .mortgage
.navy .news .ninja .pub
.rehab .republican .reviews
.rip .rocks .sale .social
.software .studio .travel .vet
.video

| | |
|---|---|
| .fun .host .online .press .site .space .store .tech .uno .website | All terms and conditions contained in: https://radix.website/policies |

## APPENDIX B
## TLD-Specific Periods

| Top Level Domains | PERIODS APPLICABLE TO TLD |
|---|---|
| .XXX | Dynadot may auction for sale any .XXX domain name that is not renewed within the first XX calendar days of its Post-Expiration Period. |

# EXHIBIT 01: DONUTS TLDS

## 1   REGISTRANT IS NOT A RESTRICTED PERSON

1.1   Neither You nor Your agent shall seek to register or gain control of, directly or indirectly, a domain name of a top-level domain to which this Exhibit 01 (Donuts Binky Moon TLDs) applies (as provided for under Appendix A (Additional TLD Rules)) if You are person or entity:

     a)   that is, or is owned or controlled by a person or entity that is, designated on sanctions list maintained by the United Nations or United States (including without limitation the U.S. Department of the Treasury Office of Foreign Assets Control); or,

     b)   located in or organized under the laws of a jurisdiction that is subject to comprehensive U.S. sanctions.

## 2   .ARMY, .NAVY & .AIRFORCE TLDS

2.1   If You register or gain control of, directly or indirectly, a domain name of a .ARMY, .NAVY or .AIRFORCE top-level domain, then You agree:

     a)   to comply with all applicable laws, including those that relate to privacy, data collection, consumer protection (including in relation to misleading and deceptive conduct), fair lending, debt collection, organic farming, disclosure of data, and financial disclosures;

     b)   to implement reasonable and appropriate security measures commensurate with the offering to collect and maintain sensitive health and financial data, as defined by applicable law;

     c)   to provide administrative contact information, which must be kept up-to-date, for the notification of complaints or reports of registration abuse, as well as the contact details of the relevant regulatory, or industry self-regulatory, bodies in their main place of business; **ER-106**

     d)   to represent that You possess any necessary authorizations, charters, licenses and/or other related credentials for

    d)  to conduct Your activity in a manner consistent with any future additional credentials for participation in the sector associated with such top-level domain;

    e)  to report any material changes to the validity of Your authorizations, charters, licenses and/or other related credentials for participation in the sector associated with the top-level domain to ensure You continue to conform to the appropriate regulations and licensing requirements and generally conduct Your activities in the interests of the consumers You serve; and,

    f)  to take steps to ensure against misrepresenting or falsely implying that You or Your business are affiliated with, sponsored or endorsed by one or more country's or government's military forces if such affiliation, sponsorship or endorsement does not exist.

## 3 .TRAVEL TLD

3.1    Neither You nor Your agent should seek to register or gain control of, directly or indirectly, a domain name of a .TRAVEL top-level domain unless You engage in or plan to engage in activities related to travel.

## 4 DPML USE

4.1    Neither You nor Your agent shall seek to, directly or indirectly, submit an application for a DPML Block or modify any DPML Block unless You agree:

    a)  to participate in good faith in any proceedings commenced by or against the applicant or holder of a DPML Block as required by the respective registry or registry operator;

    b)  that the respective registry operator and its agents are authorized to share information relating to You and Your application for a DPML Block; and,

    c)  to participate in and abide by any determinations made as part the registry operator's dispute resolution procedures, including without limitation the AAP, the URS, and the UDRP.

## 5 OTHER

5.1    You understand and agree that aggregate liability of a registry and registry operator for damages to You shall in any case be limited to the amounts specified in the respective agreement between Dynadot and the registry (or registry operator). You further agree to submit to a binding arbitration for disputes with any registry and registry operator.



# Exhibit 2



Support

# Contact Dynadot

Hey there! We're here to help if you need us.

Chat with us now ›    Email us ›

## Dynadot Contact Info



**Email**
info@dynadot.com



**Fax**
+1.415-869-2893



**Address**
210 S Ellsworth Ave
#345 San Mateo, CA
94401 US



**Office Hours**
Mon-Sun 9am - 6pm
PST



# Still have a question?

Search our FAQs    Submit an abuse complaint



| Domains | | Aftermarket | Support | Dynadot |
|---------|--|-------------|---------|---------|
| Domain | SSL | Aftermarket Search | Blog | About |

EN

USD ($)

Newsletter sign-up

Enter email **Submit**

Search

Transfer

IDNs Search

TLD Prices

Sales

Resellers

Websites

Email

Domain Suggestion Tool

Security

Grace Deletion

API

Whois Lookup

Payment Plan

Market Overview

User Listings

Backorders

Expired Auctions

User Auctions

Backorder Auctions

Last Chance Auctions

Expired Closeout

Help Files

Forums

Buying Domains

Selling Domains

Newsletter

Prepay

Payment Options

Report Abuse

Contact

Events

Site Map

APP

Refer-a-friend

Affiliate

Auction Affiliate

Download the app:

Copyright © 2002-2023 Dynadot Inc. All rights reserved.

Privacy Policy   Service Agreement

Domaining

# Exhibit 3

| California | | |
| Secretary of State | | |

Business    UCC

**DYNADOT INC (200224610093)**    ✕

- Home
- Search
- Forms
- Help

## Business Search

The California Business Search provides access to available information for **corporations**, **limited liability companies** and **limited partnerships** of record with the California Secretary of State, with **free PDF copies** of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.

Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types are **not contained** in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.

**Basic Search**

- A Basic search can be performed using an entity name or entity number. When conducting a search by an entity number, where applicable, remove **"C"** from the entity number. Note, **a basic search** will search **only ACTIVE entities** (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ?keyword? search. The Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to refine search criteria, use the **Advanced** search feature.

**Advanced Search**

- An Advanced search is required when searching for publicly traded disclosure information or a status other than active.
- An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as searching by ?begins with? specific search criteria.

**Disclaimer:** Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.

Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2)select Request Certificate in the right-hand detail drawer; and (3) complete your request online.

Request Certificate

| | |
|---|---|
| Initial Filing Date | 08/27/2002 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | CALIFORNIA |
| Entity Type | Stock Corporation - CA - General |
| Principal Address | 205 EAST 3RD AVE STE 314 SAN MATEO, CA 94401 |
| Mailing Address | 205 EAST 3RD AVE STE 314 SAN MATEO,CA94401 |
| Statement of Info Due Date | 08/31/2024 |
| Agent | Individual TODD HAN 205 E 3RD AVE STE 314 SAN MATEO, CA  94401 |

View History    Request Access

dynadot inc    🔍

Advanced ⌄

Results: 1

| Entity Information | Initial Filing Date | Status | Entity Type | Formed In | Agent |
|---|---|---|---|---|---|
| **DYNADOT INC (200224610093)** › | 08/27/2002 | Active | Stock Corporation - CA - General | CALIFORNIA | TODD HAN |

© 2023 CA Secretary of State

Login

DocuSign Envelope ID: 1A89F8B6-6A84-4A59-A54B-B6B59E64CF9B

1   Michele Floyd (SBN 163031)
    KILPATRICK TOWNSEND & STOCKTON LLP
2   2 Embarcadero Center, Suite 1900
    San Francisco, CA 94111
3   Telephone:  (415) 273-4756
    Email:  mfloyd@ktslaw.com
4
    Joseph R. Oliveri*
5   Steven J. Harrison*
    CLARE LOCKE LLP
6   10 Prince Street
    Alexandria, VA 22314
7   Telephone:  (202) 628-7400
    Email:  joe@clarelocke.com
8   Email:  steven@clarelocke.com
    *Pro Hac Vice Application Forthcoming
9
    Attorneys for Applicant Gregory Gliner
10

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14

15   *In re Ex Parte* Application of          MISCELLANEOUS CASE NO.:

16   Gregory Gliner,

17   Applicant,                               **DECLARATION OF ALEXANDRA
                                              WHISTON-DEW IN SUPPORT OF
                                              GREGORY GLINER'S *EX PARTE*
18   For an Order Pursuant to 28 U.S.C. § 1782   APPLICATION FOR AN ORDER
     Granting Leave to Obtain Discovery       PURSUANT TO 28 U.S.C. § 1782
19   for Use in Foreign Proceedings           GRANTING LEAVE TO OBTAIN
                                              DISCOVERY FOR USE IN FOREIGN
20                                            PROCEEDINGS

21

22

23

24

25

26

27

28

DocuSign Envelope ID: ...

## DECLARATION OF ALEXANDRA WHISTON-DEW

I, Alexandra Whiston-Dew, declare:

1.    I am over the age of 18 and am not a party to this proceeding.  I have personal knowledge of the facts set forth below except as to those facts set forth upon information and believe.  As to those facts, I believe them to be true.  If called as a witness, I would and could testify competently to the matters set forth below.  I make this Declaration pursuant to 28 U.S.C. § 1746 in support of Gregory Gliner's *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings (the "Application") being filed contemporaneously herewith.

### My Qualifications and Experience

2.    I am a solicitor of the Courts of England and Wales.  I was admitted to practise in England and Wales on 3 February 2014 and I have practised in England since then.  I am Partner of the law firm Mishcon de Reya LLP in London, England, where I practise as a litigator. A true and correct copy of my professional biography, as printed from the Mishcon de Reya LLP website, is attached hereto as **Exhibit 1**.

### My Retention by Gregory Gliner

3.    Gregory D. Gliner ("Mr. Gliner") has retained my law firm and me to advise him on and to prosecute contemplated defamation proceedings in the Courts of England and Wales against the person or persons who operate the website PoliticalLore.com and/or authored and/or caused to be published on PoliticalLore.com the article headlined "Inheritance of Billionaire Oleg Burlakov − A Battle on an Epic Scale" (the "Article") that lists as its author an "Edward Swensson."[1]

4.    Without waiving privilege, Mr. Gliner has expressed to me that he intends to proceed with issuing defamation proceedings in the Courts of England and Wales after discovery is obtained pursuant to the Application, provided that the discovery reveals or leads to the identity

---

[1] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov − A Battle on an Epic Scale*, Political Lore (June 2, 2023), https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

DocuSign Envelope ID: 1A59-FD23-4343E-A67A-CEE6EA65A

of the person or persons who operate the website PoliticalLore.com and/or authored, edited, and/or caused the Article to be published. Under English law, the author, editor, and publisher of the Article and the operators of PoliticalLore.com, the website on which it was published, are potentially responsible for any defamation arising from the Article. *See* Defamation Act 1996, § 1; Defamation Act 2013, §§ 5, 10.

### United Kingdom Courts Accept Evidence Obtained Under 28 U.S.C. § 1782

5.      Based on my years of experience practicing law in England and review of the relevant caselaw, I am aware that English Courts are receptive to receiving evidence obtained from United States Courts under 28 U.S.C. § 1782, and I am not aware of any reason that the English Courts would not be receptive to receiving the evidence sought in the Application.

6.      Indeed, English Courts have repeatedly accepted evidence obtained from U.S. District Courts though applications made under 28 U.S.C. § 1782.

7.      The leading authority is the House of Lords decision in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL), in which the House of Lords overturned a finding by the Court of Appeal that use of the procedure under 28 U.S.C. § 1782 was inherently objectionable and an abuse of process by interfering with the Court's control of its own procedure. The House of Lords expressly rejected the argument that a party to English litigation, "by seeking to exercise a right potentially available to them under the Federal law of the United States [specifically 28 U.S.C. § 1782], has in any way departed from, or interfered with, the procedure of the English court." *Id.* at 40. Instead, the House of Lords explained that "[a]ll they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case." *Id.* at 42. A true and correct copy of the decision in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL) is attached hereto as **Exhibit 2**.

8.      The approach in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL) has been affirmed in a number of subsequent decisions, where the English Courts have been receptive to evidence obtained from U.S. District Courts through applications made under 28 U.S.C. § 1782.

DocuSign Envelope ID: 1A85F8D7-E34B-47FB-A403-40E50752A6FE

9. For example, in *Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920, the Court rejected an attempt to "restrain [a party] from pursuing applications made in US courts under 28 USC, section 1782 for documents and other evidence," holding that "it cannot be said a priori that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings." *Id.* ¶ 32. The Court then explained that "the English court should not seek to circumscribe the discretion possessed by the [U.S.] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in the proceedings as they stand." *Id.* ¶ 32(b). And the Court held that "[i]t is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment." *Id.* Indeed, the Court acknowledged that it "is generally indifferent as to the source of admissible material." *Id.* ¶ 23. A true and correct copy of the decision in *Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920 is attached hereto as **<u>Exhibit 3</u>**.

10. More recently, in the case of *Soriano v Forensic News LLC and others* [2023] EWCA Civ 223, the English Court held that an application under 28 U.S.C. § 1782 is unlikely to be considered unconscionable simply because the U.S. Court may take a broader approach to discovery than the English Court may be prepared to order when faced with an application for third-party disclosure. A true and correct copy of the decision in *Soriano v Forensic News LLC and others* [2023] EWCA Civ 223 is attached hereto as **<u>Exhibit 4</u>**.

11. While there are some cases in which an English Court has been prepared to exercise its jurisdiction to issue an anti-suit injunction to restrain a party pursuing an application under 28 U.S.C. § 1782, those decisions are not based on unreceptiveness or hostility to the process under 28 U.S.C. § 1782. Instead, such injunctions were granted on the basis of the manner in which, effect of, or timing with which such applications were pursued. For example, in *Bankers Trust International PLC v PT Dharmala Sakti Sejahtera* [1996] CLC 252, the application under 28 U.S.C. § 1782 was pursued *after* the trial in England had already ended, and in *Omega Group*

DocuSign Envelope ID: 1A83FED3-E486-4D97-8411-F6E8EA92B3D3

*Holdings Ltd v Kozeny* [2002] CLC 132, the effect of granting an application under 28 U.S.C. § 1782 would have been to subject a witness from whom evidence was sought to unwarranted double cross-examination. Neither of these situations apply to this Application, because the anticipated claim is at an early stage and the respondent to this Application (Dynadot, Inc.) will not be a party to Mr. Gliner's intended English defamation lawsuit. True and correct copies of the decisions in *Bankers Trust International PLC v PT Dharmala Sakti Sejahtera* [1996] CLC 252 and *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132 are attached hereto as **Exhibit 5** and **Exhibit 6**.

12. In sum, I conclude based on these and other authorities that the English Court will be receptive to the evidence sought in the Application. I am unaware of any proof-gathering restrictions or policies under English law or civil procedure rules that would be circumvented by obtaining evidence pursuant to 28 U.S.C. § 1782. Accordingly, I further do not consider the Application to be seeking to circumvent any such proof-gathering restrictions, nor do I consider it to be contrary to English law or civil procedure rules.

### Defamation Under English Law

13. Under English law, a statement is defamatory if it contains an untrue imputation that tends to lower the reputation of the claimant in the estimation of right-thinking members of society.[2] To be defamatory, a statement must have also caused or be likely to cause serious harm to the claimant's reputation.[3] Under English law, the author, editor, and/or publisher of a defamatory statement and/or the operator of a website may be held liable for harm or potential harm caused to the claimant's reputation.[4]

14. The Article is defamatory of Mr. Gliner under English law because it contains serious accusations of criminal conduct by Mr. Gliner which are likely to cause serious harm to his reputation as a successful, ethical, and upstanding investment advisor and businessman. Given that

---

[2] *Sim v Stretch* [1936] 2 All ER 1237 (attached hereto as **Exhibit 7**).
[3] Defamation Act of 2013, § 1.
[4] Defamation Act 1996, § 1; Defamation Act 2013, §§ 5, 10.

DocuSign Envelope ID: 1A89FBD8-B455E-49DF-80AE-E4B013CDEA35

these allegations are entirely baseless, the usual defences run by publishers of "truth"[5] or "public interest"[6] would, in my view, inevitably fail (as would any other defences).

15.    The operator of PoliticalLore.com is the publisher of the Article, being a commercial publisher whose business is issuing material to the public and which published material containing defamatory statements about Mr. Gliner in the course of its business.[7]

16.    In the event that discovery reveals that the operator of PoliticalLore.com is domiciled in the United Kingdom, the Courts of England and Wales will almost certainly have jurisdiction over Mr. Gliner's intended defamation claim.  The Courts of England and Wales will also likely have jurisdiction over Mr. Gliner's intended defamation claim even if discovery reveals that the operator of PoliticalLore.com is not domiciled in the United Kingdom, because Mr. Gliner is a citizen of the United Kingdom with an established reputation in the jurisdiction such that there are grounds on which England and Wales is the most appropriate forum for Mr. Gliner to bring his claim irrespective of where the publisher is based.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11th day of April, 2024, at London, England, United Kingdom.

DocuSigned by:

*Alexandra Whiston-Dew*

60885F5EA833420...

Alexandra Whiston-Dew

---

[5] Defamation Act 2013, § 2.

[6] Defamation Act 2013, § 4.

[7] Defamation Act 1996, § 1(2).

# Exhibit 1

Mishcon de Reya LLP

**Main menu**



# Alexandra Whiston-Dew

PARTNER

## Contact Information

- +44 20 3321 7182 (tel:+44 20 3321 7182) 📞
- alexandra.whistondew@mishcon.com (mailto:alexandra.whistondew@mishcon.com) ✉

## Personal Profile

- Profile
- More Details

Alexandra has a broad range of experience advising both international and UK based individuals and companies. With expertise in matters bridging the specialisms of private client law and a focus on reputation protection, she is an experienced commercial litigator. Alexandra participates in the Data Protection, Extradition, Russia and Africa groups.

Managing the firm's engagement in the SPITE project - a pro bono partnership with Queen Mary University - she advises victims of revenge porn. Having written articles and presented lectures on the issue of sharing intimate images and personal data, she also delivers training to PR companies and publishers on developments in media law and data protection.

Alexandra is a trustee and Company Director of LHA London, a housing charity that caters for students and young people, and a trustee of Future Talent, a charity that provides support and

Case 3:24-mc-80087   Document 1-7   Filed 04/11/24   Page 9 of 95

guidance to young musicians who demonstrate outstanding musical ability from low income backgrounds.

# Key Experience

- Taking legal action on behalf of a multimillionaire who was having difficulty obtaining a bank account due to false information and incorrect categorisation as a Politically Exposed Person ("PEP")
- Attaining a public and private apology and payment of legal costs for Agroherni Group, a well-known food producer, who came under attack by a Channel 4 and Daily Mail documentary that made false allegations concerning the organisation's treatment of their staff.
- Assisting an 80 year old British business man facing extradition charges from Greek authorities with his appeal against his convictions of fraud.
- Assisting the owning body of a successful football club to rebuild their reputation following ongoing scrutiny and defamation from the local supporters and media.
- Acting on behalf of a multi-million-pound oil broker who was caught in a scandal making false and serious allegations which were damaging to the client's reputation and prevented them from being able to pursue various commercial endeavours.
- Advising companies and high net worth individuals in reputation crisis on immediate and long term legal action.

# Career History

Partner, Mishcon de Reya LLP
Managing Associate, Mishcon de Reya LLP
Associate, Mishcon de Reya LLP
Legal Assistant, Mishcon de Reya
Business Development & Events Director, Brand Distillery
Lincolns Inn, Called to the Bar November 2011
BPP, BVC 2011
BPP, GDL 2009
University of Edinburgh, MA (Hons) Philosophy & Theology

## Services

- Private (/mishcon-private)
- Regulatory (/services/regulatory)
- Reputation Protection and Crisis Management (/services/reputation-protection)
- The Online Safety Act (/services/the-online-safety-act)